# CASSIDY -V- LAWSON - JOHN J. CASSIDY - 6/29/04

**Page 1 to Page 170**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY: NIZIANKIEWICZ & MILLER

*NIZIANKIEWICZ & MILLER*
*972 Tolland St.*
*East Hartford, CT   06108-1533*
*Phone:   860-291-9191*
*FAX:   860-528-1972*

# EXHIBIT K

### Page 33

1  Ringrose or one of his partners.
2  Q. (By Ms. Jordan) But you don't know for sure?
3  A. No, I don't know for sure.
4  Q. And you believe that the comment that you weren't
5  fit to run for office indicates that the ten individuals were
6  attempting to penalize the newspaper?
7  A. They were attempting to degrade people that were
8  associated with the newspaper, like Helen and them, with the
9  remarks they made that she should resign and she was guilty
10 and she was this and she was that. Yes, they were after her.
11 Q. What other actions do you believe is evidence that
12 the ten individuals were attempting to penalize the newspaper
13 other than that one comment by Ringrose?
14 A. The article they wrote about the school.
15 Q. What article?
16 A. The letters to the editor calling us -- referring to
17 us as jackals.
18 Q. And do you recall what edition of the paper that
19 article came out in?
20 A. In the New Britain Herald.
21 Q. And do you recall which defendants signed that
22 letter to the editor?
23 A. Patrick Ringrose.
24 Q. What other actions?
25 A. Just the statements that were made.

### Page 34

1  Q. Okay. Well let's go through the statements. What
2  statements?
3  A. Derogatory statements. I can't go into detail.
4  They were derogatory, demeaning, vicious and vile.
5  Q. Well, if they were derogatory, vicious and vile, do
6  you recall any specific statements?
7  A. No.
8  Q. You don't recall a single one?
9  A. No. Not in total, no.
10 Q. Now, are you also aware that in the first count of
11 your complaint, you also alleged that the defendants brought
12 the complaint with the SEEC as political payback for your
13 opposition to the Linden Street School project?
14 A. Yes.
15 Q. And can you tell me what the basis is for your
16 belief that the complaint was filed by the ten individuals as
17 political payback?
18 A. Would you restate that, please?
19 Q. Could you tell me what the basis is for your belief
20 that the ten individuals filed the complaint with the SEEC as
21 political payback against you?
22 A. Their actions.
23 Q. What actions?
24 A. Their statements.
25 Q. What statements?

### Page 35

1  A. All of the ones that they were making. All of the
2  ones they wrote.
3  Q. Can you be more specific?
4  A. No, I can't.
5  Q. So, as you sit here today, you can't recall a single
6  action or a single statement that leads you to believe that
7  they filed a complaint as political payback against you?
8  A. They wrote editorials. They wrote articles. They
9  talked to people. People talked to me.
10 Q. But do you recall any specific article or editorial
11 or newspaper?
12 A. They were all in the New Britain Herald. I have got
13 them all home. I would have brought them if you asked me.
14 Q. So, you have kept a copy of all of the newspaper
15 articles and editorials that you believe demonstrate that
16 the --
17 A. Yes.
18 Q. And is that something that you would be able to
19 provide a copy of to your attorney?
20 A. Yes. If he asked me, yeah.
21 MS. JORDAN: Okay. Attorney Barrante, is there
22 any problem in terms of getting copies of those
23 documents, if he is relying on them for his claim,
24 that evidences the political payback? I believe that
25 was something that was asked for in discovery.

### Page 36

1  MR. BARRANTE: Yeah. I know he has a lot of
2  newspaper articles. I looked at some of them, and I
3  can't remember exactly -- I know Mr. Ringrose was
4  mentioned in at least one, maybe more of them.
5  MS. JORDAN: Well, my concern really is not
6  your, kind of, going through them. I mean, if he is
7  sitting here and he is telling me today that he is
8  relying on them or that's the basis for this claim
9  that this was a political payback issue, I think that
10 is responsive to my discovery request. I am entitled
11 to copies of them all.
12 MR. BARRANTE: Sure. I'll look at them again
13 and see how specific they are. They may have just
14 been general comments.
15 MS. JORDAN: Well, I think I am entitled to a
16 copy regardless of whether they are specific or not
17 if he is relying on them. And in light of the fact
18 that I haven't seen them, I do want to reserve the
19 right to question him again on those if I think they
20 are pertinent.
21 MR. BARRANTE: What I'll do is I'll see Mr.
22 Cassidy again. We will look at them. I'll get them.
23 I'll send them to you and you can decide whether
24 there is anything you want to inquire about. There
25 may not be --

## Page 41

1  entitled to all of them.
2      MR. BARRANTE:   Why don't you just have them all
3  available. I'll pick them up, say, nine o'clock.
4      THE WITNESS:   I'll give you the whole thing.
5      MR. BARRANTE:   You're going to be able to copy
6  them here because I won't have time to copy them.
7      MS. JORDAN:   There might be a copy center that
8  you could go to. We don't have the facilities.
9      MR. BARRANTE:   I'm not going to any copy center.
10 I'll bring them to you.
11     MS. JORDAN:   I do not have the facilities here
12 to copy newspaper articles for everyone, and I'm
13 certainly not going to incur the cost of doing that.
14     MR. BARRANTE:   Well, maybe you should.
15     MS. JORDAN:   I don't think so. I think that
16 it's your duty to produce those documents to us.
17 It's not something that I have to incur the costs
18 for.
19     MR. BARRANTE:   I am going to bring them here.
20 You have a right to copy them.
21     MS. JORDAN:   I'll look through them.
22     MR. BARRANTE:   You have a right to inspect and
23 copy, and every other counsel here has a right to
24 inspect and copy.
25     MR. VERMETTE:   We also have –

## Page 42

1      MR. BARRANTE:   If you want to have them make
2  their own copies, fine.
3      MS. JORDAN:   You also have a duty to have
4  provided those documents to me in response to my
5  discovery request, which you didn't do.
6      MR. BARRANTE:   Because I wasn't using them in
7  the case.
8      MS. JORDAN:   Well, we have been through this and
9  we are going circular on the issue. I think I am
10 entitled to copies of everything, and I expect to
11 have them tomorrow.
12     MR. BARRANTE:   Well, I am not going to have time
13 to stop at a copy place and have them copied.
14     MS. JORDAN:   Well, I am just letting you know
15 what my position is, but I want to move on with my
16 deposition.
17     MR. LASKE:   I can make a suggestion. Mr.
18 Cassidy, you can go to Executive Printing down on
19 Route 10, have photocopies made for all of us and we
20 will have copies available for –
21     THE WITNESS:   You want me to do that?
22     MR. LASKE:   Yes.
23     THE WITNESS:   No. I am not going to do that,
24 no. Go ahead.
25     MR. LASKE:   How many documents are we talking

## Page 43

1  about? Is it a folder? What you talking about?
2      THE WITNESS:   It's in a folder.
3      MR. BARRANTE:   How many pieces of paper?
4      THE WITNESS:   I don't know what is all – it's
5  everything that I saved.
6      MR. BARRANTE:   We aren't talking about since
7  2001, not anything before that.
8      THE WITNESS:   No, all 2001.
9      MR. BARRANTE:   And not anything that deals with
10 recent things, only the 2001 election.
11     THE WITNESS:   Well, I have things that are
12 recent articles.
13     MR. BARRANTE:   But that's about it?
14     THE WITNESS:   Yeah.
15     MR. BARRANTE:   We are only talking about
16 relating to the November, 2001, election –
17     THE WITNESS:   Okay.
18     MR. BARRANTE:   – and this particular complaint.
19     THE WITNESS:   All right, yeah.
20     MR. BARRANTE:   So everything in that box may not
21 even be –
22     THE WITNESS:   True. It's not a box. It's a
23 folder.
24     MR. BARRANTE:   Folder.
25     THE WITNESS:   Yeah.

## Page 44

1   Q.   (By Ms. Jordan) Are you also aware in the first
2  count of your complaint you also alleged that the defendant
3  filed a complaint with the SEEC for the purpose of influencing
4  the outcome of the election and the Linden Street School
5  referendum?
6   A.   Yes.
7   Q.   Can you tell me what the basis is for your belief
8  that the defendants filed that complaint to influence the
9  election and the referendum?
10  A.   My belief is that they knew about this before the
11 paper was ever officially out.
12  Q.   That they knew about what?
13  A.   The ads and everything, all that they complained
14 about.
15  Q.   How would they know about the ads and what was in
16 the ads before the paper was published?
17  A.   This is not fact. I just suppose that one of the
18 complainants had seen a newspaper.
19  Q.   So, this is just based on your assumption, then?
20  A.   Yes.
21  Q.   And can you tell me how the defendants' act of
22 filing the complaint with the SEEC, how did that influence the
23 election or the referendum?
24  A.   The complaint itself.
25  Q.   Their act of filing the complaint?

### Page 45

1  A. By them filing the complaint and making it public,
2  in my opinion, they wanted to demean us and take away our
3  credibility, enhance theirs.
4  Q. So, this is based on your opinion?
5  A. Yes. That's what it's all about, isn't it?
6  Q. Other than your opinion and your assumptions that
7  the defendants knew about the paper before it was published,
8  do you have any other support for your claim that they were
9  attempting to influence the election or the referendum?
10 A. What they said and published.
11 Q. And, again, these are the items that you can't
12 identify. You said what they said and what they published.
13 Are these the statements and the articles that you cannot
14 identify?
15 A. Right.
16 Q. Now, in the first count of your complaint, you also
17 alleged that the defendants, the ten individuals you
18 identified, that their act of filing the complaint with the
19 SEEC resulted in an abuse of process. Are you aware of that?
20 A. An abuse?
21 Q. Abuse of process.
22 A. Against me or against one of us? Against who?
23 Q. You're alleging that their actions in filing that
24 complaint resulted in an abuse of process against you?
25 A. I believe it, yes.

### Page 46

1  Q. And what is the basis for your claim that it
2  resulted in an abuse of process against you?
3  A. My belief is that the State of Connecticut has
4  election laws and they have a right to investigate complaints.
5  They don't have to investigate all complaints. They don't
6  have to honor all complaints. These ten individuals had an
7  ulterior motive not – their complaint was not to protect the
8  citizens of the State of Connecticut against election
9  infractions or alleged infractions, but they had an ulterior
10 motive because of the school and to get back at me and other
11 individuals, and that's not what the process is used for.
12 They conspired to do something, to gain something that they
13 couldn't gain in another way, and they used the process that
14 the state gives us with the laws to protect citizens against
15 election infractions.
16 Q. Okay. Well, what is the basis for your claim that
17 the defendants had an ulterior motive? Is that just based on
18 your belief?
19 A. To me it's clear.
20 Q. Okay. I understand that, but I am asking what that
21 is based on. Is it based on your belief that it's clear that
22 they had an ulterior motive? What is it based on?
23 A. Why would they file a complaint? They never filed
24 it before.
25 Q. You don't get to ask the questions.

### Page 47

1  A. Huh?
2  Q. You don't get to ask the questions. My question to
3  you is, what is the basis for your belief that they had an
4  ulterior motive? Is it just something that you believe or do
5  you have any support for that?
6  A. I ran advertisements before, never put my address
7  before and I never had a complaint filed against me before.
8  Q. Okay. My question is, is your argument that there
9  was an ulterior motive against you, is that –
10 A. Of course.
11 Q. – just based on your belief?
12 A. Yes.
13 Q. And can you tell me how the filing of the SEEC
14 complaint by the defendants, how that was an abuse of process?
15 A. Because they used the system to make a gain; to
16 demean us and to take away and violate my rights; and that is
17 wrong and that's an abuse of process.
18 Q. Well, how did they violate your rights?
19 A. Because in my opinion it had nothing to do with
20 election laws. It had all to do with the school project and
21 the election.
22 Q. Well, did any of the ten defendants that you
23 identified appear at the hearing of your complaint before the
24 SEEC?
25 A. At my hearing?

### Page 48

1  Q. Yes, at your hearing?
2  A. No, they weren't there.
3  Q. Did any of the defendants offer any type of written
4  statement or testimony at the hearing against you?
5  A. No, they did not.
6  Q. Did any of the defendants that you identified offer
7  any evidence at your hearing against you?
8  A. I thought I answered that, but they didn't. No,
9  they did not.
10 Q. And the SEEC did, in fact, find you in violation of
11 the election laws. Is that correct?
12 A. They said I shouldn't do it again.
13 Q. But they acknowledged that there was something that
14 you did in error and advised you not to do it again?
15 A. That's their opinion. I could do it again if I
16 wanted to.
17    MR. BARRANTE: Excuse me. To interject, I have
18 a copy of the letter that Patrick Ringrose wrote to
19 the New Britain Herald regarding the election and the
20 complaint that was filed against the plaintiffs.
21 I'll give you each a copy of it.
22    MS. JORDAN: Well, I am just going to go on with
23 my questioning and we will take a break so I will
24 have a chance to go through it.
25    MR. BARRANTE: That's a partial response.

### Page 53

1    Q.    In your complaint, you also alleged that William
2 Petit, Patrick Ringrose and Marliss Pavano filed the complaint
3 with the SEEC in their capacity as public officials for the
4 Town of Plainville. Can you tell me what the basis is for
5 your claim that they filed the complaint as public officials
6 or in that capacity as public officials?
7    A.    That's the way they signed it.
8    Q.    So, it's based purely on the manner in which they
9 signed the complaint?
10    A.    Right.
11    Q.    Can you just describe for me what damages or
12 injuries you're claiming to have sustained as a result of the
13 defendants' filing of the SEEC complaint?
14    A.    Rephrase that, please.
15    Q.    What damages or injuries are you claiming to have
16 suffered because of the filing of the SEEC complaint?
17    A.    My reputation, number one.
18    Q.    Anything else?
19    A.    My credibility and my intelligence.
20    Q.    Anything else?
21    A.    Not, that I can think of.
22    Q.    I'm going show you a document and I'm going to ask
23 you to please take a look at that and let me know if you
24 recognize that document.
25    A.    I don't.

### Page 54

1    Q.    Can you look through the entire document, please?
2 Do you recognize that document?
3    A.    No.
4    Q.    Okay. I am going to ask you to turn to page
5 fourteen of that document. Is that your signature that
6 appears on the bottom of page fourteen?
7    A.    Yes, it is.
8    Q.    Do you recall assisting Attorney Barrante in
9 preparing some answers to some questions that were asked?
10    A.    Yes, I do.
11    Q.    Does that now refresh your memory about what that
12 document might be?
13    A.    I know what the document is, you asked me if I had
14 seen it before. I am saying, no, I didn't.
15    Q.    But you do know that document is your responses to
16 questions that were asked?
17    A.    I understand that.
18    Q.    And that, in fact, is your signature that appears on
19 page fourteen?
20    A.    Right.
21    MS. JORDAN:    Can we have that marked?
22
23    (Defendant's Exhibit 2, Plaintiff's Responses,
24 marked for identification)
25

### Page 55

1    Q.    (By Ms. Jordan) Now, a moment ago I was asking you
2 about the damages or injuries you claim to have suffered and
3 you indicated reputation, credibility and intelligence.
4 Correct?
5    A.    Right.
6    Q.    I am going to ask you to turn to page nine and look
7 at question number fifteen.
8    A.    Okay.
9    Q.    And I just want you to review question number
10 fifteen and your response.
11    A.    Right. Yes, sixteen you're saying?
12    Q.    No, fifteen.
13    A.    Fifteen. Yeah, okay.
14    Q.    Does your response to question fifteen accurately
15 state the damages and injuries you claim to have sustained as
16 a result of the filing of the complaint?
17    A.    I don't understand what you're saying.
18    Q.    Does your response to question number fifteen
19 accurately state what you believe your damages and your
20 injuries are?
21    A.    Oh, yeah, all right. Okay.
22    Q.    Is that a yes to the question?
23    A.    Yes.
24    Q.    Now, the first thing you indicate is that you were
25 caused to expend time in defending against the charges with

### Page 56

1 the SEEC?
2    A.    Right.
3    Q.    How much time?
4    A.    Oh, I don't know. Phone calls and going up there.
5 I don't know a time.
6    Q.    Was it a few minutes? A few hours? A few days?
7    A.    I would say not total. It's got to be, I'd say,
8 hours.
9    Q.    And were you employed at the time that you were
10 defending yourself against the complaint with the SEEC?
11    A.    No.
12    Q.    So, you were retired at that time?
13    A.    Yes, I was.
14    Q.    Do you believe you lost several hours?
15    A.    Time, yeah, time.
16    Q.    You next indicate that you suffered adverse
17 publicity in having the charges brought and in not having
18 prevailed before the SEEC?
19    A.    Adverse publicity, yes.
20    Q.    And is that the damage to your reputation and
21 credibility that you had indicated a few moments ago?
22    A.    Right.
23    Q.    Can you tell me how the defendants' filing of the
24 complaint adversely affected your reputation?
25    A.    Because what was stated is that it was -- the way it

### Page 57

1  was projected, it was like we did something, that we were like
2  criminals or something, which we were not. It was a very
3  small charge, a minor charge. I didn't even know. It was
4  lower than a misdemeanor, probably, and they made statements
5  that weren't totally accurate. And by doing things like that,
6  you demean people and you hurt them and you hurt their
7  families. People have a right to run for office without
8  people making -- using the government who is there to protect
9  your rights to go against your rights. That's damages. When
10 you damage somebody's name, their honesty, that's priceless.
11 It's priceless what they tried to take away from me. It's
12 wrong.
13     Q.   Well, my question to you is, how was your reputation
14 damaged?
15     A.   By their actions.
16     Q.   Did anyone ever indicate to you that your reputation
17 in the town had been damaged?
18     A.   Did they ever indicate that my --
19     Q.   Did anyone ever indicate to you that your reputation
20 in the town had been damaged?
21     A.   People had, yes.
22     Q.   Who did?
23     A.   What?
24     Q.   Who told you that your reputation had been damaged?
25     A.   The general public. I don't remember names. It's

### Page 58

1  been so long ago.
2     Q.   You can't remember a single person that told you
3  that your reputation had been damaged?
4     A.   I'd have to really think on that one. At this
5  point, I can't.
6     Q.   I'm going to ask you to turn to page ten and take a
7  look at question number eighteen.
8     A.   Go ahead.
9     Q.   I just want you to take a quick look at that
10 question and your answer.
11    A.   Okay. What about it?
12    Q.   Are you claiming that the defendants' action in
13 filing the SEEC complaint caused you to lose the election?
14    A.   There is no way to measure that. It caused me to
15 lose votes.
16    Q.   How do you know that it caused you to lose votes?
17    A.   Well, one time I got 1,100 votes and another time I
18 got 831 out of the election.
19    Q.   And that's based on the time in 1993 or 1995, some
20 six years before you got 1,100 votes?
21    A.   Yes.
22    Q.   And in this particular election you got 831 votes?
23    A.   Yes.
24    Q.   Is that based on your belief that the differential
25 in the votes was because of the complaint?

### Page 59

1     A.   I think that it factored into the equation, yes.
2     Q.   And that's based on your belief?
3     A.   Yes.
4     Q.   Well, do you have any way of knowing how many votes
5  you would have received in November, 2001?
6     A.   Of course not. I don't know that.
7     Q.   And in each of the prior elections that you ran,
8  prior to November, 2001, you didn't prevail in any of those
9  elections. Correct?
10    A.   No, never, never.
11    Q.   Now, you also claim that the ten individuals
12 intimidated you with regard to your First Amendment rights.
13 Can you tell me how they intimidated you in expressing your
14 First Amendment rights?
15    A.   I said they intimidated me?
16    Q.   Right. I would direct you to page ten and look at
17 question number nineteen, your answer to question nineteen.
18    MR. BARRANTE:   The answers are on a separate
19 sheet.
20    THE WITNESS:   Okay.
21    Q.   (By Ms. Jordan) Can you explain for me how the
22 defendants' filing of the complaint intimidated you in the
23 exercise of your First Amendment rights?
24    A.   By filing the complaint.
25    Q.   Well, how did it intimidate you?

### Page 60

1     A.   By their action of filing the complaint.
2     Q.   Can you be more specific?
3     A.   No, I can't.
4     Q.   Well, did the filing of the complaint prevent you
5  from publishing any materials in any newspaper?
6     A.   It made me look and be very careful of what I did
7  and I said.
8     Q.   Okay. But my question to you is, did the filing of
9  the complaint prevent you from ever publishing anything in a
10 newspaper?
11    A.   Nothing prevents me from doing anything that I want
12 to do. That's my right. I can do what I want to do.
13    Q.   So, is your answer no?
14    A.   Whether I suffer from it, that's another case, but I
15 can do what I want to do.
16    Q.   So, is that a no, that it didn't prevent you?
17    A.   Of course it didn't prevent me. It caused me -- it
18 made me look at things different.
19    Q.   And you presently write a column for the Hometown
20 Connection. Correct?
21    A.   No, I don't.
22    Q.   At some point in, I believe, 2003 you indicated that
23 you were writing a column for the Hometown Connection?
24    A.   Yes, I did.
25    Q.   And that was after the filing of the SEEC complaint.

## Page 61

1 Correct?
2   A.   Yes.
3   Q.   And do you still speak on political issues or
4 express your views?
5   A.   Yes, I do.
6   MS. JORDAN:   Why don't we just take a quick
7 break so I can look at my notes, and I think I might
8 be all set.
9
10      (A recess was taken)
11
12   MS. JORDAN:   Back on the record. I have no
13 further questions at this point, but I am going to
14 reserve the right to recall Mr. Cassidy for a
15 continued deposition to inquire as to anything I
16 think I need to follow-up on with regard to the
17 articles that you are going to produce to me, but I'm
18 going to let other counsel take over.
19   MR. BARRANTE:   Fair enough.
20
21 CROSS-EXAMINATION BY MS. KARPIE:
22
23   Q.   Mr. Cassidy, you indicated that you have a file that
24 contains copies of some newspaper articles or letters to the
25 editor?

## Page 62

1   A.   Yes, I do.
2   Q.   Is there anything in that file?
3   A.   There's a lot of stuff in that file.
4   Q.   Does it have to do with this matter?
5   A.   No. There is a lot of stuff that doesn't have to
6 do –
7   Q.   Just give me for instance. What might be in there
8 that has nothing to do with this matter?
9   A.   I have in there other letters to the editor that are
10 not germane to this case. I have letters that I have written
11 to people that are not germane to this case.
12   Q.   All right. Is this file a collection of items that
13 have to do with political issues?
14   A.   Political, yeah.
15   Q.   Okay. So, at some point you decided to keep a file
16 and you put things that have to do with politics in it?
17   A.   Yes.
18   Q.   So, you didn't, for instance, put anything about
19 your personal finances in that file?
20   A.   No.
21   Q.   And how do you decide what you're going to save and
22 what you're not going to save in that file?
23   A.   What is important to me, like if I wrote a letter to
24 Dick Lohan, and any response. If I wrote a letter to Susan or
25 when I wrote a letter to the person before her, the Secretary

## Page 63

1 of State, I save all of that correspondence between me and the
2 state, between me and the Town of Plainville, anyone who might
3 respond, and I would save those things.
4   Q.   All right. Do you presently write letters to
5 politicians and committees or boards?
6   A.   I have written letters mostly to the Secretary of
7 State, to Attorney Blumenthal and to Attorney John Rowland.
8   Q.   And what were those letters about, just general
9 topics?
10   A.   The one to Rowland was over grants, how the grants
11 are exercised and how they came about. It was over the ball
12 field in Plainville. The one to the Secretary of State, I
13 would write election processes and laws, how votes – like one
14 time we had a budget hearing, town budget meeting, and they
15 had a vote and he was the moderator, and I just thought it
16 took a two-thirds majority to – usually you go by the senate,
17 congress when you go to voting regulations. They are letters
18 like that.
19   Q.   So, when you felt that rules were being violated,
20 you thought that it was your right and you petitioned the
21 government to look into those matters?
22   A.   Yes. I did, yes.
23   Q.   And do you believe all citizens have that right to
24 petition the government?
25   A.   Yes, I do.

## Page 64

1   Q.   All right. Do you or have you kept any notes or
2 diaries about, let's say, the events of the 2001 local
3 election?
4   A.   No.
5   Q.   Since the SEEC complaint was made against you, have
6 you kept any notes or diaries up to the present time?
7   A.   No.
8   Q.   Now, did you just place one ad in the Hometown
9 Connection with respect to the 2001 election?
10   A.   Yes.
11   Q.   All right. And did you place any ads in any other
12 newspapers?
13   A.   No, I did not.
14   Q.   Did you prepare any fliers?
15   A.   No, I did not.
16   Q.   Were you a member of any committees –
17   A.   No.
18   Q.   – that were formed at that time?
19   A.   No, I was not.
20   Q.   Were you a member of a slate of candidates that was
21 being presented during that election?
22   A.   It was not a slate, no.
23   Q.   Was there an informal agreement among certain
24 candidates, yourself included, that you were going to present
25 yourself as a group of candidates that –

### Page 77

1  A. We have disagreements. I have no hard feelings
2  against him.
3  Q. You did name him as a defendant in this case?
4  A. Yes, I did.
5  Q. So, you understand that you're suing him?
6  A. Yes, I do.
7  Q. And why are you suing Mr. Petit?
8  A. Because of what his actions were.
9  Q. And what were his actions?
10 A. He filed a complaint.
11 Q. Is that the only reason that you're suing Mr. Petit,
12 because he signed the complaint that was filed against you in
13 the Election Commission?
14 A. Yes.
15 Q. Do you have any knowledge of any malice that he had
16 towards you?
17 A. No.
18 Q. In fact, do you believe he had any malice or any ill
19 feelings towards you when he signed the complaint?
20 A. I don't think he did.
21 Q. Did you ever speak with any of the defendants about
22 the complaint to the State Elections Commission? The
23 defendants are the people that you have sued.
24 A. Right.
25 Q. Have you ever discussed anything with them about the

### Page 78

1  complaint?
2  A. No.
3  Q. Now, you mentioned that you had had some prior
4  contact with the State Elections Enforcement Commission –
5  A. Yes.
6  Q. – is that right? Okay. And you mentioned
7  something about a referendum. When was that that you made –
8  that you had contact with the Commission about a referendum?
9  A. The last time was in 2001 because the school – the
10 Linden Street School project and using kids as a vehicle to
11 send home literature and stuff, so I called up the state.
12 Q. Was this because – I didn't understand. Did you
13 say the Linden School or a nursery school?
14 A. The Linden Street School.
15 Q. All right. So, the referendum you're talking about
16 is the one that was in the 2001 election?
17 A. Yes.
18 Q. Okay. All right. And you felt that who was doing
19 something wrong in terms of sending literature home?
20 A. I thought that the PTO was doing things wrong.
21 Q. All right. And did you make a complaint to anybody
22 about that?
23 A. No. I just I called up and I talked to – I forget
24 whose name it was – and I talked them on the phone and,
25 evidently, they talked to Kathy Binowski, who is the

### Page 79

1  superintendent of schools, and she called me on the phone and
2  said that they would stop certain things. They wouldn't do
3  certain things because it was wrong. I said, I have no
4  problem with that. I just made an inquiry of what was going
5  on.
6  Q. And the inquiry you made was because you had found
7  out that there was literature going home with students?
8  A. Right.
9  Q. And that literature was in favor of the school
10 project?
11 A. Yes.
12 Q. And just for the record, were you opposed to the
13 Linden Street School project as it was printed in that
14 referendum?
15 A. Yes, at the poll. Yes, I was.
16 Q. Okay. All right. And did you ever make a written
17 complaint to the State Elections Commission with respect to
18 the 2001 election or the referendum?
19 A. No.
20 Q. You did not?
21 A. No, not a written complaint, no.
22 Q. I am going to show you a copy of this letter that
23 appears to be from you to the State Elections Enforcement
24 Commission and ask you to take a look at that.
25 A. Right.

### Page 80

1  Q. Is that a letter that you wrote?
2  A. Yes.
3  Q. And that's to the State Elections Enforcement
4  Commission, is it not?
5  A. Yes, it is.
6  Q. All right. And does that refresh your memory as
7  to –
8  A. Yes, it does.
9  MS. KARPIE: Why don't we have that marked and
10 then I am going to ask you some questions about it.
11
12 (Defendant's Exhibit 3, Letter, marked for
13 identification)
14
15 MR. LASKE: What is the date of that?
16 Q. (By Ms. Karpie) This is undated, but it does refer
17 to a referendum that is on the agenda for or on the calendar,
18 I guess, for November 6th of 2001. Is that correct?
19 A. Yes, it is.
20 Q. All right. And tell me why it was that you wrote
21 that letter to the State Elections Commission?
22 A. I wrote it because I wanted a clear definition of
23 just what it says, what it allows and disallows and the
24 procedure regarding referendum items. That's all it was
25 about, what it allows, disallows, the procedure and a

### Page 157

1  A. No. I don't think you were.
2  Q. So, then you didn't really need to write down any
3  notes for your attorney?
4  A. No.
5  Q. Now, the ad on page five, which was brought out,
6  it's denoted at page five. It says October, 2001, but I
7  believe that's a typo. But do you regard this simply as an
8  endorsement?
9  A. Yes.
10 Q. So, it's not something that you put out or that you
11 agreed to?
12 A. Never seen it before until I read it in the paper.
13 Q. And it doesn't indicate – you weren't running –
14 were you running with Helen Bergenty?
15 A. No.
16 Q. With Tom Arcari?
17 A. No.
18 Q. With Kathy Pugliese?
19 A. No.
20 Q. You were a petitioning candidate, though, with Bill
21 Cunningham?
22 A. Yes, I was.
23 Q. And with Bob Mercer?
24 A. Yes, I was.
25 Q. And with Janice Eisenhauer?

### Page 158

1  A. Yes, I was.
2  Q. But at that time you weren't running as a slate?
3  A. No.
4  MR. BARRANTE: I'm through.
5  MS. JORDAN: I have some follow-up questions
6  for you, unfortunately, about the testimony that you
7  have given.
8  THE WITNESS: I thought you fell asleep.
9
10 REDIRECT EXAMINATION BY MS. JORDAN:
11
12 Q. Do you need to take a break?
13 A. No. Go ahead.
14 Q. You testified earlier while you were being
15 questioned by Attorney Karpie and you indicated that you did
16 not like Val Dumais and you didn't like Patrick Ringrose?
17 A. What was the first one?
18 Q. Val Dumais?
19 A. That's true, yes.
20 Q. Why don't you like Patrick Ringrose?
21 A. I don't like his arrogance, what he writes and what
22 he says, and I am joined by many in the town of the same
23 opinion of him.
24 Q. Well, I am asking you what – why you don't like
25 him?

### Page 159

1  A. I don't like the way he acts. I don't like what he
2  says in regards to the school board. I just don't like the
3  man. I don't know him. I know his father. I knew his
4  grandfather, but –
5  Q. So, that was my other question. Do you know Pat
6  Ringrose? Have you met him before?
7  A. No. I just don't like his – I don't like what he
8  does, no.
9  Q. And you indicated that you believe Bill Petit was
10 okay?
11 A. Billy is all right.
12 Q. Do you think that Bill Petit had any malice towards
13 you?
14 A. No. I think his malice is directed towards Helen.
15 Q. Do you believe that Patrick Ringrose had any malice
16 directed towards you?
17 A. Towards me personally? No, I don't think he does.
18 I wouldn't know. I don't think so. I think he hates
19 everybody.
20 Q. But as you sit here today, you don't think that he
21 has any malice directed towards you personally?
22 A. Only when it comes to the school because I was
23 against the school.
24 Q. How about Marliss Pavano, do you know Marliss?
25 A. I know her father, yeah.

### Page 160

1  Q. Do you like Marliss Pavano?
2  A. Marliss kissed me one time. I like her.
3  Q. Do you believe that Marliss Pavano had any malice
4  directed towards you personally in filing the complaint?
5  A. Personally? No. Only when it comes to the school.
6  They are all upset about the school.
7  Q. Well, I am asking about you do you think she –
8  A. No, I don't think so.
9  Q. So, if I understand your testimony correctly, then,
10 you do not believe that Patrick Ringrose, William Petit or
11 Marliss Pavano had any malice towards you personally in filing
12 the complaint. You think that it may have been related to the
13 school issue?
14 A. Centered around – for those individuals.
15 Q. Did you mean now Patrick Ringrose?
16 A. Yeah.
17 Q. William Petit?
18 A. No.
19 Q. And Marliss Pavano?
20 A. Okay. Ringrose and Marliss, their anger centered
21 over the school. Billy hates Helen. He was after Helen and
22 the newspaper, and I think it was because of this. Well, he
23 didn't like her anyway, but it was because of this ad that
24 somebody put in there.
25 Q. But you don't believe any of those individuals filed

Page 161

1 a complaint against you personally because of some malice
2 towards you?
3    A.   Only my stand on the school.
4    MR. BARRANTE:   Let the record show that Mr.
5 Cassidy was pointing at the page five ad that was
6 previously referred to.
7    Q.   (By Ms. Jordan) Now, when you were being questioned
8 by Attorney Vermette, you gave some testimony about the
9 statements that the ten individuals did or did not make, and
10 you indicated that Ms. Lawson didn't make any statements that
11 you were concerned about. Correct?
12   A.   She didn't. I never heard anything from her.
13   Q.   Let's go through the other defendants. We know that
14 you have given some testimony about Mr. Ringrose, but do you
15 believe that William Petit made any statements or wrote any
16 articles in the paper that you felt were damaging to you or an
17 attack of you personally?
18   A.   No. I think Billy was just after Helen.
19   Q.   But my question is, do you think he made –
20   A.   No.
21   Q.   No? How about Marliss Pavano?
22   A.   She never said anything.
23   Q.   So, your complaint with William Petit and Marliss
24 Pavano is just in the actual filing of the complaint?
25   A.   For the reasons – the reason they filed a complaint

Page 162

1 wasn't to protect the State of Connecticut elections laws.
2    Q.   But not directed towards you personally?
3    A.   What?
4    Q.   But not directed towards you personally?
5    A.   With what?
6    Q.   With regards to William Petit and Marliss Pavano?
7    A.   I was what they called collateral damage.
8    Q.   Now, you also gave some testimony about your belief
9 that David Underwood had an opportunity to see the newspaper
10 before it was published. Do you recall that?
11   A.   Yes, I do.
12   Q.   Do you have any knowledge that Patrick Ringrose had
13 seen the paper before it was published?
14   A.   No.
15   Q.   How about William Petit?
16   A.   No.
17   Q.   How about Marliss Pavano?
18   A.   No.
19   Q.   Now, you also gave testimony that you believed that
20 the ten individuals who filed a complaint all hated Helen
21 Bergenty. Do you recall that?
22   A.   Yes, I do.
23   Q.   Do you have any personal knowledge as to whether
24 William Petit had any ill-feelings or malice towards Helen
25 Bergenty?

Page 163

1    A.   Personal knowledge?
2    Q.   Do you have any personal knowledge that he did, that
3 he harbored any malice towards her?
4    A.   He's made statements.
5    Q.   What statements?
6    A.   Where she sits in the church and a few other side
7 remarks.
8    Q.   Can you be specific?
9    A.   Huh?
10   Q.   Can you be specific?
11   A.   Well, I don't know. I guess he's upset that she
12 sits in the front row of the church and he doesn't like it.
13   Q.   Well, other than he may have a comment about where
14 she sits in church, do you have any personal knowledge about
15 that he harbored any malice towards her?
16   A.   My personal opinion.
17   Q.   I am asking you about what you know.
18   A.   About what I know?
19   Q.   Right.
20   A.   Just remarks that were made to me and what he has
21 said. I don't think he is an advocate of Mrs. Bergenty.
22   Q.   So, it's your personal opinion that he didn't like
23 her?
24   A.   Well, he is upset that one time I wouldn't vote for
25 chairperson.

Page 164

1    Q.   Well, my question is, is it your opinion he didn't
2 like her?
3    A.   Well, what I have heard him say in the hallway. I
4 don't know. That's what I get from what I hear. That's how I
5 form that opinion.
6    Q.   Okay. So, it is your opinion that he harbors malice
7 towards her?
8    A.   Oh, yeah.
9    Q.   And what about Patrick Ringrose, do you have any
10 personal knowledge other than your opinion that he harbors
11 malice towards Helen Bergenty?
12   A.   No, I don't.
13   Q.   How about Marliss Pavano?
14   A.   No. I always thought they are friends, but I think
15 different now.
16   MS. JORDAN:   That's all I have.
17   THE WITNESS:   Good.
18   MS. KARPIE:   I just have one question.
19
20 RECROSS-EXAMINATION BY MS. KARPIE:
21
22   Q.   That page five ad, that is part of Exhibit 1?
23   A.   Right.
24   Q.   Do you know who placed that ad?
25   A.   No, I don't.

Page 165

1 Q. Do you any if anyone paid for the ad?
2 A. I don't.
3 Q. When you saw the ad, did you ever inquire as to why
4 your name was in an ad that you claimed to have nothing to do
5 with?
6 A. No.
7 Q. To this day, have you ever made any inquiry?
8 A. No.
9 Q. You're not curious about that?
10 A. No, I'm not.
11 MS. KARPIE: I don't have anything further.
12
13 RECROSS-EXAMINATION BY MR. VERMETTE:
14
15 Q. In the 2003 election Mr. Cassidy, nothing prevented
16 you from placing an ad on behalf of yourself that had your
17 address in it, did it?
18 A. Did somebody prevent me? Nothing prevented me from
19 doing what I want to do as a citizen, as a human being, and my
20 natural rights. I made a conscious decision not to do it
21 because of the decision rendered by Cashman and the Election
22 Enforcement Commission.
23 MR. VERMETTE: Thank you, Mr. Cassidy. Nothing
24 further.
25

Page 166

1 RECROSS-EXAMINATION BY MR. LASKE:
2
3 Q. So, if I understand it correctly, sir, a former
4 United States Marine, a former president of a union, a former
5 treasurer of a union, a former individual that's been involved
6 in politics with his mother, Ernie Millerick, Nora Powers,
7 whimped out in the 2003 election. Is that a fair statement?
8 A. That is a fair statement. Unfortunately, that is a
9 fair statement.
10 Q. So, you're an old man and you just decided to hang
11 it up. Is that a fair statement?
12 A. No. I will be honest about this. We had this
13 situation going on since these charges were filed, and I
14 pressed and I sued. I have stayed away from the town council
15 meetings on my own volition. I have done it myself. I think
16 I haven't even appeared there once, maybe twice, since I filed
17 this lawsuit. I really – I contemplated in 2003 to put a big
18 ad in there without my address. I sat down and thought it
19 over and it was just detrimental to what I'm trying to do
20 here, and so I didn't. I withheld it. I'm not proud of
21 myself for doing that because that's not my persona or in my
22 nature, but that's the decision I made on my own and did I it,
23 you know.
24 Q. Let me ask you this. With regards to Ronald Pavano,
25 you know of no statements that were derogatory, vicious or

Page 167

1 vile made by him against you?
2 A. No.
3 Q. And Exhibit 5 that was written by a concerned
4 citizen, the letter, Exhibit 5, sir?
5 A. Okay.
6 Q. Do you know who wrote that letter?
7 A. I have no idea.
8 Q. For all you know, that could have been written by
9 Helen Bergenty. Correct?
10 A. Could have been.
11 Q. Okay.
12 A. I don't think so, but it could have been.
13 Q. And with regards to the other defendants in this
14 matter, you have no knowledge of any derogatory, vicious or
15 vile statements made by them against you. Correct?
16 A. But –
17 Q. The other people that have been mentioned –
18 A. – I think in some Ringrose letters.
19 Q. Well, you have already discussed Ringrose, but I am
20 talking about the other individuals.
21 A. No.
22 MR. LASKE: I have nothing further.
23 MR. BARBIERI: I have nothing.
24 MS. JORDAN: Nothing further.
25

Page 168

1 (Deposition concluded at 2:15 p.m.)
2
3 C E R T I F I C A T E
4
5 I, Christine E. Borrelli, a Notary Public and
6 Licensed Court Reporter for the State of Connecticut, do
7 hereby certify that the deposition of JOHN J. CASSIDY, was
8 taken before me pursuant to the Connecticut Practice Book at
9 the Law Offices of Howd & Ludorf, 65 Wethersfield Avenue,
10 Hartford, Connecticut, commencing at 10:00 a.m. on Tuesday,
11 June 29, 2004.
12 I futher certify that the witness was first sworn by
13 me to tell the truth, the whole truth, and nothing but the
14 truth, and was examined by counsel, and his testimony was
15 stenographically reported by me and subsequently transcribed
16 as herein before appears.
17 I further certify that I am not related to the
18 parties hereto or their counsel, and that I am not in any way
19 interested in the events of said cause.
20 Witness my hand this 6th day of July, 2004.
21
22
23
24
25 Christine E. Borrelli
   Notary Public

Page 169

1 CT License No. 117
  My Commission Expires:
2 June 30, 2006
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 170

1 CERTIFICATE OF DEPONENT
2
3
4 I, JOHN J. CASSIDY, have read the foregoing
5 transcript of the testimony given at the deposition on
6 Tuesday, June 29, 2004, and it is true and accurate to the
7 best of my knowledge and/or with the changes as noted in the
8 attached errata sheet.
9
10
11 John J. Cassidy
12
13
   Subscribed and sworn to before me this
14
15 day of                , 2004.
16
17 Notary Public
18 My Commission Expires:
19
20
21 NO: 302CV1688 (CFD)
   JOHN J. CASSIDY, ET AL V. KATHRYN M. LAWSON, ET AL
22 JOHN J. CASSIDY (AM) JUNE 29, 2004
23
24 CB
25