**CASSIDY -V- LAWSON - WILLIAM CUNNINGHAM - 6/30/04**

**Page 1 to Page 65**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY: NIZIANKIEWICZ & MILLER

*NIZIANKIEWICZ & MILLER*
*972 Tolland St.*
*East Hartford, CT    06108-1533*
*Phone:   860-291-9191*
*FAX:   860-528-1972*

# EXHIBIT L

## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF CONNECTICUT
 3
 4   JOHN J. CASSIDY, ET AL       :    NO.: 302CV1688(CFD)
                                  :
 5   V.                           :
                                  :    JUNE 30, 2004
 6   KATHRYN M. LAWSON, ET AL     :
 7
     ---------------------------------------------------
 8             DEPOSITION OF WILLIAM CUNNINGHAM
     ---------------------------------------------------
 9
     APPEARANCES:
10
           LAW OFFICE OF WILLIAM T. BARRANTE
11              Attorneys for the Plaintiffs
                P.O. Box 273
12              Watertown, CT  06795
                (860) 379-9885
13         BY:  WILLIAM T. BARRANTE, ESQ.
14         HOWD & LUDORF
                Attorneys for the Defendants William
15              Petit, Patrick Ringrose and Marliss Pavano
                65 Wethersfield Avenue
16              Hartford, CT  06114
                (860) 249-1361
17         BY:  BEATRICE S. JORDAN, ESQ.
18         LAW OFFICE OF CHARLES E. VERMETTE, JR.
                Attorneys for Kathryn Lawson
19              Litchfield Cavo
                40 Tower Lane, Suite 200
20              Avon, CT  06001
                (860) 255-5577
21         BY:  CHARLES E. VERMETTE, JR., ESQ.
22   APPEARANCES CONTINUED
23         NIZIANKIEWICZ & MILLER REPORTING SERVICES
                    972 Tolland Street
24            East Hartford, Connecticut 06108-1533
                    (860) 291-9191
25
                 DONNA M. DECIANTIS, LSR
```

## Page 2

```
 1   APPEARANCES:
 2
 3   SEGAL & LASKA
     Attorneys for Ronald Pavano, Marliss Pavano
 4   and Patrick Ringrose
     63 East Main Street
 5   Plainville, CT  06062
     (860) 747-2792
 6   BY: KENNETH JOHN LASKA, ESQ.
 7
 8   MURPHY AND KARPIE
     Attorneys for William Petit
 9   350 Fairfield Avenue
     Bridgeport, CT  06604
10   (203) 333-0177
     BY: KAREN L. KARPIE, ESQ.
```

## Page 3

```
 1   Deposition of WILLIAM CUNNINGHAM, taken on behalf
 2   of the defendants in the hereinbefore entitled action
 3   pursuant to the Federal Rule of Civil Procedure 30
 4   before Donna M. DeCiantis, duly qualified notary public
 5   in and for the State of Connecticut, held at the
 6   offices of Howd & Ludorf, 65 Wethersfield Avenue,
 7   Hartford, Connecticut, commencing at 1:05 p.m.,
 8   Wednesday, June 30, 2004.
 9   S T I P U L A T I O N S
10   It is hereby stipulated and agreed by and
11   among counsel for the respective parties that all
12   formalities in connection with the taking of this
13   deposition, including time, place, sufficiency of
14   notice, and the authority of the officer before whom it
15   is being taken, may be and are hereby waived.
16   It is further stipulated and agreed that
17   objections other than as to form are reserved to the
18   time of trial.
19   It is further stipulated and agreed that the
20   reading and signing of the deposition are not waived.
21   It is further stipulated that the proof of
22   the qualifications of the notary public before whom the
23   deposition is being taken are hereby waived.
```

## Page 4

```
 1   I N D E X
 2   WITNESS
     WILLIAM CUNNINGHAM
 3
         Direct examination by Attorney Jordan..........5
 4
 5
 6   ------------------------------------------------------
 7
 8   INDEX OF EXHIBITS
 9       (Marked for Identification)
10
11   DEFENDANTS' EXHIBITS
12
13   Newspaper ad from the Plainville's Hometown
14   Connection.....................34
```

Page 57

1  Q   And other than that comment by Mr. Mersher,
2  how do you know that the defendants that are named in
3  the suit, that their attempt was to penalize the
4  newspaper other than what you heard from Mersher or
5  other people?
6  A   Well, cross talk around town where you visit
7  Roger's Bakery or when you visit someplace like Mazzo's
8  or any other public gathering place, the rumor mill, or
9  however you want to refer to it, just conversation
10 around, you know, and stuff like that, you know, they
11 appeared to really have it in for the newspaper; they
12 really don't like the publication; they don't like the
13 stories, the editorials; they don't like the way it's
14 written; they don't like the way, you know, the slant
15 on the articles appears. (Phonetic.)
16 Q   So this is all based on people's perceptions
17 or what people think?
18 A   Opinion.
19 Q   Or what people have heard?
20 A   Opinions.
21 Q   So it's all based on opinions?
22 A   Right, or perceptions.
23 Q   Now, in your complaint you also allege that
24 the defendants filed their complaint with the SEEC as
25 political payback for your opposition to the Linden

Page 58

1  Street School referendum. Are you aware of that
2  allegation?
3  A   Yes, I am.
4  Q   Can you explain for me what is the basis for
5  your claim that the SEEC complaint was done for a
6  political payback against you personally?
7  A   Well, they quite literally took exception to
8  my stance with the fact that I don't believe that they
9  did due diligence to alternative concepts for Linden
10 Street School and the new construction method that they
11 were planning, and questions that I had raised about
12 that. And the easiest way to make me a nonentity would
13 be to discredit me. What better way to discredit me
14 than to make me out to be a law breaker.
15 Q   How do you know they knew what your stance
16 was on the Linden Street School?
17 A   I was quite vocal about it. I'd raised
18 multiple questions about the amount of reimbursement
19 from the State. I had raised questions about the
20 design. I've raised questions about the amount of
21 square feet and space they were attempting to build by
22 comparison to square footage space that we already had.
23 Different aspects that they appeared to be not
24 forthcoming with to the general public.
25 Q   Other than your questions about the various

Page 59

1  aspects of the project, how do you know that they
2  specifically knew that you were opposed to the project
3  and that was their intent in filing the complaint?
4  A   Like I said, I was very public about it. I
5  even drove around with signs on my truck that said,
6  "vote no on Linden Street School."
7  Q   Well, as you sit here today, other than it's
8  your assumption because you were vocal about it, do you
9  know for a fact that the defendants, each of the
10 defendants knew at the time that they filed the SEEC
11 complaint, that you were opposed to the project?
12 A   I'm sorry. I spaced in the middle of that
13 question. Can you say that again? I didn't understand
14 it.
15 Q   Sure.
16 ATTORNEY JORDAN:   Can you read it back?
17 (Whereupon, the reporter read back the
18 last question.)
19 A   I'm not sure I understand it any better the
20 second time when she read it.
21 Q   As you sit here today, do you know for a
22 fact that any of the defendants knew you were opposed
23 to the Linden Street School project and that was the
24 reason they filed the SEEC complaint?
25 A   I believe that was part of or a good portion

Page 60

1  of their reason for filing the complaint against me. I
2  believe in my mind that was their logic behind it.
3  Q   So this is based on something that you just
4  believed personally?
5  A   After conversation with them and different
6  things that had been said around town and comments to
7  the press, things of that nature, counterstatements to
8  statements that I had made, the different political
9  rhetoric going back and forth between, I can only
10 assume that they took real issue with my stance on the
11 Linden Street School.
12 Q   And that's based on your assumption?
13 A   Yes.
14 Q   When you said conversations with them, who
15 are you referring to?
16 A   I would say Mr. Pavano, Mrs. Keezer
17 Mr. DeMay. I might have even talked to Mr. Ringrose.
18 (Phonetic.)
19 Q   I'm sorry?
20 A   I may have even spoken to Mr. Ringrose about
21 it at some point in time very briefly. ...Dave Brown.
22 These are all people that were, you know, at some point
23 either members of one party or the other, either
24 members of the republican or democratic committees,
25 members of the Board of Ed or, you know, Town Council

Page 61

1  or something of that nature.
2  Q  Well, did you ever have any conversations
3  with any of the defendants? I know you indicated
4  Mr. Pavano and possibly Mr. Ringrose.
5  A  Possibly Mr. Ringrose. A good portion of
6  these people I don't even really know. I mean, not to
7  speak to anyway.
8  Q  Well, in terms of your conversation with
9  Mr. Pavano, what about that conversation leads you to
10  believe that he filed a complaint with the SEEC as
11  political payback for your position on the referendum?
12  A  I would say because in conversation with him
13  when – in our dialogue going back and forth in
14  questions that I had posed or had raised when we were
15  going back and forth in our dialogue, he became very
16  agitated, almost hostile with his answers, or with the
17  answers he couldn't give he became quite agitated, and
18  it got to the point where he just threw up his hands in
19  disgust and stormed off.
20  Q  And you assumed that that's an indication
21  that –
22  A  It was one of those things that leads you to
23  believe that it's not somebody that really wants to
24  deal with me but had gotten to the point where
25  frustration had taken over and had no viable answer to

Page 62

1  my questions and could not continue the argument with
2  me.
3  Q  What about Mr. Ringrose, what conversation
4  did you have with him?
5  A  Like I said, very very little, probably not,
6  you know, anything of substance. I mean, him and I get
7  along like oil and water.
8  Q  Well, what specifically is it that you're
9  relying on that Mr. Ringrose had said to you that
10  indicates that he filed a complaint as political
11  payback for your stance on the referendum?
12  A  I would say that probably goes back to just
13  these different comments that he has been known to have
14  made, you know, where he's taken real offense to
15  anybody that's had an opposing political view or
16  opposing view to what he thought was the direction that
17  it should move forward.
18  Q  Well, has he made any comments directed to
19  you?
20  A  As in personally, one on one?
21  Q  At any time that you feel is a basis for why
22  he is trying to use it as political payback for your
23  position.
24  A  There may have been. Like I said, the way
25  we talked was very very short, very brief. And, like I

Page 63

1  said, we really don't get along very well, so we try to
2  be polite to one another, but we don't really converse
3  that well, so we mostly just try to avoid one another.
4  But being referred to in the manner of a jackal by him
5  was really kind of – it kind of like set a tone for it
6  all.
7  Q  When did he call you a jackal?
8  A  He actually made that reference in the
9  newspaper article.
10  Q  So you're referring to some statement in a
11  newspaper article?
12  A  Yes.
13  Q  Was it directed to you personally? Did he
14  say that William Cunningham is a jackal?
15  A  Actually, I believe he made the statement in
16  reference to like Mr. Cassidy and all of us who were
17  opposed to the Linden Street School project as jackals.
18  Q  So that was your interpretation of reading
19  this article or whatever you're referring to?
20  A  Yes.
21         (Whereupon, a recess was taken at 2:55,
22         and another court reporter finished
23         taking the deposition.)
24
25

Page 64

1  C E R T I F I C A T E
2
3  I hereby certify that I am a Notary Public, in and
4  for the State of Connecticut, duly commissioned and
5  qualified to administer oaths.
6  I further certify that the deponent named in the
7  foregoing deposition was by me duly sworn, and
8  thereupon testified as appears in the foregoing
9  deposition; that said deposition was taken by me
10  stenographically in the presence of counsel and reduced
11  to typewriting under my direction, and the foregoing is
12  a true and accurate transcript of the testimony.
13  I further certify that I am neither counsel nor
14  attorney to either of the parties to said suit nor
15  related to or employed by either counsel in said suit
16  nor am I interested in the outcome of said cause.
17  Witness my hand and seal as Notary Public
18  this                day of                    20      .
19
20
21
22
         Notary Public
23
         Connecticut License No. 00181
24  My commission expires:
    November 30, 2004
25

```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT
JOHN CASSIDY, ET AL           :  NO.:  302CV1688(CFD)
                              :
VS                            :
                              :
                              :  JUNE 29, 2004
KATHRYN M. LAWSON, ET AL.     :

         CONTINUED DEPOSITION OF WILLIAM CUNNINGHAM
                         VOLUME II

A P P E A R A N C E S:
      WILLIAM BARRANTE, ESQ.
            Attorneys for the Plaintiffs
            18 Cedar Street
            P.O. Box 1445
            New Britain, Connecticut 06050
      LITCHFIELD CAVO
            Attorneys for Kathryn Lawson
            40 Tower Lane, Suite 200
            Avon, Connecticut  06001
      BY:  CHARLES E. VERMETTE, JR., ESQ.
      SEGAL & LASKA
            Attorneys for Patrick Ringrose
            63 East Main Street
            Plainville, Connecticut 06062
      BY:  KENNETH JOHN LASKA, ESQ.
                       (Continued)
                        REPORTED BY:
                        ROBERT MILLER
                LICENSED SHORTHAND REPORTER
                      LICENSE NO. 10
                 NIZIANKIEWICZ & MILLER
                    REPORTING SERVICES
                    972 Tolland Street
               East Hartford, Connecticut 06108
                  Telephone (860) 291-9191
```

Page 67

APPEARANCES: (Continued)
MURPHY AND KARPIE
   Attorneys for William Petit
   850 Fairfield Avenue, Suite 406
   Bridgeport, Connecticut 06604
BY: KAREN L. KARPIE, ESQ.
HOWD & LUDORF
   Attorney for William Petit, Patrick and
   Marliss Pavano
   65 Wethersfield Avenue
   Hartford, Connecticut 06114
BY: BEATRICE S. JORDAN, ESQ.

NIZIANKIEWICZ & MILLER REPORTING SERVICE

Page 68

1   ... Deposition of WILLIAM CUNNINGHAM,
2  being of lawful age, held pursuant to Federal Rules of
3  Civil Procedure, before Robert Miller, a duly
4  qualified Notary Public, within and for the State of
5  Connecticut, held at the law offices of Howd & Ludorf,
6  65 Wethersfield Avenue, Hartford, Connecticut, on
7  June 30, 2004, at 2:40 p.m.
8       STIPULATIONS
9      IT IS HEREBY stipulated and agreed by and
10 among counsel for the respective parties that all
11 formalities in connection with the taking of this
12 deposition, including time, place, sufficiency of
13 notice, and the authority of the officer before whom
14 it is being taken may be and are hereby waived.
15     IT IS further stipulated and agreed that
16 objections other than as to form are reserved to the
17 time of trial.
18     IT IS further stipulated that the proof of
19 the qualifications of the Notary Public before whom
20 the deposition is being taken is hereby waived.
21
22
23
24
25

Page 69

1     WILLIAM CUNNINGHAM,
2    called as a witness, having first
3    been duly sworn to tell the truth,
4    the whole truth and nothing but the
5    truth, testified as follows:
6
7  DIRECT EXAMINATION BY MS. JORDAN:
8    Q  Now, in your complaint you also alleged
9  that the defendants filed their complaint with the
10 SEEC for the purpose of influencing the outcome of the
11 election and the Linden Street School referendum.
12     Are you aware of that allegation?
13    A  Yes, I am.
14    Q  Can you tell me the basis of your claim
15 that the SEEC claim was filed for the purpose of
16 influencing the outcome of the election?
17    A  It's my belief that was done in order to
18 discredit any of us who spoke out against the Linden
19 Street referendum as well as those of us who were
20 running for elected office with that platform that the
21 referendum needed to be relooked at or that -- what's
22 the right term? That the referendum was hastily put
23 together and presented and was not the most viable
24 plan that could be brought forth.
25    Q  It was your belief that was the purpose of

Page 70

1  filing the SEEC complaint?
2    A  Yes.
3    Q  In your complaint you also allege that the
4  defendants' act in filing the complaint with the SEEC
5  resulted in an abusive process. Are you aware of that
6  claim?
7    A  Yes, I am.
8    Q  Can you explain for me how the filing of
9  the SEEC complaint was an abuse of process?
10    A  Basically because I believe that in doing
11 that they used the actual -- they used the commission
12 to take action against me to hold me to a different
13 standard. Try to keep me from the same kind of -- how
14 do I put it? The same kind of rights or the same kind
15 of opportunities that everybody else would have had.
16 I mean, nobody else was required to meet these
17 criteria.
18    Q  Well, do you believe if someone believes
19 that there is a violation of election law that they
20 have a right to make a complaint with the SEEC?
21    A  I am sure if they believe that there is,
22 yes. But if you're doing it just to, you know -- if
23 you're doing it in what appears to be a malicious way
24 or if you're just doing it to seek an alternative end
25 result, you're just not doing it out of your sense of

2 (Pages 67 to 70)

Case 3:02-cv-01688-CFD     Document 78-13     Filed 09/01/2004     Page 7 of 11
Niziankeiwicz & Miller Reporting Services


Page 75

1  requirements for endorsed or slate candidates in the
2  placement of ads versus petitioning or independent
3  candidates?
4       A   Yes. Which I -- which I also feel is
5  illegal.
6       Q   Now, did any of the defendants who signed
7  the SEEC complaint appear at your hearing before the
8  SEEC?
9       A   No. They did not.
10      Q   Did any of them offer any testimony against
11 you or statements against you at your hearing before
12 the SEEC?
13      A   No. They did not.
14      Q   Did any of them appear and offer any
15 evidence against you at the SEEC hearing?
16      A   No. They did not.
17      Q   Now, in your complaint you also alleged
18 that the individuals who signed the SEEC complaint
19 acted willfully and maliciously towards you
20 personally. Are you aware of that?
21      A   Yes, I am.
22      Q   Can you tell me what's the basis for your
23 claim that William Petit filed a complaint with the
24 SEEC because of some malice towards you personally or
25 do you believe that William Petit filed the complaint

Page 76

1  with the SEEC because of malice towards you
2  personally?
3       A   It is the only logical conclusion I can
4  come to as to why I would be singled out and have a
5  complaint filed against me.
6       Q   So, it is your assumption he had some
7  malice towards you or your logical conclusion?
8       A   Yes, it is.
9       Q   Okay.
10      A   And I come to that conclusion because I was
11 running for council at that time trying to possibly
12 unseat him or somebody from the party that he
13 represents.
14      Q   And what about Patrick Ringrose, you
15 believe he filed a complaint against you to the SEEC
16 because of some malicious intent towards you
17 personally?
18      A   For the same reason.
19          (At which time the
20          proceedings went off the record.)
21          (After a recess off the
22          record, the following occurred.)
23
24 BY MS. JORDAN:
25      Q   I was asking you about your belief

Page 77

1  regarding Patrick Ringrose, whether he filed a
2  complaint against you with malicious intent. It was
3  your belief it was a logical conclusion, is that the
4  case?
5       A   Yes.
6       Q   How about Ron Pavano?
7       A   Yes, I believe the same.
8       Q   It would be your logical conclusion that
9  was the reason why they filed the complaint?
10      A   Yes, it is.
11      Q   That is actually the place I would want to
12 stop.
13          (At which time the
14          proceedings went off the record.)
15          (After a recess off the
16          record, the following occurred at
17          4:00 p.m.)
18 BY MS. JORDAN:
19      Q   Okay. Mr. Cunningham, you understand
20 you're still under oath?
21      A   Yes, I am.
22      Q   In your complaint, you also allege that
23 three of the defendants, William Petit,
24 Patrick Ringrose and Ron Pavano harassed you because
25 of your minor violation of the election laws. Are you

Page 78

1  aware of that allegation?
2       A   Yes.
3       Q   Can you tell me how you were harassed by
4  William Petit for minor violation of the election
5  laws?
6       A   Filing the complaint with the SEEC and that
7  was continuously brought into the public eye and
8  everything else. And rather than it just being
9  allowed to work its way through the system it was
10 continuously and repeatedly brought through public
11 notification in that form or manner repeatedly. And
12 it gave the outward appearance to the general public
13 that it was already a verdict rendered in the thing.
14 We were already found guilty. And that a decision had
15 already been reached by the SEEC and we hadn't even
16 had a hearing as of yet.
17      Q   Let's back up. You believe that
18 William Petit harassed you for a minor violation of
19 the election laws first by filing a complaint with the
20 SEEC. You gave two reasons. One was in filing the
21 complaint with the SEEC?
22      A   I am sorry. I must have misunderstood your
23 first question.
24      Q   You indicate in your complaint that
25 William Petit harassed you for a minor violation of

Niziankeiwicz & Miller Reporting Services

Page 79

1  the election laws. And I asked you how did he harass
2  you. And your response was two-fold. First you said
3  that it was in filing the complaint. And, secondly,
4  you said that it was brought up continuously; is that
5  correct?
6     A  Yes.
7     Q  Okay. So I am just confirming that the
8  first manner in which you believe that William Petit
9  harassed you for a minor violation of the election law
10 was in filing the complaint with the SEEC?
11    A  Right.
12    Q  And I believe you testified a little
13 earlier that you believe that someone has the right to
14 file a complaint with the SEEC if they believe that
15 there was a violation of an election law, correct?
16    A  Sure.
17    Q  So, how is the filing of the complaint with
18 the SEEC for what Mr. Petit believed was a violation
19 of the law a harassment to you?
20    A  I believe the manner in which it was done.
21 It was done very publicly. It was done very --
22    Q  Well, what did Mr. Petit do to publicize
23 that he had filed a complaint against you? Is there
24 any action you can point to?
25    A  I am not sure that Mr. Petit himself was

Page 80

1  completely responsible for it or if he even had a hand
2  in it at all per se.
3     Q  I am going to stop you because my question
4  is limited to Mr. Petit.
5     A  I understand that.
6     Q  It is not including anyone else that you
7  think might have played a role. Solely Mr. Petit. As
8  you sit here today, what did Mr. Petit do publicly to
9  harass you?
10    A  At this time I can't recall. At that time
11 there may have been comments made to the newspapers.
12    Q  That is just based on your speculation, you
13 can't recall anything as you sit here today.
14       You have to wait until I finish. As you
15 sit here today, you can't think of anything that Mr.
16 Petit did publicly to harass you for a minor violation
17 of the election laws?
18    A  No.
19    Q  Okay. Now, what is it that you believe
20 Patrick Ringrose did or the manner in which he
21 harassed you for a minor violation of the election
22 laws?
23    A  Like I said, just in the manner in which it
24 was all conducted.
25    Q  Well, what did Mr. Ringrose do personally

Page 81

1  directed towards you that you view as a harassment?
2     A  The same answer that I have just given for
3  Mr. Petit. And my answer would be the same for Mrs.
4  Pavano when you asked me that question as well.
5     Q  And what is it you believe that
6  Marliss Pavano did or the manner in which she harassed
7  you for a minor violation of the election law?
8     A  As I said, just the manner in which the
9  complaint was filed.
10    Q  Anything else?
11    A  No.
12    Q  Are you alleging that Marliss Pavano did
13 anything publicly directed towards you that was a
14 harassment for a minor violation of the election law?
15    A  No.
16    Q  Now, in your complaint you also allege that
17 three of the defendants, William Petit,
18 Patrick Ringrose and Marliss Pavano, filed their
19 complaint with the SEEC in their official capacity as
20 a public official for the Town of Plainville. Are you
21 aware of that allegation?
22    A  Yes, I am.
23    Q  Can you please tell me what evidence you
24 have that William Petit, Patrick Ringrose and
25 Marliss Pavano signed the complaint in their official

Page 82

1  capacity as a public official for the Town of
2  Plainville?
3     A  Because that is how it appeared in the
4  complaint on the form they sent to the SEEC.
5     Q  When you say that is how it appeared in the
6  complaint are you referring to the manner in which
7  they signed the complaint with their title?
8     A  Yes, I am.
9     Q  Is that solely based on the fact they
10 signed the complaint with their title?
11    A  Yes, I am.
12    Q  Do you have any other evidence that
13 William Petit, Patrick Ringrose and Marliss Pavano
14 were acting in their official capacity as public
15 officials for the Town of Plainville other than the
16 manner in which they signed the complaint?
17    A  No.
18    Q  Can you just tell me what damages or
19 injuries you are claiming to have sustained as a
20 result of the filing of the SEEC complaint against
21 you?
22    A  I incurred lost wage from time off for
23 having appeared in front of the SEEC. Lawyer's fees
24 and I believe that is pretty much covering just about
25 it. Unless maybe there is travel expenses I may have

Page 91

1  A  Yes. He indicated because of the race this
2  changes my entire outlook of it with you.
3  Q  Anyone else who has specifically told you
4  that they -- their opinion of you has changed to a
5  negative view because of the SEEC complaint?
6  A  Off the top of my head I can't think of
7  anybody else right now.
8  Q  Okay. Now, in your complaint you also
9  allege that the defendants' filing of the SEEC
10 complaint adversely affected your standing in the
11 November 2001 election. Are you aware of that
12 allegation?
13 A  Yes.
14 Q  Could you explain to me what you have to
15 support your claim that the SEEC complaint adversely
16 affected your standing in the election?
17 A  It came out just shortly before the
18 election day with very little time to countermand the
19 allegations or countermand the quotes and everything
20 else that appeared in the paper. It never gave any of
21 us an opportunity to address the complaint to the
22 general public that was getting inundated by all the
23 press that was flying around there.
24 Q  My question is what evidence do you have
25 that the complaint adversely affected your standing,

Page 92

1  not the time it came out, but it, in fact, adversely
2  affected your standing in the election?
3  A  You are asking me to predict how the polls
4  would have gone. I don't know.
5  Q  That leads me to my next question. Can you
6  tell me today how many votes you would have gotten?
7  A  No, I can't.
8  Q  That is something you can't predict
9  admittedly, correct?
10 A  You're right, I cannot.
11 Q  Other than your belief it adversely
12 affected your standing, can you prove it, in fact, did
13 so?
14 A  No, I can't.
15 Q  Now, you also indicate that the defendants
16 intimidated you with regard to the exercise of your
17 First Amendment right. Can you tell me how the
18 defendants intimidated you?
19 A  Well, it becomes a matter of having to
20 double check anything and everything for fear of
21 speaking out publicly or in print or any other manner
22 to where you have to double check and make sure you
23 are not offending some insecure, little, lost somebody
24 that's now going to take advantage and prosecute you.
25 Q  Are you now prevented from speaking out on

Page 93

1  your political views?
2  A  I am very restrained about what I say now.
3  I am very, very careful about what I say. There is
4  quite a few times that I have foregone saying anything
5  for fear that what I had to say about it would be
6  deemed as being too controversial or it might have
7  been off on a bit of a tangent that may have been
8  misconstrued and actually been able to be taken as
9  violating some law somewhere that somebody could
10 exploit.
11 Q  You feel you can still speak, you're just
12 more careful about what you say?
13 A  I don't think it is worth the risk.
14 Q  You don't speak about your political views
15 ever?
16 A  I didn't say that. I said I am very, very
17 careful. I quite now literally I live with the
18 thought that at any point depending on what I say or
19 what I may possibly submit, that editorial would bring
20 grief on me and my family.
21 Q  You do speak on political issues, you're
22 just careful about what you say?
23 A  Yes, but not all the time.
24 Q  Okay. But the question is you do still
25 speak on political issues?

Page 94

1  A  Yes.
2  Q  And you indicated you're just more careful
3  of putting editorials or things of that nature,
4  correct?
5  A  Yes.
6  Q  You still feel you can do that, you're more
7  careful about it?
8  A  I limit it to issues now more in line of
9  open space, Greenpeace issues rather than more along
10 the lines of political rhetoric as to party things.
11 Q  But you still do speak or do editorials?
12 A  I have just about all but stopped
13 editorials.
14 Q  When did you stop doing editorials?
15 A  Quite some time ago. Maybe as far back as
16 two years. Maybe more.
17 Q  That would be about 2001/2002 thereabouts?
18 A  Yes.
19 Q  Do you know which?
20 A  I would say probably somewhere right around
21 2002. Early 2002.
22 Q  Do you recall what was the last editorial
23 you wrote?
24 A  No.
25 Q  You don't recall the substance of it?

Niziankeiwicz & Miller Reporting Services

Page 95

1    A    No. Not really.
2    Q    You don't recall where it was published?
3    A    No. If anything, it would have probably
4  been in the New Britain Herald or Hometown Connection.
5    Q    If it was an issue of Greenpeace or
6  something that you mentioned that you wanted to speak
7  on would you write an editorial?
8    A    Probably. But, if anything like that, I've
9  probably spoken to either the P & Z board or possibly
10 the town council.
11   Q    If you felt it was something you wanted to
12 respond to?
13   A    If it was something that needed to be
14 addressed.
15   Q    Okay. Now, I have asked you a series of
16 questions about your allegations against the
17 defendants and you have given me several responses in
18 terms of what the rumors were and what people have
19 said to you.
20       Other than rumors and your personal opinion
21 and what people have said to you, do you have any
22 actual evidence to show that the defendants intended
23 some malice towards you in filing the complaint with
24 the SEEC?
25   A    No.

Page 96

1    Q    Okay. That is all the questions I have.
2
3  CROSS EXAMINATION BY MS. KARPIE:
4    Q    Mr. Cunningham, you indicated last night
5  you spoke to Mr. Cassidy for about 15 minutes?
6    A    Yes, I did.
7    Q    And also spoke with Mrs. Hinkson for about
8  the same amount of time?
9    A    Yes, I did.
10   Q    When you were talking about your calling
11 Ms. Hinkson, you said that people were wondering where
12 she was. That she couldn't be located. What people
13 did you talk to who was wondering where she was?
14   A    Her daughter called me last night. Her
15 daughter is a Down's syndrome child.
16   Q    We know that.
17   A    She called my cell phone last night looking
18 for her mother, that maybe I might know where she was.
19   Q    Do you normally hang out with Ms. Hinkson?
20   A    I wouldn't say hang out. I associate with
21 her. I sometimes give her a helping hand moving
22 furniture, the occasional odd job. Lend a helping
23 hand.
24   Q    Who other than Ms. Hinkson's daughter was
25 wondering where she was?

Page 97

1    A    Her caretaker, Elaine.
2    Q    They both called you?
3    A    Shirley was there. Elaine was with her.
4    Q    Were the other plaintiffs also in contact
5  with you wondering where Ms. Hinkson was?
6    A    No.
7    Q    What did Mrs. Hinkson tell you during that
8  fifteen-minute conversation?
9    A    That she had been here. That it was quite
10 the marathon session. That she was surprised it ran
11 as long as it did. Basically, be prepared for a
12 session that would run every bit as long. Really
13 nothing too spectacular.
14   Q    Whether it was spectacular or not I think
15 what you just told me she said that probably took
16 about a minute for you to relate to us. If you had a
17 fifteen-minute conversation what were the other 15
18 minutes about?
19   A    She told me there was like six attorneys
20 here yesterday. That the first attorney whoever that
21 might have been went at it for the better part of
22 almost two hours. Little better than two hours. The
23 rest kind of like moved right along. That toward the
24 end things had started to kind of regress like to the
25 beginning, started the same questions all over again.

Page 98

1  It started to get a little more agitated or mundane or
2  hostile. The mood started to deteriorate a little bit
3  in the room. And that it just seemed like it was a
4  long drawn out process. And it was really nothing
5  spectacular.
6    Q    Did she tell you that the questioning was
7  what she expected?
8    A    Yes. Kind of. What she said was a lot of
9  the questions were expected. Some of them weren't,
10 but nothing that she couldn't answer.
11   Q    Did she tell you how she thought she did
12 during the deposition?
13   A    Only that she said she had done fairly well
14 in keeping her cool.
15   Q    Did you talk about the lawsuit itself or
16 the merits of the lawsuit?
17   A    Not really. Like I said earlier, we were
18 very careful about not discussing anything that could
19 possibly taint either testimony especially with mine
20 still having to be done.
21   Q    Did she tell you what any of the questions
22 were asked of her?
23   A    No. Definitely not.
24   Q    Did you tell her not to do that?
25   A    No, I didn't even have to.

Niziankeiwicz & Miller Reporting Services

Page 163

1  Q  You can answer. Was that -- relating to
2  the question of intimidation that was brought out by
3  one of the defendants' attorneys.
4       MR. VERMETTE: Objection to the
5       form.
6       MR. BARRANTE: You already
7       objected.
8       MR. VERMETTE: It is a new
9       question. You just asked it. The
10      last objection to form.
11 A  Yes, I do believe that there is an ongoing
12 intimidation factor as to being able to speak out
13 about anything.
14      MR. BARRANTE: Thank you.
15      MS. JORDAN: I will hold onto the
16      exhibits.
17      (At 6:10 p.m. the Deposition
18      concluded.)

Page 164

1  STATE OF CONNECTICUT)
         ) ss:
2  COUNTY OF HARTFORD )
3       I, Robert Miller, a Notary Public, do
4  hereby certify that WILLIAM CUNNINGHAM was by me first
5  duly sworn, to testify the truth, the whole truth, and
6  nothing but the truth, and that the above deposition,
7  was recorded stenographically pursuant to Notice by me
8  and reduced to typewriting by me.
9       I FURTHER CERTIFY that the foregoing
10 transcript of the said deposition is a true and
11 correct transcript of the testimony given by the said
12 witness at the time and place specified hereinbefore.
13      I FURTHER CERTIFY that I am not a relative
14 or employee or attorney or counsel of any of the
15 parties, nor a relative or employee of such attorney
16 or counsel, or financially interested directly or
17 indirectly in this action.
18      IN WITNESS WHEREOF, I have hereunto set my
19 hand and seal of office at East Hartford, Connecticut,
20 this      day of         , 2004.
21
22
23
        (SEAL)
24      Robert Miller, Notary Public
25 My Notary Commission Expires
   April 30, 2005

Page 165

1  CERTIFICATION OF DEPONENT
2
3
4  I, William Cunningham, have read the
   foregoing transcript of the testimony given at the
   deposition held on July 30, 2004, and it is true
   and accurate to the best of my knowledge as originally
   transcribed or with the changes as noted on the
   attached Errata Sheet.

       William Cunningham
       (Signature of Deponent)

       Subscribed and sworn to before me
this      day of         , 2004.


       _____
       Notary Public

My Commission Expires:

Page 166

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| William Cunningham | 69 | 95 | -- | 159 |
|  | -- | 120 | -- | 160 |
|  | -- | 137 | -- | 161 |
|  | -- | 152 | -- | -- |