---

**CASSIDY -V- LAWSON - HENRY R. SYSKOWSKI, JR. - 6/30/04**

**Page 1 to Page 130**

---

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY: NIZIANKIEWICZ & MILLER

*NIZIANKIEWICZ & MILLER*
*972 Tolland St.*
*East Hartford, CT    06108-1533*
*Phone:   860-291-9191*
*FAX:    860-528-1972*

# EXHIBIT N

## Page 1

```
 1         UNITED STATES DISTRICT COURT
 2           DISTRICT OF CONNECTICUT
 3
 4   JOHN J. CASSIDY, ET AL    :  NO.: 302CV1688(CFD)
                               :
 5   v.                        :  JUNE 30, 2004
                               :
 6   KATHRYN M. LAWSON, ET AL  :
 7
     ------------------------------------------------
 8        DEPOSITION OF HENRY R. SYSKOWSKI, JR.
     ------------------------------------------------
 9
     APPEARANCES:
10
         LAW OFFICE OF WILLIAM T. BARRANTE
11          Attorneys for the Plaintiffs
            P.O. Box 273
12          Watertown, CT  06795
            (860) 379-9885
13       BY: WILLIAM T. BARRANTE, ESQ.
14       HOWD & LUDORF
            Attorneys for the Defendants William
15          Petit, Patrick Ringrose and Marliss Pavano
            65 Wethersfield Avenue
16          Hartford, CT  06114
            (860) 249-1361
17       BY: BEATRICE S. JORDAN, ESQ.
18       LAW OFFICE OF CHARLES E. VERMETTE, JR.
            Attorneys for Kathryn Lawson
19          Litchfield Cavo
            40 Tower Lane, Suite 200
20          Avon, CT  06001
            (860) 255-5577
21       BY: CHARLES E. VERMETTE, JR., ESQ.
22   APPEARANCES CONTINUED
23       NIZIANKIEWICZ & MILLER REPORTING SERVICES
                  972 Tolland Street
24         East Hartford, Connecticut 06108-1533
                  (860) 291-9191
25
              DONNA M. DECIANTIS, LSR
```

## Page 2

```
 1  APPEARANCES:
 2
 3  SEGAL & LASKA
    Attorneys for Ronald Pavano, Marliss Pavano
 4  and Patrick Ringrose
    63 East Main Street
 5  Plainville, CT 06062
    (860) 747-2792
 6  BY: KENNETH JOHN LASKA, ESQ.
 7
    LAW OFFICES OF HEIDI ZULTOWSKI
 8  Attorneys for Daniel Ciesielski
    700 Stanley Drive, P.O. Box 9011
 9  New Britain, CT 06050-9948
    (860) 827-4366
10  BY: PAUL M. CLYONS, ESQ.
11
    MURPHY AND KARPIE
12  Attorneys for William Petit
    350 Fairfield Avenue
13  Bridgeport, CT 06604
    (203) 333-0177
14  BY: KAREN L. KARPIE, ESQ.
```

## Page 3

```
 1  Deposition of HENRY R. SYSKOWSKI, JR., taken on
 2  behalf of the defendants in the hereinbefore entitled
 3  action pursuant to the Federal Rule of Civil Procedure
 4  30 before Donna M. DeCiantis, duly qualified notary
 5  public in and for the State of Connecticut, held at the
 6  offices of Howd & Ludorf, 65 Wethersfield Avenue,
 7  Hartford, Connecticut, commencing at 9:20 a.m.,
 8  Wednesday, June 30, 2004.
 9  STIPULATIONS
10  It is hereby stipulated and agreed by and
11  among counsel for the respective parties that all
12  formalities in connection with the taking of this
13  deposition, including time, place, sufficiency of
14  notice, and the authority of the officer before whom it
15  is being taken, may be and are hereby waived.
16  It is further stipulated and agreed that
17  objections other than as to form are reserved to the
18  time of trial.
19  It is further stipulated and agreed that the
20  reading and signing of the deposition are not waived.
21  It is further stipulated that the proof of
22  the qualifications of the notary public before whom the
23  deposition is being taken are hereby waived.
```

## Page 4

```
 1  INDEX
 2  WITNESS
    HENRY R. SYSKOWSKI, JR.
 3
    Direct examination by Attorney Jordan...........5
 4  Cross-examination by Attorney Karpie...........80
 5  ------------------------------------------------
    INDEX OF EXHIBITS
 6      (Marked for Identification)
 7
    DEFENDANTS' EXHIBITS
 8
 9  1 Newspaper ad from the Plainville's Hometown
10    Connection.....................29
11
12  State of Connecticut State Elections
13  Enforcement Commission, Agreement Containing
14  Consent Order for Violations of Connecticut
15  General Statutes 9-333w........................42
16  3 Plaintiff Henry R. Syskowski's Responses to
17    Defendants' First Set of Interrogatories.......67
18
19  Letter to Mr. Gilberto dated 11/19/01 from
20    Henry Syskowski, Jr...........................103
```

### Page 49

1    A    The fact that, as I indicated in my letter
2    to Mr. Oyola, that my first ad brought no response at
3    all from the people, which is also placed in the
4    Hometown News, and the complaint was made only on the
5    second ad which was just before the election. And I
6    know a few times at the Town Council meetings, which I
7    had attended almost every one, the discussion had come
8    up about the Hometown News, trying to get rid of the
9    newspaper because of the stuff they were publishing and
10   whatnot.
11       Q    Well, what comments and who made them?
12       A    Well, I'm a registered democrat. The
13   democratic party did not like the Hometown News or me
14   because we were controversial to their followings,
15   their beliefs.
16       Q    Who specifically?
17       A    Namely Bill Petit, Val Dumais, Dan Cieselski
18   – he threw me off the Democratic Town Committee
19   because I had spoken against the democratic party.
20       Q    Well, what specific statement did Bill Petit
21   make that leads you to believe that he intended to
22   penalize the newspaper?
23       A    Well, just statements at the council
24   meetings, you know, that the paper should be abolished
25   and, you know, quite a few references were made

### Page 50

1    alleging that Helen Berganti owned the newspaper and
2    ran it the way she wanted.
3        Q    Now, you indicated a little earlier in your
4    testimony that your concern is bringing an action on
5    your behalf and not on behalf of the newspaper.
6        A    I filed on my behalf, but I joined in with
7    the suit that was against – for the paper. That suit
8    had already been filed, and I joined in. I'm Complaint
9    No. 7, or something, in the suit.
10       Q    Would it surprise you to know that there is
11   no lawsuit on behalf of the newspaper?
12       A    No, it wouldn't surprise me. Like I said, I
13   really didn't go through this thing in depth.
14       Q    And your intent is solely to bring a lawsuit
15   for the actions against you personally?
16       A    That was my intent when I joined in, I
17   guess.
18       Q    Okay. Now, in your complaint are you aware
19   that you also allege that the defendants brought the
20   complaint with the SEEC as political payback against
21   you personally for your opposition to the Linden Street
22   School project?
23       A    That was one of the things, yes.
24       Q    Can you tell me what the basis is for your
25   claim that the defendants filed their complaint with

### Page 51

1    the SEEC as political payback against you for your
2    opposition to the referendum?
3        A    I had gotten a lot of static because I voted
4    against their followings when it came to the school.
5        Q    When you say you got a lot of static, can
6    you be more specific?
7        A    At the time I think two of my grandchildren
8    were going to Linden Street School, and I still voted
9    against it. But I got quite a bit of static from them
10   –
11       Q    When you say from "them," who is them?
12       A    – for going against it.
13       Q    Who's "them"?
14       A    Bill Petit. I know Val Dumais at a lot of
15   the Town Council meetings speaking up. And I couldn't
16   be specific, there were other people at the meeting
17   that spoke up. Town Council meetings, it's an open
18   meeting for anybody to attend. I couldn't give you
19   exact names.
20       Q    But the only person you can recall is Bill
21   Petit and possibly Val Dumais?
22       A    Yes.
23       Q    What do you mean by static?
24       A    I've been having an ongoing problem with
25   Bill Petit for a few years.

### Page 52

1        Q    What type of ongoing problem?
2        A    Well, I had been licensed to sell guns for,
3    I guess, 16 years in the town of Plainville, and they
4    made an attempt to have my license taken away.
5        Q    Well, how does all of that relate to your
6    belief that he intended to file this suit against you
7    as political payback for your opposition to the
8    referendum?
9        A    Well, the referendum was just one of the
10   things. There's no way Bill wanted me to get in
11   office. That was known with people through the whole
12   town. He would have done anything to keep me from
13   getting into office.
14       Q    Okay. But in terms of those specific
15   allegations, you indicate that it was political payback
16   for your opposition to the referendum. So what is it
17   that he gave you static about, as you call it, with
18   regard to the referendum? How do you know that that
19   was the purpose?
20       A    It was specifically brought up, like I said,
21   at Town Council meetings in the course of discussions,
22   you know, the fact that I had voted against it. And I
23   had been called a rebel rouser, troublemaker at almost
24   every Town Council meeting that there was by Bill Petit
25   and, you know, later his daughter when he got out.

### Page 53

1  Q  So you believe that he filed the complaint
2  against you because you voted against the referendum?
3  A  One of the things, yes.
4  Q  When did you vote against the referendum?
5  A  I couldn't – the referendum would have been
6  the same time as this.
7  Q  It was in the November 2001 election,
8  correct?
9  A  Right.
10 Q  So he wouldn't know what your vote would
11 have been until the election occurred.
12 A  He knew what my intention was.
13 Q  How did he know what your intention was?
14 A  Because it had been discussed. Like I said,
15 we'd been going back and forth at many of the town
16 meetings, you know, Bill and some of the other council
17 members and myself. I know Dean Stewart was another
18 one that was on the council that kept going back and
19 forth at these meetings.
20 Q  Other than your belief that Bill Petit filed
21 a complaint against you because he knew what your
22 intention was with regard to the referendum, do you
23 have any other evidence to support your claim that that
24 was the reason why he filed a complaint?
25 A  What do you mean by "evidence"? I mean, he

### Page 54

1  never specifically stated that was the reason why.
2  Q  Do you have any other support other than
3  that's your belief?
4  A  Well, I guess just the fact that it was
5  mentioned at the meetings. And I've been having quite
6  a few problems with them regarding my license and
7  everything else. And I was going to file suit against
8  them for discrimination, because out of 13 dealers at
9  the time I was the only one that they found a violation
10 and tried to pull my license on. Nobody else. There
11 were 12 left unscathed.
12 Q  Are you talking about the gun license?
13 A  Yeah. Bill was – I don't know if you call
14 it the chairman of the council. He was head of the
15 council, whatever his position was.
16 Q  And when you say it was discussed at
17 meetings, what specifically was discussed at meetings?
18 A  I had appealed to the Town Council because
19 the Zoning Board had ruled against me. And prior to
20 ruling against me, they had a letter from the assistant
21 zoning enforcement officer, Voloski, Bill Voloski,
22 stating there were 13 dealers, and because I was
23 getting my license renewed, despite the fact that I had
24 it for 16 years, that they should, you know, look
25 carefully and set an example by me for the rest of

### Page 55

1  them.
2  Q  So your belief about Bill Petit's intent to
3  file a complaint against you because of the school
4  referendum is really based on the fact about this gun
5  license issue?
6  A  It's a compilation of quite a few things,
7  not just that one specific.
8  Q  So nothing specific, just a variety of
9  things?
10 A  Yeah, quite a few. I guess you might say
11 that was "the coup de grace," the last straw.
12 Q  Now, in your complaint you also allege that
13 the defendants filed the SEEC complaint for the purpose
14 of influencing the outcome of the election and the
15 referendum. Are you aware of that?
16 A  Yes.
17 Q  Can you tell me what the basis of your claim
18 is that the purpose of the defendants was to influence
19 the election and the referendum?
20 A  Well, like I stated earlier, they would have
21 done anything at all to keep me from getting into
22 office, absolutely anything. I had been slandered and
23 whatnot at Town Council meetings.
24 Q  Well, how would the filing of the SEEC
25 complaint influence the election?

### Page 56

1  A  By putting me in bad light with the public.
2  Once the word got out that the complaint had been
3  filed...
4  Q  And this is based on your opinion that it
5  would place you in a bad light?
6  A  Based on common sense.
7  Q  It's your belief, though?
8  A  Yes.
9  Q  And what is the basis for your claim that
10 the purpose of filing the SEEC complaint was to
11 influence the school referendum?
12 A  The SEEC complaint wouldn't have influenced
13 the school referendum that I know of specifically.
14 Q  So it's your testimony that it wouldn't
15 influence the referendum?
16 A  Specifically not that I can – no, other
17 than the fact, like I say, reference had been made to
18 the fact that we were in violation of the election laws
19 and we were the same people that voted against the
20 school referendum. You know, things of this nature.
21 Q  But nothing specific that you can think of
22 as you sit here?
23 A  Not that I can recall. I have to apologize,
24 like I say, because I've had 19 hospital admissions
25 since this and 11 surgeries. I spent six months in one

### Page 57

1 convalescent home and three months at another; so it's
2 kind of hard to remember this in between everything
3 else.
4    Q   Okay. We're just asking to the best that
5 you can remember.
6    A   Okay.
7    Q   In your complaint you also allege that the
8 defendants' filing of the SEEC complaint resulted in an
9 abuse of process. Are you aware of this?
10    A   Yes.
11    Q   Can you explain to me how the filing of the
12 SEEC complaint resulted in an abuse of process?
13    A   As it related to me, like I said in the
14 letter to Mr. Oyola, nothing had been said about my
15 first ad appearing. And if it was to make sure that
16 the election laws were complied with, I would think
17 they would have made a complaint when my first ad
18 appeared, rather than the one just before the election.
19    Q   How does that result in an abuse of process?
20    A   It's what I would call selective
21 enforcement.
22    Q   Well, do you know if any of the defendants
23 appeared before the SEEC to offer any testimony or
24 statements against you personally?
25    A   No.

### Page 58

1    Q   Do you know if any of the defendants offered
2 any evidence against you before the SEEC?
3    A   No.
4    Q   And you, in fact, signed the consent
5 agreement with the SEEC about the violation that was
6 marked as Defendants' Exhibit 2 that you looked at
7 earlier?
8    A   Yeah. I signed this on the recommendation
9 of Mr. Oyola.
10    Q   Now, in your complaint you also allege that
11 the defendants William Petit, Patrick Ringrose and
12 Marliss Pavano acted willfully and maliciously against
13 you personally in filing the SEEC complaint. Are you
14 aware of that allegation?
15    A   Yes.
16    Q   What I want to do is I want to go through
17 that with regard to each of the people I've identified.
18 Can you tell me what is the basis for your belief that
19 William Petit filed a compliant with a malicious intent
20 towards you personally?
21    A   Well, like I said, I'd been having problems
22 with Mr. Petit for years before this.
23    Q   So this would be the gun issues –
24    A   Right.
25    Q   – that you've mentioned earlier?

### Page 59

1    A   Right. A compilation of everything.
2    Q   Anything other than what you've mentioned
3 earlier?
4    A   In regard to the gun issue, he had made
5 tentative agreements with me regarding the license and
6 then, you know, backed out of them.
7    Q   I understand that. But as you sit here
8 today, do you believe that Mr. Petit filed a complaint
9 with the SEEC against you because he had some malice
10 towards you personally?
11    A   Yes.
12    Q   And that again goes back to the gun issues
13 that we've talked about?
14    A   Right.
15    Q   How about Patrick Ringrose, do you believe
16 that he filed the complaint with the SEEC with a
17 malicious intent towards you personally?
18    A   There's no question as far as Pat goes. I
19 don't know if you ever met Mr. Ringrose, but he's a
20 unique person.
21    ATTORNEY KARPIE:   He's what?
22    THE DEPONENT:   A unique person.
23    Q   My question to you is, do you believe that
24 Patrick Ringrose filed a complaint with the SEEC
25 because he intended malice towards you personally?

### Page 60

1    A   Yes.
2    Q   What is the basis for that claim?
3    A   Well, based on a lot of arguments that him
4 and I had at the Town Council meetings.
5    Q   Such as?
6    A   Regarding the school board.
7    Q   I'm sorry?
8    A   My position on the Linden Street School, it
9 would start with that and just keep on expanding on.
10    Q   What specifically did he say to you that
11 leads you to believe that he had malice towards you?
12    A   Well, he knew that if I had been elected one
13 of my first endeavors would have been to try to get him
14 off the school board.
15    Q   How did that lead you to believe that he had
16 malice towards you?
17    A   I had made verbal complaints against
18 Mr. Ringrose regarding the school process because my
19 grandchildren had been kind of told about the Linden
20 Street School and quite a few other endeavors at class
21 meetings. They were set aside to tell these kids what
22 they should do or what they shouldn't do.
23    Q   What type of complaints did you make?
24    A   I made verbal complaints against him with
25 the Town Council. That's the governing body, and

### Page 65

1  as well made reference to the complaint and violation
2  of the election laws when you would speak?
3   A   Yes.
4   Q   And you believe that that was a harassment
5  of you for violation of the election laws?
6   A   For alleged violation, yes.
7   Q   In your complaint you also allege that
8  William Petit, Patrick Ringrose and Marliss Pavano
9  filed their complaint with the SEEC in their capacity
10 as public officials for the Town. Are you aware of
11 that allegation?
12  A   I know Bill Petit was a public official, and
13 Pat Ringrose was chairman of the school board. Miss
14 Pavano, I'm really not that familiar with. I thing she
15 was a board member.
16  Q   What's the basis for your claim that when
17 they signed the SEEC complaint they did so in their
18 official capacity as a town official?
19  A   I'm trying to think back to the complaint.
20 I'm trying to think. I think some did sign as
21 officials. Others were known to be officials.
22  Q   Is the basis of your claim just purely on
23 the fact on how they signed the complaint, that they
24 signed with their title?
25  A   That, plus, like I said, they were known as

### Page 66

1  public officials.
2   Q   So just the fact that they signed with their
3  titles and they were generally known as public
4  officials?
5   A   Yeah. And the way the Town Charter reads,
6  they would be held responsible for any actions, etc.
7   Q   Well, do you know if the Town sanctioned and
8  voted to say go ahead and file the SEEC complaint?
9   A   I really don't know, but I know the Town
10 agreed to defend them in some capacity. That was
11 brought up at a meeting. And Attorney Mischalik said
12 they'd be defended by the Town, so I would assume that
13 the Town was backing them.
14  Q   So that's just your assumption?
15  A   Yeah. Nothing was said to me specifically.
16  Q   Now, can you just explain for me what
17 damages or injuries you're claiming to have sustained
18 as a result of the filing of the SEEC complaint?
19  A   Well, most of it is the stress factor
20 related to, you know, hearing this over and over at the
21 coffee shop, at the Town Council meetings.
22  Q   Anything else or just the general stress?
23  A   The general stress factor that's involved.
24  Q   Okay. I'm going to show you a document and
25 ask you to take a look at that.

### Page 67

1   A   Do you want me to read the whole document?
2   Q   I want you to look through it and let me
3  know if you recognize it. Do you recognize that
4  document?
5   A   Yes.
6   Q   And do you recognize that to be answers that
7  you provided to some questions?
8   A   Yes.
9   Q   And if you could take a look at page 16 of
10 that document. Can you tell me if that's your
11 signature that appears on page 16?
12  A   Yes, it is.
13  ATTORNEY JORDAN:   Can you mark this?
14  (Defendants' Exhibit No. 3, Plaintiff
15  Henry R. Syskowski's Responses to
16  Defendants' First Set of
17  Interrogatories, was marked for
18  identification.)
19  Q   Now, if you can turn to page 9. If you
20 could review your answer to Question 15.
21  A   Yes.
22  Q   Okay. Now, in your response you indicated
23 that you had to spend time defending yourself against
24 the charges with the SEEC?
25  A   Yes.

### Page 68

1   Q   How much time did you have to spend
2  defending yourself?
3   A   I don't know exactly. Like I say, Mr. Oyola
4  had called me, and when I had told him I wasn't
5  involved in the group ad that was the center of the
6  complaint, and I had mentioned to him there was a
7  previous ad to the November ad, he had told me he would
8  have to amend the complaint, fax it to me for me to
9  sign it and fax it back.
10  Q   Well, would –
11  A   I would probably say on that aspect maybe
12 three and a half hours with him all tolled for the day.
13  Q   Now, in that response you also indicate that
14 you were infringed on your right to freedom of the
15 press.
16  A   Yes.
17  Q   Can you tell me how?
18  A   Because I was unjustly penalized for placing
19 an ad.
20  Q   Are you saying that you're prevented from
21 placing any other ads should you feel like doing so?
22  A   Ads per se, no. Political ads – I never
23 ran it again because of, you know, the hassle involved
24 with that.
25  Q   So this hasn't prevented you from placing an

### Page 69

1  ad or writing a letter to the editor of the paper or
2  anything of that sort?
3     A   No, it hasn't.
4     Q   Has this prevented you at all from speaking
5  freely on political issues or concerns that you have at
6  council meetings?
7     A   By no means.
8     Q   Now, looking at the last sentence of that
9  response –
10     A   To justify, I had to defend myself at
11  counsel meetings, but I never hesitated to speak up.
12     Q   Okay. The last sentence of that response
13  you indicate that this incident has caused you anxiety
14  that resulted from this experience, which may have had
15  an adverse impact on existing medical problems.
16     A   Yes.
17     Q   Can you explain that to me?
18     A   I was in a cancer support group at the
19  Veterans' Hospital. And when all this came about, I
20  was put into – I don't know what group it is, it's a
21  support group, people with depression and things of
22  that nature.
23     Q   Well, is it your claim that the SEEC
24  complaint caused your depression or caused you to be in
25  that group?

### Page 70

1     A   The SEEC complaint and the hassle that
2  followed. It would put stress on anybody.
3     Q   Well, has a doctor ever told you that your
4  stress was a result of the SEEC complaint?
5     A   Not in writing. Like I said, he put me into
6  a stronger support group instead of the cancer group,
7  which I'm still in. We discussed this at meetings.
8     Q   But did he tell you that he was transferring
9  you to a stronger group because of the SEEC complaint?
10     A   Not specifically. It was because of the
11  raise in the anxiety level.
12     Q   Now, have you been formally diagnosed with
13  anxiety?
14     A   Yes.
15     Q   When were you formally diagnosed?
16     A   I would assume it was when I was put into
17  the support group, which would have been 2002. I was
18  put into Maria Wrenn's, W-r-e-n-n, group.
19     Q   But you don't recall the doctor discussing
20  the specific diagnosis of anxiety; you just assumed it
21  was because you were put in this group?
22     A   Dr. Tom Rayne, R-A-Y-N-E, and I had been
23  discussing this because he was concerned with what was
24  bothering me in the cancer support group. Then he told
25  me he was going to put me into a different stress

### Page 71

1  group, as he referred to it, dealing with stress.
2     Q   I understand that; but in discussing your
3  anxiety and changing groups, did he indicate that the
4  reason for doing that was because of the SEEC
5  complaint? Did he ever say that?
6     A   Oh, no, not specifically. Just because of
7  the increase in the stress level.
8     Q   And that was just a general increase in your
9  stress level?
10     A   Yes.
11     Q   And have you ever treated with a physician
12  before for anxiety or stress?
13     A   No.
14     Q   Have you ever treated with a psychologist
15  before for anxiety or stress?
16     A   No.
17     Q   Have you ever treated with a psychiatrist
18  before for anxiety or stress?
19     A   Not specifically.
20     Q   When you say "not specifically," what do you
21  mean?
22     A   I had to see a psychiatrist a couple of
23  times when they were going to try experimental
24  surgeries to try to contain pain. And it was to make
25  sure that I could deal with the stress after the

### Page 72

1  surgery and the stress in the event it didn't work.
2  But that was like a one or two session discussion. It
3  was in the hospital.
4     Q   When was that?
5     A   That would have been – it was Dr. Dinep.
6  The first was – it's the first part of 1980, I think
7  it was.
8     Q   Have you ever treated with a therapist for
9  anxiety or stress before?
10     A   No.
11     Q   Any other health care provider?
12     A   Not for anxiety or stress.
13     Q   Have you ever had any other type of
14  counseling for anxiety or stress?
15     A   No.
16     Q   But you indicated that you were in a cancer
17  support group?
18     A   Yes.
19     Q   And that was for dealing with the stress or
20  emotional issues related to your cancer condition?
21     A   Yeah. When I initially got it, it was in
22  the liver and the pancreas. I was put on a liver
23  transplant list for a while.
24     Q   But the support group was to provide you –
25  or the counseling group was to provide you with support

Page 129

1  C E R T I F I C A T E
2
3   I hereby certify that I am a Notary Public, in and
4  for the State of Connecticut, duly commissioned and
5  qualified to administer oaths.
6   I further certify that the deponent named in the
7  foregoing deposition was by me duly sworn, and
8  thereupon testified as appears in the foregoing
9  deposition; that said deposition was taken by me
10  stenographically in the presence of counsel and reduced
11  to typewriting under my direction, and the foregoing is
12  a true and accurate transcript of the testimony.
13   I further certify that I am neither counsel nor
14  attorney to either of the parties to said suit nor
15  related to or employed by either counsel in said suit
16  nor am I interested in the outcome of said cause.
17  Witness my hand and seal as Notary Public
18  this             day of                     20      .
19
20
21
22
    Notary Public
23
    Connecticut License No. 00181
24  My commission expires:
    November 30, 2004
25

Page 130

1  CERTIFICATE OF DEPONENT
2
3   I, HENRY R. SYSKOWSKI, JR., have read the
4  foregoing transcript of the testimony given at the
5  deposition on Wednesday, June 30, 2004, and it is true
6  and accurate to the best of my knowledge and/or with
7  the changes as noted in the attached errata sheet.
8
9
10
11
12
    DATE WITNESS
13
14  At                         in said County
15  of              ,
16  this       day of              , 2004, personally
17  appeared Henry R. Syskowski, Jr., and he made oath to
18  the truth of the foregoing answers by him subscribed.
19
20
21  Before me,                        , Notary Public.
22  My Commission Expires
23
    302CV1688(CFD)
24  CASSIDY, ET AL VS. LAWSON, ET AL
    HENRY R. SYSKOWSKI, JR. JUNE 30, 2004
25