---

# CASSIDY -V- LAWSON - JEANNETTE HINKSON - VOLUME I - 6/29/04

## Page 1 to Page 70

---

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY: NIZIANKIEWICZ & MILLER

*NIZIANKIEWICZ & MILLER*
*972 Tolland St.*
*East Hartford, CT    06108-1533*
*Phone:   860-291-9191*
*FAX:   860-528-1972*

# EXHIBIT O

### Page 1

```
              UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT
JOHN J. CASSIDY, ET AL      :    NO: 302CV1688 (CFD)
  vs.                       :
KATHRYN M. LAWSON, ET AL    :    JUNE 29, 2004
           DEPOSITION OF:  JEANNETTE HINKSON
                 Volume I    Pages 1-70
APPEARANCES:
       LAW OFFICES OF WILLIAM T. BARRANTE
             Attorney for the Plaintiffs
             P.O. Box 273
             Watertown, CT 06795
             (860) 274-0301
       BY:   WILLIAM T. BARRANTE, ESQ.
       LITCHFIELD CAVO
             Attorneys for the Defendant Lawson
             40 Tower Lane - Suite 200
             Avon, CT 06001
             (860) 255-5577
       BY:   CHARLES E. VERMETTE, JR., ESQ.
       HOWD & LUDORF
             Attorneys for Defendants Petit, Ringrose, Pavano
             65 Wethersfield Avenue
             Hartford, CT 06114
             (860) 249-1361
       BY:   BEATRICE S. JORDAN, ESQ.
       MURPHY & KARPIE
             Attorneys for Defendant Petit
             350 Fairfield Avenue - Suite 408
             Bridgeport, CT 06604
             (203) 333-0177
       BY:   KAREN L. KARPIE, ESQ.
Appearances contd.
                    Christine E. Borrelli
                    Connecticut License No. 117, RMR
```

### Page 2

**APPEARANCES:**

SEGAL & LASKA
Attorneys for Defendants Pavano, Ringrose
63 East Main Street
Plainville, CT 06062
(860) 747-2792
BY: KENNETH JOHN LASKA, ESQ.

LAW OFFICES OF HEIDI ZULTOWSKI (NOT PRESENT)
Attorneys for Defendant Daniel Ciesielski
700 Stanley Drive - P.O. Box 9011
New Britain, CT 06050-9948
(860) 827-4352
BY: PAUL M. CLYONS, ESQ.

LAW OFFICES OF JOHN A. BARBIERI (NOT PRESENT)
Attorneys for Defendants Willard, Underwood
18 Cedar Street - P.O. Box 1445
New Britain, CT 06050
(860) 224-7119
BY: JOHN A. BARBIERI, ESQ.

...... Deposition of JEANNETTE HINKSON, a Plaintiff, taken on behalf of the Defendants, in the herein before entitled action, pursuant to the Connecticut Practice Book, before Christine E. Borrelli, duly qualified Notary Public in and for the State of Connecticut, held at the Law Offices of Howd & Ludorf, 65 Wethersfield Avenue, Hartford, Connecticut, commencing at 2:40 p.m. on Tuesday, June 29, 2004.

**STIPULATIONS**

It is hereby stipulated and agreed by and among counsel for the respective parties that all formalities in connection with the taking of this deposition, including time, place, sufficiency of notice, and the authority of the officer before whom it is being taken may be and are

### Page 3

INDEX

WITNESS    DIRECT    CROSS    REDIRECT    RECROSS

Jeannette Hinkson
By Ms. Jordan    4

EXHIBIT PAGE:

Defendant's Exhibit 1, Announcement, November, 2001 .. 26

* * * * * * * * * * * *

### Page 4

MS. JORDAN:  Usual stipulations?
MR. BARRANTE:  Yes.
MS. JORDAN:  Is she going to read and sign?
MR. BARRANTE:  If you want, you can -- after the transcript is completed -- read it over, make sure there no errors, not changing testimony, but correcting it. For example, if you say to T-W-O and she typed T-O-O, errors like that.
MS. HINKSON:  All right.
MR. BARRANTE:  Or if she had taken it down wrong, you have a right to read it over and make the corrections. We will do that.

JEANNETTE HINKSON, called as a witness by the Defendants, having been first duly sworn by the Notary, was examined and testified on her oath as follows:

DIRECT EXAMINATION BY MS. JORDAN:

Q.  Good afternoon, Mrs. Hinkson. My name is Beatrice Jordan, and I represent William Petit, Patrick Ringrose and Marliss Pavano in a lawsuit that you have filed against them. Have you ever had your deposition taken before?
A.  Yes.
Q.  You have? Okay. You might be a little familiar

### Page 33

1  regarding election laws before?
2   A.  Before this?
3   Q.  Before this. Before November, 2001?
4   A.  No.
5   Q.  How about since November, 2001?
6   A.  I contacted them regarding the placement of signs by
7  myself and what were my rights.
8   Q.  What type of signs?
9   A.  There were signs for the Linden Street School
10 referendum.
11  Q.  And when did you contact them regarding the signs?
12  A.  Prior to the last referendum on the Linden Street
13 School, which must have been probably a year ago.
14  Q.  So, about one year ago as best you can recall?
15  A.  Yeah.
16  Q.  What was the content of the signs that you were
17 looking to post?
18  A.  Well, I put up seventy-six signs in the Town of
19 Plainville to vote no against the school referendum.
20  Q.  Okay.
21  A.  And that night I had seventy-six signs torn down.
22 So, the next day or two days later, I hired an airplane with a
23 banner to fly over the town saying to vote no for the
24 referendum.
25  Q.  Okay.

### Page 34

1   A.  And for that, the Election Enforcement was notified.
2   Q.  For flying of the banner?
3   A.  Uh-huh. To see if it was legal.
4   Q.  So, you said about a year ago you contacted the SEEC
5  for the signs –
6   A.  Right.
7   Q.  – posting of the signs. Correct?
8   A.  Right.
9   Q.  And what specifically did you inquire of them?
10  A.  I inquired because I was – it was my own thing,
11 paid with my own money, did I have to put my name on them.
12  Q.  Okay.
13  A.  And they said no.
14  Q.  Okay.
15  A.  And that was Mr. Smith that said I didn't.
16  Q.  And did you contact the SEEC at all before hiring
17 the plane with the banner?
18  A.  Yes, I did.
19  Q.  You did. And what was the content of that
20 conversation?
21  A.  I asked them would it be prudent, should I have put
22 on the banner paid for by myself, and he said if I wanted to.
23 I didn't have to because it wouldn't be able to be seen, but I
24 did put it on the corner of the banner. And there was no
25 specific sign size, so I – you know, it was probably two- or

### Page 35

1  three-inch letters that the pilot put on the banner.
2   Q.  Now, for each of the inquiries, the one with regard
3  to the signs and the one with regard to the banners, did you
4  do that in writing or did you do that by phone? How did you
5  contact them?
6   A.  I just called them on the phone.
7   Q.  So, you just made a phone call?
8   A.  Yeah.
9   Q.  And said, Can I do this?
10  A.  Yes.
11  Q.  And what prompted you to contact the SEEC on each of
12 those occasions?
13  A.  Because of this – these charges in 2001. I didn't
14 want to go through this again. This was – this was very
15 hard. This has been very hard.
16  Q.  Now, can you tell me, when did you first become
17 aware that a complaint had been filed with the State Elections
18 Enforcement Committee?
19  A.  I believe it was when I received the letter, but I
20 knew something was terribly wrong just prior to the election
21 when we had a Republican Town Committee meeting and Mrs.
22 Bergenty and myself were verbally attacked by Mr. Pavano and
23 Mr. Petit and Mr. Underwood. And it was such a terrible night
24 and I am not one – I'm not a public speaker. I have gotten a
25 little better, but that night the bashing was so bad of Mrs.

### Page 36

1  Bergenty, and we sat there and we took it and took it until
2  finally I got up because many people had written letters to
3  the paper, letters to the editor, with statements of past
4  indiscretions by Mr. Underwood and Mr. Petit, and finally I
5  got up and I really lost it and, I'm sorry to say it, but I
6  told them that if what half of these people said was true,
7  they should be in jail and to stop picking on Mrs. Bergenty.
8  And I think most people thought that I would say what was in
9  the content of some of the messages that I had received.
10  Q.  Okay. As you sit here today, then, you believe that
11 the first time you became aware of the complaint with the SEEC
12 was when you received a letter from the commission?
13  A.  Yes.
14  Q.  And do you know when you received that letter?
15  A.  Pardon?
16  Q.  Do you know when you received that letter?
17  A.  That was probably mid-November.
18  Q.  So, this would have been after the election?
19  A.  Yes.
20  Q.  And you also indicated that you knew you said
21 something was up based on conversations at a Republican Town
22 Committee meeting I think you said?
23  A.  Yeah. That night was such a heated night, you know,
24 words were said and things were said that, We are going to get
25 you, and We are going to get the paper and – it was just such

Page 45

1 papers – because we keep other papers to check the ads and
2 things to see if we can get these people to advertise in our
3 paper – and there were some other political ads from other
4 areas and they didn't have their address or paid for by even
5 under their pictures.
6    Q.   But do you recall anything else specific about your
7 conversation with Helen Bergenty regarding the SEEC complaint
8 other –
9    A.   No, other than I was going to call, and I believe
10 she called also. I don't know.
11    Q.   Now, do you recall having a meeting with any
12 individuals regarding the SEEC complaint at any time?
13    A.   I believe we did. I believe we had a meeting – in
14 fact, I believe we had a meeting with Mr. Barrante when he saw
15 it in the paper.
16    Q.   Was this before you retained Mr. Barrante as an
17 attorney?
18    A.   Yes, it was.
19    Q.   Do you know who called that meeting?
20    A.   I believe Mr. Barrante had called – Mrs. Bergenty
21 had called – wait. Mrs. Bergenty had called Attorney
22 Barrante to thank him for a letter he had written to say, you
23 know, that he had read about our plight in the paper and she
24 called to just thank him for his letter. And we thought it
25 might be a good idea to speak with him. And at that point, we

Page 46

1 had not retained him, and that was it.
2    Q.   Okay. So, if I understand you, then, Attorney
3 Barrante had forwarded a letter to Helen Bergenty or the
4 paper?
5    A.   Yeah. It was just – yeah.
6    Q.   Okay. And do you recall the contents of that
7 letter?
8    A.   No, I never saw it.
9    Q.   But to the best of your knowledge, it was something
10 saying that a complaint had been filed?
11    A.   No. I don't know – I really don't know because I
12 don't – I never saw the letter.
13    Q.   But you recall that Helen Bergenty had returned a
14 phone call to Attorney Barrante thanking him for the letter?
15    A.   Yes.
16    Q.   And who made the decision that you all should meet
17 with Attorney Barrante?
18    A.   I think it was really kind of a – nobody made a
19 decision. I think, you know, we just went and, all right,
20 should we talk to this guy. Should we find out how much
21 trouble we are in.
22    Q.   Who is "we"?
23    A.   We, Helen Bergenty and I.
24    Q.   So, just the two of you?
25    A.   Yes.

Page 47

1    Q.   And the two of you decided that maybe you should
2 speak with Attorney Barrante?
3    A.   (Witness nodding in the affirmative).
4    Q.   Correct?
5    A.   Right.
6    Q.   And this is before you retained him as an attorney.
7 Correct?
8    A.   Right.
9    Q.   When you decided that you were going to have a
10 meeting with Attorney Barrante about the SEEC complaint, did
11 you inquire as to whether anyone else was interested in
12 meeting with him?
13    A.   When I say "we," I didn't know the other people. I
14 didn't know the candidates.
15    Q.   Okay.
16    A.   So, I believe Mrs. Bergenty may have called them and
17 told them about Mr. Barrante and what a nice letter she had
18 received.
19    Q.   So, it's your belief that she knew the other
20 individuals and would have contacted them about the meeting?
21    A.   Yeah.
22    Q.   Okay. Do you recall when the meeting was?
23    A.   No.
24    Q.   Do you recall if it was in November of 2001?
25    A.   It may have been – it may have been December

Page 48

1 because we had already been to the Election Enforcement.
2    Q.   So, it was after you already went up to the
3 commission?
4    A.   Yeah, it was.
5    Q.   And do you recall who was present at the meeting?
6    A.   At the Election Enforcement or with Mr. Barrante?
7    Q.   No. The meeting with Mr. Barrante?
8    A.   Well, Attorney Poulis was there and I believe Mr.
9 Cassidy was there, and I believe Robert Pugliese was there,
10 Helen Bergenty, myself, Janice Eisenhauer was there, and I
11 want to say Robert Mercer, but I won't swear that he was there
12 that day.
13    Q.   Okay.
14    A.   And I don't believe Mr. Majsak was there.
15    Q.   Do you recall if William Cunningham was present?
16    A.   No. I don't believe he was.
17    Q.   Do you recall if John Mastrianni was present?
18    A.   Yes, Mr. Mastrianni was there.
19    Q.   Do you recall if Henry Syskowski was present?
20    A.   I think Henry Syskowski was there, but don't hold me
21 to that one either because, like I say, I didn't really know
22 any of these people. I knew of Mr. Cassidy because he used to
23 get up at the podium at council meetings and say Jack Cassidy,
24 7 Florence Lane. But as for the rest of the candidates, no,
25 you know, I had no association with them prior to that.

### Page 61

1  you sit here today, do you know of any specific article or
2  newspaper that it was published in?
3    A.   As far as election things or as part of, you know,
4  just discrediting Mrs. Bergenty and the paper itself?
5    Q.   No. Articles that you believe establish that the
6  defendants filed a complaint with the SEEC to discredit or
7  penalize the paper?
8    A.   No, not that I recall right at this moment.
9    Q.   Now, in your complaint, you also alleged that the
10 defendants filed their complaint with the SEEC to penalize you
11 for associating yourself with the other plaintiffs in the
12 newspaper. Are you aware of that?
13   A.   Yes.
14   Q.   Can you tell me what the basis is for your claim
15 that that's the case?
16   A.   Well, just by the remarks. Like I say, the
17 continuing remarks by Mr. Pavano, the looks I get at functions
18 from the Willards. And the Willards stem back a long way with
19 a little animosity towards me, so –
20   Q.   Anything else?
21   A.   No.
22   Q.   Okay. Well, do you believe that William Petit filed
23 the complaint with the SEEC specifically to penalize you?
24   A.   Not penalize me personally, but because of my
25 association with the paper and Mrs. Bergenty.

### Page 62

1    Q.   Okay. So, if I understand you, then, you believe
2  that he filed the complaint with the intent to penalize you
3  for your association with the newspaper?
4    A.   I don't know what his intent was, to tell you the
5  truth. It's very strange because I always, you know, talked
6  to Mr. Petit and thought as another business person – we
7  served with the Chamber of Commerce and always thought things
8  were just fine.
9    Q.   So, it's your belief that he threatened to penalize
10 you?
11   A.   Yes.
12   Q.   And how about Patrick Ringrose?
13   A.   I never knew Mr. Ringrose.
14   Q.   Well, do you believe that Patrick Ringrose filed a
15 complaint with the SEEC to penalize you for your association
16 with the newspaper and the plaintiffs?
17   A.   I think Mr. Ringrose filed a complaint against me
18 because he knew I was against the school referendum.
19   Q.   Well, my question was limited to your allegation
20 that he filed the complaint to penalize you for associating
21 yourself with the other plaintiffs and the newspaper.
22   A.   Mr. Ringrose filed a complaint to penalize anybody
23 that went against that referendum for that school.
24   Q.   So, that's still not the question that I'm asking.
25 In your complaint, you alleged that the defendants, including

### Page 63

1  Patrick Ringrose, filed the complaint with the SEEC to
2  penalize you for your association personally with the
3  plaintiffs and the newspaper.
4    A.   If you mean by that did he file it because the
5  newspaper had a good control on what was printed about the
6  school referendum, then, yes, he went after me for that.
7    Q.   No. I'm asking you why you believe he was
8  attempting to penalize you. I mean, it says penalize you
9  personally specifically with your association with the other
10 plaintiffs and the newspaper, not including the school
11 referendum, just with regard to your association with the
12 newspaper and the other plaintiffs. Do you think –
13   A.   It would be with the newspaper. As far as the other
14 plaintiffs, I didn't know the other plaintiffs. So, he
15 couldn't have – if that's what he thought, that was his
16 thought, but I didn't know these other people.
17   Q.   No. Well, my question to you is based on your
18 allegation, do you believe he intended to penalize you
19 personally?
20   A.   No. I don't think he was going to penalize me
21 personally, but because of my association with the paper, he
22 was going to do anything he could to stop any arguments.
23   Q.   And you indicated that you didn't know William
24 Petit. Correct?
25   A.   I knew William Petit. He is a businessman in town.

### Page 64

1    Q.   No. But I mean you don't know him personally?
2    A.   Oh, I know him personally. I am not a social – I
3  have never been invited to his house.
4    Q.   Okay.
5    A.   But I know who he is and I, you know, served on the
6  Chamber of Commerce in different functions with him.
7    Q.   And how about Patrick Ringrose?
8    A.   Never met the man –
9    Q.   How about –
10   A.   – until after this.
11   Q.   Okay, how about Marliss Pavano?
12   A.   Never saw her except during election time.
13   Q.   And do you believe that Marliss Pavano filed a
14 complaint with the SEEC to penalize you yourself for your
15 association with the paper?
16   A.   Marliss, no.
17   MR. BARRANTE:   Can we take a short break right
18 now. It's about four o'clock. I just want to see if
19 Mrs. Taddy had come on the assumption that she didn't
20 get my message.
21
22      (A recess was taken)
23
24   MS. JORDAN:   Back on the record.
25   Q.   (By Ms. Jordan) Now, in your complaint you also

Page 65

1 alleged that the defendants, in filing the complaint with the
2 SEEC, resulted in an abuse of process. Are you aware that you
3 made that claim?
4    A.   Yes.
5    Q.   Can you tell me what the basis is for your complaint
6 that the filing of the complaint was an abuse of process?
7    A.   Well, there were so many people that signed it, it
8 was almost like a gang. And as far as filing it against me, I
9 still don't know what I did. So, I would have to say it was
10 an abuse of process. I'm not an attorney, thank God. You
11 guys are, because you are going to sort this all out.
12   Q.   But it's your belief that it was an abuse of process
13 because of the number of people who signed it?
14   A.   The number of people, and I felt as if I didn't do
15 anything. I still don't know if I did anything wrong. Well,
16 according to the SEEC, I didn't do anything, but they never
17 withdrew the charges. They just let it run its full course.
18   Q.   Now, at the time that you had your hearing before
19 the SEEC, did any of the defendants appear at the hearing
20 against you?
21   A.   I didn't have a hearing.
22   Q.   You didn't? Okay. Did you know if any of the
23 defendants offered any statements against you with the SEEC?
24   A.   No, I don't.
25   Q.   Do you know if any of the defendants offered any

Page 66

1 evidence against you?
2    A.   No, I don't. Just this.
3    Q.   So, it's just your belief by the number of people
4 who signed it and the fact that it was brought against you and
5 not withdrawn, that's your belief that there was an abuse of
6 process?
7    A.   Right.
8    Q.   Okay. Now, in your complaint, you also alleged that
9 each of the defendants acted willfully and maliciously against
10 you in filing the complaint with the SEEC. Are you aware of
11 that?
12   A.   Somewhat. I know that all of them – I really don't
13 think – maybe they did as a group file this because sometimes
14 people do things in mass that they wouldn't do alone. So, in
15 that way, yes, but I don't think that personally – Mrs.
16 Pavano knows me. I believe there is a Dean Rustic –
17   Q.   Well, why don't I make it easier. Why don't we go
18 through them so you're not guessing.
19   A.   All right. Go ahead.
20   Q.   Do you believe that William Petit filed the
21 complaint with some malice towards you personally?
22   A.   Yes.
23   Q.   He did. And what is that based on?
24   A.   Based on just the remarks after the filing of what
25 he said the night before election and after – since then.

Page 67

1    Q.   So, these are the remarks that you have heard?
2    A.   Yes, heard around.
3    Q.   From other people?
4    A.   Yeah, that he has made statements to other people.
5    Q.   So, nothing that you have heard personally?
6    A.   No, just what I was told.
7    Q.   So, it's based purely on the fact that you were told
8 he made these comments?
9    A.   Right.
10   Q.   And how about Patrick Ringrose, do you believe that
11 he filed the complaint with the SEEC against you with some
12 malice towards you?
13   A.   Yes. Only the fact that Mr. Ringrose being so for
14 the school and knowing that I was against the school.
15   Q.   And how do you know that he knew you were against
16 the school?
17   A.   Well, when you fly an airplane over and you hand out
18 pamphlets they are pretty well sure you did it.
19   Q.   But you indicated that handing out the pamphlets and
20 the plane banner was a year ago?
21   A.   That was a year ago, but at that time the
22 newspaper – we were accused of a lot of things, but I am
23 vocal – not standing up before a group, but I am vocal around
24 town just saying, you know, I thought the school was –
25 taxpayers couldn't afford it, and I don't mind saying it.

Page 68

1    Q.   Well, as you sit here today, do you know for a fact
2 that he knew that you were against the school?
3    A.   Yes.
4    Q.   Okay. And how do you know that?
5    A.   Well, I'm trying to think –
6
7        (Deposition continues with another court reporter)

Page 69

1  C E R T I F I C A T E
2
3   I, Christine E. Borrelli, a Notary Public and
4  Licensed Court Reporter for the State of Connecticut, do
5  hereby certify that the deposition of JEANNETTE HINKSON, was
6  taken before me pursuant to the Connecticut Practice Book at
7  the Law Offices of Howd & Ludorf, 65 Wethersfield Avenue,
8  Hartford, Connecticut, commencing at 2:40 p.m. on Tuesday,
9  June 29, 2004.
10  I futher certify that the witness was first sworn by
11  me to tell the truth, the whole truth, and nothing but the
12  truth, and was examined by counsel, and her testimony was
13  stenographically reported by me and subsequently transcribed
14  as herein before appears.
15  I further certify that I am not related to the
16  parties hereto or their counsel, and that I am not in any way
17  interested in the events of said cause.
18  Witness my hand this 6th day of July, 2004.
19
20
21
22
23  Christine E. Borrelli
    Notary Public
24  CT License No. 117
    My Commission Expires:
25  June 30, 2006


Page 70

1  CERTIFICATE OF DEPONENT
2
3
4   I, JEANNETTE HINKSON, have read the foregoing
5  transcript of the testimony given at the deposition on
6  Tuesday, June 29, 2004, and it is true and accurate to the
7  best of my knowledge and/or with the changes as noted in the
8  attached errata sheet.
9
10
11  Jeannette Hinkson
12
13
    Subscribed and sworn to before me this
14
15  day of                      , 2004.
16
17  Notary Public
18  My Commission Expires:
19
20
21  NO: 302CV1688 (CFD)
    JOHN J. CASSIDY, ET AL V. KATHRYN M. LAWSON, ET AL
22  JEANNETTE HINKSON (PM) JUNE 29, 2004
23
24  CB
25

# CASSIDY -V- LAWSON - JEANNETTE HINKSON - 6/29/04

## Page 71 to Page 211

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY: NIZIANKIEWICZ & MILLER

*NIZIANKIEWICZ & MILLER*
*972 Tolland St.*
*East Hartford, CT   06108-1533*
*Phone:   860-291-9191*
*FAX:   860-528-1972*

Page 71

```
 1            UNITED STATES DISTRICT COURT
                DISTRICT OF CONNECTICUT
 2  JOHN CASSIDY, ET AL      : NO.:  302CV1688(CFD)
                             :
 3  VS                       :
                             : JUNE 29, 2004
 4  KATHRYN M. LAWSON, ET AL.:
       CONTINUED DEPOSITION OF JEANNETTE HINKSON
 5  A P P E A R A N C E S:
       WILLIAM BARRANTE, ESQ.
 6         Attorneys for the Plaintiffs
           18 Cedar Street
 7         P.O. Box 1445
           New Britain, Connecticut 06050
 8     LITCHFIELD CAVO
           Attorneys for Kathryn Lawson
 9         40 Tower Lane, Suite 200
           Avon, Connecticut  06001
10     BY:  CHARLES E. VERMETTE, JR., ESQ.
11     SEGAL & LASKA
           Attorneys for Patrick Ringrose
12         63 East Main Street
13         Plainville, Connecticut 06062
14     BY:  KENNETH JOHN LASKA, ESQ.
15              (Continued)
16           REPORTED BY:
17             ROBERT MILLER
18        LICENSED SHORTHAND REPORTER
19             LICENSE NO. 10
20         NIZIANKIEWICZ & MILLER
21           REPORTING SERVICES
22            972 Tolland Street
23       East Hartford, Connecticut 06108
24         Telephone (860) 291-9191
25
```

Page 72

```
 1  A P P E A R A N C E S: (Continued)
 2  MURPHY AND KARPIE
 3  Attorneys for William Petit
 4  850 Fairfield Avenue, Suite 406
 5  Bridgeport, Connecticut 06604
 6  BY: KAREN L. KARPIE, ESQ.
 7  HOWD & LUDORF
 8  Attorneys for William Petit, Patrick,
 9  and Marliss Pavano
10  65 Wethersfield Avenue
11  Hartford, Connecticut 06114
12  BY: BEATRICE S. JORDAN, ESQ.
```

Page 73

1  ... Continued deposition of JEANNETTE
2  HINKSON, being of lawful age, held pursuant to Federal
3  Rules of Civil Procedure, before Robert Miller, a duly
4  qualified Notary Public, within and for the State of
5  Connecticut, held at the law offices of Howd & Ludorf,
6  65 Wethersfield Avenue, Hartford, Connecticut, on
7  June 29, 2004, at 4:40 p.m.

9  S T I P U L A T I O N S
10  IT IS HEREBY stipulated and agreed by and
11  among counsel for the respective parties that all
12  formalities in connection with the taking of this
13  deposition, including time, place, sufficiency of
14  notice, and the authority of the officer before whom
15  it is being taken may be and are hereby waived.
16  IT IS further stipulated and agreed that
17  objections other than as to form are reserved to the
18  time of trial.
19  IT IS further stipulated that the proof of
20  the qualifications of the Notary Public before whom
21  the deposition is being taken is hereby waived.
22  IT IS further stipulated and agreed that
23  the reading and signing of said deposition by the
24  witness is hereby waived.

Page 74

1  J E A N N E T T E  H I N K S O N,
2  called as a witness, having been
3  previously duly sworn to tell the
4  truth, the whole truth and nothing
5  but the truth, testified as follows:

7  CONTINUED DIRECT EXAMINATION BY MS. JORDAN:
8      Q    A few moments ago you indicated that you
9  believed Patrick Ringrose filed the SEEC complaint
10  against you with malicious intent, right?
11     A    Right.
12     Q    You also indicated that your belief is
13  based on the fact that you're against the Linden
14  Street School project, correct?
15     A    Correct.
16     Q    Before we broke you indicated that you knew
17  for a fact that Patrick Ringrose knew you were against
18  the Linden Street School project, correct?
19     A    Correct.
20     Q    And I was asking you for your basis for
21  your claim he, in fact, knew that?
22     A    I didn't know it prior to the charges, but
23  after the charges it was very well-known that he knew
24  I was against it. Because I had said it at meetings.
25     Q    Do you know if he knew you were against the

Page 79

Q That is based on the comments you indicated earlier today?
A Yes.
Q And what about Barbara Willard, do you believe she filed a complaint against you with a malice towards you personally?
A Yes.
Q And what's that based on?
A It goes back many, many years.
Q Can you explain?
A Both Gary and Barbara Willard were president and treasurer of the – of PARC. Plainville Association for Retarded Citizens back approximately I would have to say ten years ago. Gary and Barbara Willard decided to remove all the services from the retarded children because it was going to then become a profit-making organization and they sent out letters to all the parents, unless they could pay $1,800 a year for their child – when I say child I don't really mean children. These are adults over 21 that would ride the association bus back and forth to their place of work. When they stopped this service, a lot of the parents called me, said my god, we don't have $1,800. You are talking senior citizens, so on so

Page 80

forth. So what can we do. Most people do not know the retarded children. I don't believe the Willards know when you're over 18 unless you hold that position where you work with the – you know, you're put into that slot with the State of Connecticut, you will lose all your benefits. You will lose your medical. You have got to go to that job or to that workshop. And if you stop the transportation, that bus was their legs.
At that time I contacted the Connecticut Association for Retarded Citizens. They helped me. We formed a new group which is called ARC of Plainville. Within 14 hours we had a van on the road. Then a large company in our town, I contacted them, a big contractor. They donated a van to use. In the meantime, I used my van and we got a van on the road and that van is still going to this day.
But the Willards have never forgiven me for that because I opened the service for these kids. The animosity is there. You asked me how I know this. When you get the looks, the stares and turning away. So I think when the opportunity came up this time it was payback time. And I think that is why the Willards were very happy to see my name that they could do something with.

Page 81

Q And that is your belief with regard to both Barbara and Gary Willard?
A Absolutely.
Q In your complaint you also allege that three of the defendants, William Petit, Patrick Ringrose and Marliss Pavano, filed the complaint with the SEEC in their capacity as public officials for the Town of Plainville. Are you aware of that?
A I am aware they filed the complaint using their titles as public officials.
Q Okay.
A But – there is a – but to that I do not believe the Town of Plainville sanctioned them to use their title as public officials. I believe everyone that filed the charges used the title to kind of show credibility for themselves as some titled official. I know the town didn't sanction that.
Q So, if I understand your testimony, you don't believe they were acting in their official capacity as public officers?
A No.
Q It is your belief they simply signed with their title?
A Signed with their title.

Page 82

Q Now, can you explain for me what damages or injuries you are claiming to have suffered as a result of this incident?
A Other than losing time from my business to have to go to Hartford to retain an attorney, give depositions which my business has had to suffer. Monetarily I can't tell you how many people didn't buy merchandise because they sympathize with them. Or the remarks I was involved in some criminal act along with my good friend, Ms. Bergenty. That is another remark. You must have done something, the state is investigating you. Other than that which when you have a stroke or a heart attack this cannot be a proven thing because you don't know what caused it. But I have always been a very healthy and strong person until after this. To have a doctor swear this heart attack or this stroke was caused by this, you can't – no one knows what this is caused by, but I know how I felt. I know I can't face people anymore.
  MS. JORDAN: Could you read back the response when she was talking about the business suffering.
  (At which time the Reporter

### Page 91

1  A   Other than being branded possibly a
2  troublemaker.
3  Q   Who branded you a troublemaker?
4  A   Most recent or back then?
5  Q   Since –
6  A   How about Joe Lieberman.
7  Q   Has anyone in the community that you know
8  of told you that they now believe you're a
9  troublemaker?
10  A   Well – yeah. I guess everybody says that.
11  Other than Mr. Pavano I am going to get even.
12  Q   When you say everybody says that who's told
13  you that your reputation is damaged?
14  A   Well, like I said, Mr. Lieberman said he
15  read it in the paper.
16  Q   Did he tell you he had a negative view of
17  your reputation?
18  A   No, it was more of a joking kind of thing.
19  Q   My question is has anyone told you that
20  they believe your reputation has been damaged?
21  A   Not that they would dare walk up and say
22  it.
23  Q   So, no one has said that to you?
24  A   No, but it is a feeling.
25  Q   Okay. I would like you to take a look

### Page 92

1  at –
2  A   Can I clarify something?
3  Q   Yes.
4  A   When I say me and like Mr. Lieberman said
5  this, I said what do you mean by that. He said oh, I
6  read the papers. So if Joe Lieberman can read the
7  paper and read this in when he's introduced to me and
8  I never met the man before, how far does that go?
9  That was quite a statement. I couldn't believe that
10  the man said that. He said I read the papers. Where
11  did he read this?
12  Q   But as you sit here, you can't think of a
13  single person who has told you their view of you has
14  changed as a result –
15  A   Not changed, but a man I never met before
16  comes up with the statement. You know which really
17  shocked me.
18  Q   You said you thought that was more in a
19  joking manner?
20  A   It was in a joking manner, but the crux of
21  the statement was there. How did he ever get this?
22  It's not somebody I chum around with.
23  Q   Now, you're also alleging that the
24  defendants threatened you with regard to your – the
25  exercise of your right to publish items in the paper.

### Page 93

1  Are you aware of that?
2  A   Yes.
3  Q   Can you tell me how the defendants have
4  threatened your right to publish things in the paper?
5  A   By filing this action.
6  Q   What about filing this action has
7  threatened you?
8  A   I would certainly never put anything in the
9  political part of a paper again. In fact, we don't
10  publish anything political anymore as far as political
11  ads paid for. We don't touch them. Anything I write
12  in the paper, any column I write, I run it through my
13  attorney before it is published.
14  Q   But you're still publishing items in the
15  paper, your column specifically?
16  A   Yes.
17  Q   It hasn't prevented you from continuing
18  publication of your columns?
19  A   Prevented me from publishing anything that
20  would be for the paper to put an ad in. We don't do
21  any more advertising for someone who's running for
22  office whether they are from any party, we don't. I
23  don't do that anymore.
24  Q   You indicated that you – if I remember
25  correctly, you indicated a little earlier in your

### Page 94

1  testimony you generally didn't do any work with ads
2  except the bakery ad and that one announcement that is
3  the only time you have done that?
4  A   Right.
5  Q   Now, you also indicated earlier you're very
6  vocal as to your position on things. Do you recall
7  that?
8  A   Yes.
9  Q   Are you still vocal about your position and
10  express your position?
11  A   Yes, I am.
12  Q   So this incident hasn't prevented you from
13  speaking your mind on issues?
14  A   I didn't say anything for probably a year
15  and a half or two years after this incident. Until I
16  then spoke with my attorney and asked him can I do
17  this. Can I do that. Am I going to get in trouble
18  again.
19  Q   But you now feel like you can freely speak
20  about your position?
21  A   I don't freely speak.
22  Q   You do speak on your position on issues?
23  A   Only after I contact my attorney and fax
24  him everything I write.
25  Q   But you do so?

### Page 123

1  went with the ads because Mrs. Stafkovich, the
2  bookkeeper, put the ad and copied the check on the
3  back of it.
4      Q    All right. Looking through the ads that
5  are attached to that complaint or the portions of the
6  newspaper, do you recall whether or not anyone
7  submitted any one of those ads to you either at the
8  store or –
9      A    Not to me. No. Not to me personally.
10     Q    Did you help in the layout of that
11 particular edition when the ads appeared?
12     A    I helped with the layout, but not the ads,
13 these. Not the political part.
14     Q    You mean the content?
15     A    Not just the content, but even putting them
16 in the paper. In other words, there is 42 pages of
17 paper. There could be, like I say – the ad part was
18 not my thing. The stories about, you know, the police
19 and the fire department and all. If I did anything
20 with the paper, the pictures and little story unit, if
21 I wasn't typing it out and passed on to one of the
22 kids that typed or some of the women that came in.
23     Q    And this Defendant's Exhibit One, which is
24 marked at your deposition today, that is the ad that
25 you put into the paper and paid for; is that right?

### Page 124

1      A    Yes.
2      Q    And is that a part of the complaint that
3  was made by the defendants to the SEEC?
4      A    Evidently because that is what came to me.
5  That I was charged along with everybody else.
6      Q    But do you see that as part of the
7  complaint, your ad?
8      A    No, I don't see that listed here.
9      Q    You're looking at Exhibit B which lists the
10 specific potential violations of law?
11     A    Right.
12     Q    Your ad is not among them?
13     A    It's not among them, but it is on the
14 complaint to the election enforcement which that is
15 what I got a letter regarding, I was being charged
16 along with everybody else that ran an ad.
17     Q    Are you referring to a letter that you got
18 from the Election Commission?
19     A    Yes. Saying that Kathryn Lawson and these
20 people were charging me along with everybody else.
21 That is why when I called the state and discussed this
22 with them, you know, I was in the mix.
23     Q    All right. Is this a copy of the letter
24 you got from the state regarding the complaint?
25     A    Yes. Then it says, "Ms. Hinkson, this is

### Page 125

1  to inform you that Mrs. Kathryn Lawson has filed a
2  complaint against you for alleged violations of
3  Connecticut General Statutes Section 9-33(d),
4  9-33(f), 9-33(w).
5      Q    That is from the state, though; is that
6  right?
7      A    Yes.
8      Q    Did you ever see any complaint that the
9  defendants filed that included you by name?
10     A    The only letter I have was another letter
11 from the state. I don't have it. That said that the
12 state said that these people had made the charges
13 against me. And that was from Mr. Blumenthal's office
14 that said that.
15     Q    So, there is another letter other than this
16 one that I just showed you.
17     MS. KARPIE:    Why don't we have this
18 marked.
19          (At which time the Letter
20 referred to was marked Defendant's
21 Exhibit Three for Identification.)
22
23 BY MS. KARPIE:
24     Q    Looking at Exhibit One a copy of your ad.
25     A    It's not an ad. It is a public service

### Page 126

1  announcement.
2      Q    That indicates you wrote it?
3      A    No.
4      Q    In fact, it said it was paid for by Someone
5  Who Cares?
6      A    Yes.
7      Q    Do you have any knowledge as to whether any
8  one of the defendants knew you had written that
9  particular ad or public service announcement, whatever
10 you want to call it?
11     A    The rest of the candidates. The rest of
12 these people in there, the Cassidys, all those people.
13 Is this who we are talking about?
14     Q    What I am asking you if you know whether
15 the people you have sued in this lawsuit, the
16 defendants?
17     A    Knew that I put that in?
18     Q    Yes.
19     A    Well, I assume that the Election
20 Enforcement Commission must have told them.
21     Q    And how would they have found that out, the
22 Election Enforcement Commission?
23     A    I told the Election Enforcement Commission.
24 I went before them, told them I did that.
25     Q    Until you told the Election Enforcement

### Page 135

1  that appeared in the Hometown Connection?
2  A    No. No violations.
3  Q    What's your understanding as to what
4  happened to the complaints with respect to lack of
5  addresses by individual petitioning candidates?
6  A    They just said don't do that or whatever.
7  Q    But there was a finding made that the law
8  required addresses?
9  A    Right.
10 Q    And that the law was violated; is that
11 right?
12 A    There were some findings made that the law
13 was violated, but it wasn't – there was no fines
14 imposed. There were no slaps on the wrist. They were
15 don't you ever do that. No scolding.
16 Q    Weren't the people told not to do it again,
17 run an ad without an address?
18 A    They were told if they ever ran again you
19 should put your address on it.
20 Q    Did the Hometown Connection run any
21 political ads after the 2001 election?
22 A    No, Ma'am.
23 Q    There was a conscious decision made not to?
24 A    Absolutely.
25 Q    That was you and Helen?

### Page 136

1  A    It was a consensus among all of us we would
2  never want to go through this again.
3  Q    Who else. Who do you mean?
4  A    Everybody that worked on the paper. I will
5  furnish you with a list of everybody, everybody that
6  attends the meeting.
7  Q    Who goes to the meeting?
8  A    Yes.
9  Q    Can anyone go?
10 A    Yes.
11 Q    Have you ever told anyone not to come?
12 A    No.
13 MS. KARPIE:    I don't have
14 anything further.
15
16 CROSS EXAMINATION BY MR. VERMETTE:
17 Q    Good afternoon. I am Chip Vermette. I
18 represent Kate Lawson. I have some questions for you.
19 When the complaint was signed by the ten
20 individuals who signed it, did any of those defendants
21 know that you had paid for the Someone Who Cares
22 announcement?
23 A    I don't think so.
24 Q    How about when that complaint was filed
25 with the SEEC, did any of the defendants know that you

### Page 137

1  had paid for the Someone Who Cares announcement?
2  A    No.
3  Q    You said it would be very easy to find out
4  when the Hometown Connection's November 2001 issue was
5  first available to a member of the general public.
6  How would you go about doing that?
7  A    I would probably call the printer and find
8  out when it was sent to the post office because that
9  would be the first step. And then – not the post
10 office, to the labeling company. Then the labeling
11 company would have then – it usually takes a day or
12 so to send it up to the Plainville post office.
13 Q    What's the typical number of days for an
14 edition to be available to the public from the time it
15 leaves your office?
16 A    From the time it leaves my office at that
17 time was probably about three or four days.
18 Q    And you don't know as you sit here today
19 what day the paper left your office back in November
20 of 2001?
21 A    No, I don't.
22 Q    Where do the Balbonis pick up the paper to
23 be publicly displayed?
24 A    At the Plainville post office.
25 Q    Okay. Those papers wouldn't have labels on

### Page 138

1  them, would they?
2  A    No.
3  Q    So, a set of papers went to the labeling
4  company without any labels being put on them?
5  A    Yes.
6  Q    Then they went to the post office?
7  A    Yes.
8  Q    Then the Balbonis would pick them up?
9  A    Yes.
10 Q    How would they know they were to be picked
11 up?
12 A    That was their job. We would say the
13 papers was going to the post office this morning.
14 Q    How would you learn that?
15 A    Usually the labeling company would call us.
16 Q    Say we are done with the labeling, they are
17 at the post office?
18 A    Yes. We would meet them at the post office
19 with a check.
20 Q    Would that check be dated?
21 A    Yes.
22 Q    The day you pick them up or paid for them?
23 A    Yes.
24 Q    You have access to those checks?
25 A    Yes.

Page 139

1  Q   Can we request you get a copy of that check
2  for the November 2001 edition?
3  A   Sure.
4  Q   Is it possible that the November 2001
5  edition was available for public reading on
6  November 1, 2001?
7  A   It is conceivable that they could have
8  gotten to the post office. If they got there – I
9  don't know. That would have been awful short. Really
10 short. But I can't say that it absolutely can't
11 happen. You can't say never on anything. But I can
12 check on that and find out when they actually got to
13 the post office. We have never even thought about it
14 other than what transpired prior to that. It is just
15 getting the form. Getting the form and filling it out
16 for the 1st of November. Somebody had to call a
17 meeting, hold a meeting that everybody had to sign
18 this. It's not that the paper got there on the 1st.
19 Even if it got there on the 1st somebody had to read
20 this and say oh, we are going to have a meeting. You
21 follow what I am saying?
22 Q   Not really, but –
23 A   I am saying if this – to get a form from
24 the state saying there was a violation. And getting
25 this form, holding a meeting with ten people and say

Page 140

1  oh, look what they did. Look at the paper. If they
2  held it at night getting that paper there and holding
3  the meeting, the time isn't there. But knowing it and
4  then waiting for the paper to come, having this all
5  signed and set to go that is a possibility.
6  Q   What I don't understand how the timing of
7  that changes the content of any of the ads?
8  A   It doesn't change the contents of the ads
9  other than if somebody had prior knowledge as to what
10 the ad was and said oh, you people forgot to put in
11 the address or the candidates forgot to put in their
12 address. Maybe like being a nice guy saying that is
13 against the law because we certainly didn't even think
14 of it as being against the law.
15 Q   So, is that your contention with the timing
16 of this that if somebody had advance knowledge of an
17 ad that was going to appear in the paper without
18 proper attribution of the candidates that person
19 should have come to the candidates?
20 A   It would have been nice. Rather than
21 knowing they would have a charge to file.
22 Q   Okay. Do you acknowledge that members of
23 the general public have a right to provide information
24 to the SEEC?
25 A   Yes.

Page 141

1  Q   If they think they have information they
2  can provide that information to the Commission?
3  A   Yes.
4  Q   It is up to the Commission to investigate?
5  A   Yes.
6  Q   It is up to the Commission to decide to
7  proceed to a hearing or drop a matter that is
8  presented to it?
9  A   They have the right.
10 Q   Okay.
11 A   But, on the other hand, if the person that
12 files the charge then finds the charges they filed
13 against someone are not valid shouldn't they drop the
14 charges?
15 Q   Let me back up. We still haven't
16 established that any of the defendants filed any
17 charges against you. What is your basis for saying
18 that?
19 A   The letter from the EEC (sic).
20 Q   Have you ever seen a complaint that has
21 your name in it?
22 A   Other than what came from the EEC.
23 Q   What complaint has your name in it?
24 A   This one here.
25 Q   If you could just identify the document.

Page 142

1  MR. BARRANTE:   Hinkson Number
2  Three.
3  Q   That is the November 13, 2001, letter?
4  A   Yes.
5  Q   That is a letter. I am asking if you have
6  ever seen an actual complaint with your name in it?
7  A   That is as close to a complaint as I can
8  get when the EEC says Ms. Lawson has filed a complaint
9  against me.
10 Q   That is a letter which refers to a
11 complaint; is that correct?
12 A   Uh-huh.
13 Q   It doesn't say I have enclosed a copy of
14 the letter of complaint and a copy of the letter sent
15 to Ms. Lawson acknowledging receipt of her complaint.
16 A   Nope.
17 Q   It doesn't say that at the bottom of your
18 letter?
19 A   She must have filed a complaint if the EEC
20 says that they acknowledged receipt of her complaint.
21 Q   Fair enough. I am just trying to establish
22 that piece of paper is a letter, not a complaint.
23 A   It acknowledges the EEC has a copy of her
24 complaint.
25 Q   That letter refers to a complaint?

### Page 143

1  A   Okay.
2  Q   Have you ever seen that complaint that has
3  your name in it?
4  A   No.
5  Q   And the complaint that we have here signed
6  by ten individuals does not have your name in it?
7  A   No.
8  Q   Getting back to what you mentioned a little
9  while ago. You said that once any of the complainants
10 found out there was no basis for any charges against
11 you those charges should have been withdrawn?
12 A   Right.
13 Q   But you can't put your fingers on any
14 complaint that brought any charges against you?
15 A   Other than this letter saying that the EEC
16 had one which they didn't forward to me.
17 Q   You didn't get a copy of any attachment to
18 that letter?
19 A   No.
20 Q   You never saw a copy of –
21 A   This one here.
22 Q   That one?
23 A   I saw this one.
24 Q   Plaintiff's One?
25 A   This didn't come with this.

### Page 144

1  Q   You didn't get any attachment with that
2  letter?
3  A   No.
4  Q   How did you know what Mr. Oyola was talking
5  about?
6  A   I knew of this one.
7  Q   How did you know about this?
8  A   It came to Ms. Bergenty. Ms. Bergenty said
9  look at this. Next thing I know I get this. I am
10 drawn into it.
11 Q   So, you did see the June 23, 2001, Exhibit
12 One?
13 A   Yes, I saw it.
14 Q   Is that the only complaint you saw signed
15 by these ten individuals about the November 2001
16 Hometown Connection?
17 A   No.
18 Q   Your name is not listed in the complaint?
19 A   No.
20 Q   When you got the letter from Mr. Oyola,
21 nobody filed a complaint against you. Your name is
22 not in it?
23 A   I called Mr. Oyola, I asked him. That's
24 when he said I was going to jail and get a two
25 thousand dollar fine.

### Page 145

1  Q   You didn't say my name isn't in here?
2  A   I have to believe this man who is in power.
3  Then I get this and I am going to jail for a year. I
4  am not an attorney. I didn't have an attorney at the
5  time. And I am saying where do I go from here. All I
6  do is sell some wicker and volunteer at a newspaper.
7  The only thing Mrs. Lawson who I never met these
8  people have a case against me. For what I don't know.
9  Q   That is what I am trying to find out. What
10 is your basis for saying Mrs. Lawson or anybody else
11 filed a complaint against you?
12 A   This letter.
13 Q   This is it?
14 A   Yes.
15 Q   That document, Exhibit Three?
16 A   And I had to go to the election
17 enforcement, present all these facts, say what I had
18 put in the paper.
19 Q   When did any of the defendants learn that
20 you had paid for the Someone Who Cares announcement?
21 A   I assume the Election Enforcement
22 Commission notified them.
23 Q   What is the basis for that assumption?
24 A   Because then in February they found me –
25 that I didn't do anything.

### Page 146

1  Q   What is the basis for your assumption that
2  any of the defendants found out that you had paid for
3  the Someone Who Cares announcement?
4  A   Because they cleared me of it. They must
5  have told these people there was nothing more that
6  they could do to me.
7  Q   Is it your position the first time any of
8  the defendants learned you were the one who paid for
9  the Someone Who Cares announcement was after the SEEC
10 had issued its ruling?
11 A   No, I think they knew before that.
12 Q   How did they know?
13 A   I don't know. All I know when I went
14 around town to any coffee shop hey, your paper did
15 something. They are going to get you.
16 Q   What I am specifically asking you what this
17 line of questioning has to do when any of the
18 defendants learned you were the one who paid for the
19 Someone Who Cares announcement?
20 A   I wasn't in their mailbox. I don't know if
21 they got a letter or when they got a letter. All I
22 know is this was the letter I got saying that I was
23 being charged. I can't tell you any different than
24 that.
25 Q   Can you tell me whether any of the

### Page 147

1 defendants ever learned you paid for the Someone Who
2 Cares announcement?
3    A    No.
4    Q    All right. And without being able to tell
5 me that, how do you support your position that any of
6 the defendants should have withdrawn any charges with
7 regard to the Someone Who Cares announcement?
8    A    Well, it stands to reason I don't think the
9 state agency is going to come after me unless there is
10 some charges filed.
11   Q    You were the one who told the state agency
12 you were the one who paid for the Someone Who Cares
13 announcement?
14   A    I went up there. They asked who put the
15 ads in and asked for the ads. Next thing I know I get
16 this letter I had to go up there prior to November 13.
17 Now, is this a copy of the letter that was received
18 from the state?
19   Q    I just want an answer to my question as to
20 how – it was you who informed the state Election
21 Commission that you had paid for the Someone Who Cares
22 announcement?
23   A    Right.
24   Q    You don't know whether any of the
25 defendants ever learned of that?

### Page 148

1    A    No.
2    Q    Okay. And yet you maintained that the
3 defendants should have somehow notified the Election
4 Commission that the charges against whoever paid for
5 that ad should be withdrawn. What is the basis for
6 your being able to say that?
7    A    The basis is did the Election Enforcement
8 Commission make this up and file the charges for
9 Ms. Lawson? By this letter Ms. Lawson somehow filed
10 the charges. So if Ms. Lawson filed the charges then
11 she – she figured I wrote something. My name isn't
12 in there. Did the state do this then? Is this what
13 you're saying?
14   Q    No, Ma'am. You're saying the defendants,
15 the ten people who signed the SEEC complaint should
16 have withdrawn the charges against you. I am trying
17 to explore your basis for that assessment. How do you
18 come to that conclusion if they didn't know it was
19 you?
20   A    Yes.
21   Q    And you have no basis to know they ever
22 found out it was you. And those charges were
23 ultimately dismissed by the State. When did they
24 possess any information that should have led them to
25 withdraw those charges?

### Page 149

1    A    I have no idea.
2    Q    Okay. Didn't you advise the state Election
3 Enforcement Commission on November 7, 2001, you were
4 responsible for that ad?
5    A    Did I – back on November 7 I must have
6 talked to Mr. Oyola and told him that I had done this.
7 That I had put that in. There was no secret. I
8 wasn't ashamed of the thing and sent him a copy of the
9 letter.
10   Q    That is how the state learned you were the
11 one who paid for the Someone Who Cares announcement?
12   A    Yes. They wanted copies of all the ads and
13 who put them in.
14   Q    If you could hand that to the court
15 reporter so he could mark that, please.
16       (At which time the Letter
17       referred to was marked Defendant's
18       Exhibit Four for Identification.)
19
20 BY MR. VERMETTE:
21   Q    Ma'am, I will show you what we have now had
22 marked for identification as Defendant's Exhibit Four
23 for your deposition today. Is that your signature
24 that appears on the copy of that document?
25   A    Yes.

### Page 150

1    Q    Thank you. You indicated that your
2 decision to file suit was because it didn't stop and
3 there were a series of questions after that about what
4 didn't stop. You were talking about the statements
5 being made around town. Were such statements ever
6 made by Kate Lawson, to your knowledge?
7    A    No.
8    Q    And you felt the statements that were being
9 made around town weren't going to stop and that led to
10 your decision to file a lawsuit?
11   A    Yes.
12   Q    Why did you file a lawsuit against
13 Kate Lawson if she wasn't making any statements?
14   A    Kate Lawson was the one I received this
15 letter from the EEC, said that Kate Lawson had filed a
16 complaint against me. So –
17   Q    That wasn't a reason you had given earlier
18 for filing a lawsuit. You said you filed a lawsuit
19 because the statements weren't going to stop?
20   A    Kate Lawson was part of the overall thing.
21 In other words, John Cassidy is part of that even
22 though it had nothing to do with John Cassidy.
23 Everything seems to go Cassidy and Lawson.
24   Q    Because her name is first on the list?
25   A    Yes.

Page 207

1  Q  You printed an article in the Hometown
2  Connection signed J. Chapman not indicating it was
3  Lana Chapman Petit, correct?
4  A  It was J. Chapman. He wrote a letter to
5  the editor. I don't even remember what it was about.
6  Q  Did you have it printed and signed
7  J. Chapman to mislead the public so the public
8  wouldn't know it was Lana Chapman?
9  A  That has been J. Chapman's for his place of
10  employment.
11  Q  You didn't put an address to differentiate
12  from Lana Chapman, correct?
13  A  I didn't –
14  Q  You didn't put an address there to
15  differentiate from Lana Chapman, correct?
16  A  No. We don't put addresses under it
17  because we have home addresses rarely – I can't even
18  answer this for sure, but we put Plainville because
19  they are from Plainville. We just put the person's
20  name.
21  Q  Thank you.
22  A  You're welcome.
23  MS. JORDAN:  I will have them
24  copied for everyone.
25  (At 7:50 p.m. the Deposition

Page 208

1  concluded.)

Page 209

1  STATE OF CONNECTICUT)
   ) ss:
2  COUNTY OF HARTFORD )
3  I, Robert Miller, a Notary Public, do
4  hereby certify that JEANNETTE HINKSON was by me first
5  duly sworn, to testify the truth, the whole truth, and
6  nothing but the truth, and that the above deposition,
7  was recorded stenographically pursuant to Notice by me
8  and reduced to typewriting by me.
9  I FURTHER CERTIFY that the foregoing
10  transcript of the said deposition is a true and
11  correct transcript of the testimony given by the said
12  witness at the time and place specified hereinbefore.
13  I FURTHER CERTIFY that I am not a relative
14  or employee or attorney or counsel of any of the
15  parties, nor a relative or employee of such attorney
16  or counsel, or financially interested directly or
17  indirectly in this action.
18  IN WITNESS WHEREOF, I have hereunto set my
19  hand and seal of office at East Hartford, Connecticut,
20  this day of , 2004.
21
22
23
   (SEAL)
24  Robert Miller, Notary Public
25  My Notary Commission Expires
   April 30, 2005

Page 210

1  C E R T I F I C A T I O N  O F  D E P O N E N T
2
3
4  I, Jeannette Hinkson, have read the
   foregoing transcript of the testimony given at the
5
6  deposition held on June 29, 2004, and it is true and
7  accurate to the best of my knowledge as originally
8  transcribed or with the changes as noted on the
   attached Errata Sheet.
9
10
11
12  JEANNETTE HINKSON
   (Signature of Deponent)
13
14
15  Subscribed and sworn to before me
16  this day of , 2004.
17
18
   Notary Public
19
20
   My Commission Expires:
21
22
23
24
25