**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**


JOHN J. CASSIDY, ET. AL.   :   CIVIL ACTION NO. 3:02CV1688 (CFD)
           :
  v.        :
           :
KATHRYN M. LAWSON, ET. AL.  :   SEPTEMBER 1, 2004


**AMICUS CURIAE BRIEF OF STATE ELECTIONS ENFORCEMENT COMMISSION**
**IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

   Months of discovery have only confirmed, at considerable expense, what was obvious from the start of this case – that this is a classic "strategic lawsuit against public participation," or "SLAPP" suit, in which individuals who appropriately reported suspected violations of state law to the proper governmental authority have found themselves slapped with a burdensome, totally meritless, retaliatory lawsuit by those who were the subject of the complaints.

   Specifically, this case involves citizens of the Town of Plainville, who complained to the State Elections Enforcement Commission (the "Commission") that certain candidates for public office and their supporters were violating the state election laws. When the Commission concluded that the political advertisements of three out of four candidates in question had, in fact, violated state law, the plaintiffs chose not to appeal the Commission's ruling, but rather to make an end run around the entire administrative process and file a retaliatory suit directly against the complainants. Because such conduct is an intimidation tactic, that effectively discourages individual citizens from reporting violations of state law and publicly participating in governmental processes out of fear that they will be sued, it should not be tolerated by this Court. This is especially true in a case such as this, in which the plaintiffs' claims, as discussed

in detail in the defendants' briefs, have no merit whatsoever as a matter of law. Accordingly, as the governmental agency that oversees the administration of the state election laws with a strong interest in ensuring that citizens freely report suspected violations of those laws, the Commission urges this Court to grant the defendants' motions for summary judgment.

## STATEMENT OF FACTS

The plaintiffs are five individuals, all of whom published or distributed election related materials in connection with the November, 2001, municipal election in the Town of Plainville and three of whom -- John Cassidy, William Cunningham, and Henry Syskowski, Jr. – were candidates for the Plainville Town Council in that election. (Second Amended Complaint, First Count, ¶ 14, 16; Third Count ¶ 6; Fourth Count ¶ 15; Seventh Count ¶ 14, 16).

In their eight count Second Amended Complaint,[1] the plaintiffs claim that the defendant individuals, during the course of the November, 2001 election, violated the plaintiffs' common law and constitutional rights by filing complaints against them with the State Elections Enforcement Commission.

Specifically, the plaintiffs claim in Counts One, Two, Seven and Eight of their Complaint that the defendants improperly filed a complaint with the Commission after Messrs. Cassidy, Cunningham and Syskowski, who were candidates for the Plainville Town Council, failed to include their addresses in political advertisements that they published in a monthly newspaper

---

[1] The plaintiffs have filed two motions seeking to amend their Second Amended Complaint. The first of these motions, dated October 27, 2003, sought to add the Commission as a defendant. The second motion, dated June 25, 2004, sought to add the Commission's Executive Director, Jeffrey Garfield, as a defendant and to file a Substitute Third Amended Complaint. The Court denied the first motion on August 30, 2004, and has not ruled on the second motion. Accordingly, the Second Amended Complaint is the relevant document for purposes of the defendants' motions for summary judgment.

during their campaigns. (Second Amended Complaint, First Count, ¶ 19; Second Count ¶¶ 14, 19; Seventh Count ¶ 19; Eighth Count ¶¶ 14, 19).[2] Although the Commission found that the candidates' failure to include their addresses violated Conn. Gen. Stat. § 9-333w, the plaintiffs claim that by filing the complaints, the defendants engaged in an abuse of process and violated the plaintiffs' First and Fourteenth Amendment rights. (Second Amended Complaint, First Count ¶ 24; Second Count ¶ 25; Seventh Count, ¶ 26; Eighth Count, ¶ 27).

In Counts Four, Five and Six, the plaintiffs claim that the defendants improperly filed a complaint with the Commission alleging violations of the state election laws after plaintiff Jeannette Hinkson published a political notice in a local newspaper concerning the November, 2001 election. Because the Commission concluded that Ms. Hinkson had not violated state law, the plaintiffs accuse the defendants of abuse of process, malicious prosecution, and violation of the plaintiffs' First Amendment rights. (Second Amended Complaint, Fourth Count, ¶ 25; Fifth Count ¶ 25; Sixth Count ¶ 26).

---

[2] Although the plaintiffs claim in their Second Amended Complaint that (1) there is no statute that requires them to publish their addresses and (2) any such statute, if it did exist, would violate their First Amendment rights, both statements are incorrect. Conn. Gen. Stat. § 9-333w(a) explicitly requires candidates for political office to include their addresses in any communications promoting their candidacies. Specifically, § 9-333w(a) states that: "[N]o candidate . . . shall make or incur any expenditure for any written, typed or other printed communication which promotes the success or defeat of any candidate's campaign for nomination at a primary or election . . . unless such communication bears upon its face the words 'paid for by' and the following: (1) In the case of such an individual, the name **and address** of such individual . . . ." Conn. Gen. Stat. § 9-333w(a)(emphasis added). Furthermore, the Connecticut Supreme Court explicitly held in <u>Seymour v. Elections Enforcement Commission</u>, 255 Conn. 78, 762 A.2d 880 (2000), <u>cert</u>. <u>denied</u>, 533 U.S. 931 (2001), that § 9-333w(a) did not violate the First Amendment and the address requirement served the legitimate government purpose of further identifying the candidate as the source of the communication.

Finally, in the only count of the Complaint that does not involve the Commission, the plaintiffs claim that defendant Daniel Ciesielski engaged in libel by stating in a newspaper interview that plaintiff John Mastrianni was spreading incorrect information about a school project that was the subject of a November, 2001 referendum. (Second Amended Complaint, Third Count, ¶¶ 9-10). By way of relief, the plaintiffs are seeking compensatory and punitive damages and attorneys' fees. (Second Amended Complaint, Eighth Count, ¶ 30).

## ARGUMENT[3]

I.    **THIS IS A "SLAPP" SUIT THAT SEEKS TO PUNISH INDIVIDUALS FOR PROPERLY REPORTING SUSPECTED ELECTION LAW VIOLATIONS TO THE APPROPRIATE GOVERNMENTAL AGENCY AND SHOULD NOT BE SANCTIONED BY THIS COURT**

As the discovery process has confirmed, this is an utterly meritless lawsuit. The plaintiffs have failed to state a claim for violation of state or federal law, and all of the plaintiffs' claims are barred by absolute immunity. See Defendants' Memoranda in Support of Motion for Summary Judgment. In short, this case is totally devoid of any legal merit whatsoever. Its sole function is to punish the defendant individuals for having lawfully reported apparent violations of state election law to the appropriate government agency. In other words, this is a SLAPP suit.

As described by the Connecticut Appellate Court, "[t]he distinctive elements of a SLAPP suit are (1) a civil complaint (2) filed against a nongovernment individual (3) because of their communications to government bodies (4) that involves a substantive issue of some public

---

[3] The Court's order dated September 19, 2003, requested that the defendants address three issues if they filed a motion for summary judgment. These issues were "(1) state action by the defendant; (2) whether common law absolute immunity applies to the federal constitutional claims; and (3) the relevance of probable cause findings by the Commission." Because these issues are fully addressed by the defendants in their briefs, the Commission, as amicus curiae, will not address them here. Instead, the Commission will focus on the public policy that supports the defendants' arguments.

concern." <u>Field v. Kearns</u>, 43 Conn. App. 265, 276, 682 A.2d 148, <u>cert</u>. <u>denied</u>, 239 Conn. 942

(1996), citing G. Pring & P. Canan, "Strategic Lawsuits Against Public Participation (SLAPPs):

An Introduction for Bench, Bar and Bystanders," 12 U. Bridgeport L. Rev. 937 (Summer 1992).

Because, "[r]egardless of how unmeritorious the . . . suit is, the [defendant] will most

likely have to retain counsel and incur substantial legal expense to defend against it," <u>Bill</u>

<u>Johnson's Restaurants, Inc. v. N.L.R.B</u>., 461 U.S. 731, 740-741 (1983), such a lawsuit is "a

powerful instrument of coercion or retaliation." <u>Id</u>. at 740. Thus, "[t]he purpose of a SLAPP suit

is to punish and intimidate citizens who petition state agencies and [to] have the ultimate effect

of 'chilling' any such action." <u>Field</u>, 43 Conn. App. at 276.

This is precisely such a case. The defendant individuals identified what they perceived to

be violations of state election law by political candidates and filed proper complaints with the

Commission that is responsible for enforcing the state's election laws. That the defendants'

concerns were warranted was confirmed by the fact that in three out the four cases reported, the

Commission found that the candidates had in fact violated state law. <u>See</u> Second Amended

Complaint, First Count ¶ 22,  Seventh Count ¶ 22. In the fourth case, the Commission found that

the communication on its face appeared to violate the law, but after a full investigation

concluded that it did not. In response to the Commission's rulings, the plaintiffs did not appeal,

but instead sued the ten defendants, resulting in the hiring of six private attorneys and the

expenditure of untold thousands of dollars in legal defense.

As a matter of public policy, citizens should be encouraged to report perceived violations

of the state election laws to Commission. Such reports help to uphold the integrity of, and

promote public confidence in, the electoral process by ensuring that as many violations as

possible are identified and addressed by the Commission. The purpose of the disclosure requirements in the statute at issue in the underlying proceedings in this case, Conn. Gen. Stat. § 9-333w, is to prevent actual and perceived corruption in candidate elections, aid the Commission in enforcing other campaign finance laws, inform the voters about candidates, and prevent fraud and libel. Seymour v. State Elections Enforcement Commission, 255 Conn. 78, 86-93, 762 A.2d 880 (2000). All of these interests are furthered when members of the public report perceived statutory violations, that otherwise might go undetected, to the Commission.

In Field v. Kearns, 43 Conn. App. 265, 682 A.2d 148, cert. denied, 239 Conn. 942 (1996), a case that bears many similarities to the present case, the Connecticut Appellate Court held that individuals who file grievance complaints against attorneys with the Statewide Grievance Committee are entitled to absolute immunity from liability for the act of filing the grievance. In so holding, the court emphasized that such complaints are part of a comprehensive disciplinary scheme that is designed to protect the integrity of the court. According to the court, "[i]f unsuccessful bar grievants were subject to retaliatory lawsuits it would have a 'chilling effect' on the public." Id. at 275. "[O]ne who felt aggrieved by his lawyer would hesitate to complain for fear that he might face a damage suit if he failed to prove his complaint. Such a fear, whether it was groundless or not, would reduce the bar's effectiveness in policing its own ranks." Id., quoting Netterville v. Lear Siegler, Inc., 397 So. 2d 1109, 1113 (Miss. 1981).

The same concerns are equally applicable to the present case, in which any ruling that permits individuals to be subjected to retaliatory lawsuits simply for bringing possible election law violations to the attention the Elections Enforcement Commission will severely chill the public's willingness to file such complaints. There can be no question that many of the

individuals who file complaints with the Commission every year will think twice if they face the prospect of being sued for monetary damages as a result of voicing their concerns.

Such a result would not only make it significantly more difficult for the Commission to protect the integrity of the electoral process, but would also threaten the democratic principles on which our government is founded. As one commentator, Professor George Pring, has observed, "[t]he First Amendment to the United States Constitution guarantees 'the right of the people . . . to petition the government for redress of grievances,' . . . . [If] [u]nchecked, SLAPPs raise real concern for the future of 'citizen involvement' or 'public participation' in government, long viewed as essential in our representative democracy." G. Pring & P. Canan, "Strategic Lawsuits Against Public Participation (SLAPPs): An Introduction for Bench, Bar and Bystanders," 12 U. Bridgeport L. Rev. 937, 942-944 (Summer 1992). "Persons who have been outspoken on issues of public importance targeted in such suits or who have witnessed such suits will often choose in the future to stay silent. Short of a gun to the head, a greater threat to First Amendment expression can scarcely be imagined." Id. at 944.

Finally, it is important to recognize that suits such as the present one represent an end-run around the administrative process. If the plaintiffs felt that the defendants' complaints were not justified or that the Commission's interpretation of the election laws was incorrect, their remedy, after losing before the Commission, was to appeal the Commission's ruling to the Superior Court pursuant to Conn. Gen. Stat. § 4-183 and the provisions of Connecticut's Uniform Administrative Procedures Act ("UAPA"). Instead, the plaintiffs have deliberately bypassed the UAPA and hauled the defendants into federal court, where the merits of the underlying complaints cannot be resolved. As Professor Pring has observed, such conduct, in addition to

burdening our overloaded courts, "impede[s] solution of the public problem by removing parties from the public decisionmaking forum where the cause of the damage can be resolved and by invoking a judicial forum where only the effects of the dispute can be adjudicated." G. Pring & P. Canan, "Strategic Lawsuits Against Public Participation (SLAPPs): An Introduction for Bench, Bar and Bystanders," 12 U. Bridgeport L. Rev. 937, 943 (1992).

In sum, this Court should recognize this suit for what it is – a SLAPP suit that does not address the merits of the defendants' underlying complaints about the plaintiffs' conduct, but rather seeks to punish the defendants for voicing their concerns by filing the complaints. Nothing warrants this Court condoning such an abuse of the judicial system.

## II. THE PUBLIC POLICY AGAINST SLAPP SUITS IS EMBODIED IN THE COMMON LAW DOCTRINE OF ABSOLUTE IMMUNITY, WHICH BARS THE PLAINTIFFS' CLAIMS.

The public policy against SLAPP suits is embodied in the common law doctrine of absolute immunity, which applies to the present case and clearly bars all of the plaintiffs' claims.

"Absolute immunity confers complete protection from civil suit." Tulloch v. Coughlin, 50 F.3d 114, 116 (2d Cir. 1995). Such immunity applies "to all persons – governmental or otherwise – who are integral parts of the judicial process," Briscoe v. LaHue, 460 U.S. 325, 335 (1983), and has long barred claims against prosecutors for initiating prosecutions. Imbler v. Pachtman, 424 U.S. 409, 421-424 (1976), citing Griffith v. Slinkard, 44 N.E. 1001 (1896). The rationale for such absolute prosecutorial immunity is "concern that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." Imbler, 424 U.S. at 423.

Absolute immunity is distinguished from qualified immunity in that absolute immunity applies even to clearly erroneous or malicious behavior. Although such broad immunity may leave a genuinely wronged defendant without redress against a prosecutor who maliciously or erroneously institutes proceedings against him, the Court has concluded that it is "better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." Imbler, 424 U.S. at 428, quoting Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949), cert. denied, 339 U.S. 949 (1950).

In Butz v. Economu, 438 U.S. 478 (1978), the Supreme Court held that the same absolute immunity that is accorded to prosecutors is equally applicable to administrative agency officials performing comparable functions. As stated by the court, "[t]he decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution." Butz, 438 U.S. at 515. Because "agency officials must make the decision to move forward with an administrative proceeding free from intimidation or harassment[,] . . . those officials who are responsible for the decision to initiate or continue a proceeding subject to agency adjudication are entitled to absolute immunity from damages liability for their parts in that decision." Id.

The Connecticut courts have applied the same analysis and reached the same conclusion with regard to private individuals who initiate quasi-judicial proceedings. In Field v. Kearns, 43 Conn. App. 265, 682 A.2d 148, cert. denied, 239 Conn. 942 (1996), as noted above, the Connecticut Appellate Court held that an individual who filed an attorney grievance complaint with the Statewide Grievance Committee was entitled to absolute immunity from liability for the act of filing the grievance. In reaching this conclusion, the court first considered whether the

Statewide Grievance Committee's proceedings were quasi-judicial, and thus the type of proceeding to which absolute immunity attaches. To make this determination, the court considered the following six factors identified by the Connecticut Supreme Court in <u>Kelley v. Bonney</u>, 221 Conn. 549, 567, 606 A.2d 693 (1992), -- whether the Committee had the power to "(1) exercise judgment and discretion; (2) hear and determine or to ascertain facts and decide; (3) make binding orders and judgment; (4) affect the personal or property rights of private persons; (5) examine witnesses and hear the litigation of the issues on a hearing; and (6) enforce decisions or impose penalties." <u>Id</u>. at 272.

Having concluded that the Committee possessed authority of a quasi-judicial nature and therefore that its proceedings were quasi-judicial, the court in <u>Field</u> considered whether the absolute immunity that therefore attached to the proceedings applied to the act of filing the grievance. In concluding that it did, the court reasoned that "[i]f unsuccessful bar grievants were subject to retaliatory lawsuits it would have a 'chilling effect' on the public." <u>Field</u>, 43 Conn. App. at 275. "[O]ne who felt aggrieved by his lawyer would hesitate to complain for fear that he might face a damage suit if he failed to prove his complaint. Such a fear, whether it was groundless or not, would reduce the bar's effectiveness in policing its own ranks." <u>Id</u>., quoting <u>Netterville v. Lear Siegler, Inc</u>., 397 So. 2d  1109, 1113 (Miss. 1981). The court concluded that because "the public policy of protecting the courts and the public from unethical and unprofessional attorneys is so strong . . . there is absolute immunity for the complainant in filing or otherwise causing the institution of attorney disciplinary proceedings." <u>Field</u>, 43 Conn. App. at 277.

The court in Craig v. Stafford Construction Inc., 78 Conn. App. 549, 827 A.2d 793, cert. granted, 266 Conn. 916, 833 A.2d 466 (2003), reached a similar conclusion. At issue in Craig was whether an individual who filed a citizen complaint alleging racial bias on the part of a Hartford police officer, and thereby initiated an internal affairs investigation by the police department, was absolutely immune from liability for alleged defamation. As in Field, the court first analyzed whether the proceeding at issue was quasi-judicial. Finding that it was, the court concluded that absolute immunity protected the complainant who initiated the proceeding because such immunity "serves the public policy of protecting free speech that furthers the interests of a democratic society." Craig, 266 Conn. at 561. Recognizing that "if there were no absolute immunity, good faith criticism of governmental misconduct might be deterred by concerns about unwarranted litigation," id. at 557, the court concluded that absolute immunity applied even if the complainant's accusations were false and malicious.

Similarly, in the present case, absolute immunity protects the defendants from liability for filing complaints with the State Elections Enforcement Commission. Like the administrative proceedings in Field and Craig, the proceedings at issue in the present case are clearly quasi-judicial. Pursuant to § 9-7b of the Connecticut General Statutes, the Commission may commence an investigation (1) on its own initiative; (2) based on a statement by the Secretary of the State or a town clerk; or (3) pursuant to a complaint by any individual. Conn. Gen. Stat. § 9-7b(a)(1). If the complaint sets forth sufficient facts and allegations which, if true, would constitute a violation of the General Statutes within the Commission's jurisdiction, the Executive Director assigns it for investigation. Regulations Conn. Agencies, SEEC, § 9-7b-58(a). In connection with its investigation, the Commission is authorized to hold hearings, subpoena witnesses, and compel

11

the production of documents. Conn. Gen. Stat. § 9-7b(a)(1). After an initial investigation by a Commission legal investigator, the Commission will hold a hearing if a majority of a quorum of the Commission finds probable cause to believe that a violation of the General Statutes within the Commission's jurisdiction has been committed and the case cannot be settled. Regulations Conn. Agencies, SEEC § 9-7b-35.[4] If the Commission finds a violation, it has the authority to levy civil penalties, order the repayment of misspent funds, or refer matters to the chief state's attorney or attorney general for possible criminal prosecution or equitable relief. Conn. Gen. Stat. § 9-7b; see also Concerned Citizens of Sterling v. Sterling, 204 Conn. 551, 558, 529 A.2d 666 (1987).

Because this process contains all of the factors set forth in Field v. Kearns and Kelley v. Bonney in that the Commission exercises discretion, ascertains facts, conducts hearings, examines witnesses, makes decisions, issues binding orders, imposes penalties, and may seek to enforce its decisions, it is unquestionably a quasi-judicial process to which the protection of absolute immunity applies. Because absolute immunity applies, it protects those involved in all phases of the process, including the individuals who initiate the process by filing the complaint. See Imbler v. Pachtman, 424 U.S. 409 (1976); Craig v. Stafford Construction Inc., 78 Conn. App. 549, 827 A.2d 793, cert. granted, 266 Conn. 916, 833 A.2d 466 (2003); Field v. Kearns, 43 Conn. App. 265, 682 A.2d 148, cert. denied, 239 Conn. 942 (1996). Any other conclusion would effectively kill public participation and citizen involvement in enforcing the state's election laws and upholding the integrity of the state's electoral process.

---

[4] It should be noted that the probable cause determination is made by the Commission, not by the Executive Director as plaintiffs have suggested.  The Executive Director is the legal and procedural advisor to the Commission. He did not initiate any of the complaints against the plaintiffs or play any role in their prosecution.

The fact that the plaintiffs are alleging federal constitutional violations pursuant to 42 U.S.C. § 1983, in addition to state tort claims, does not alter the conclusion that absolute immunity bars their complaint in its entirety. In <u>Imbler v. Pachtman</u>, 424 U.S. 409 (1976), the U.S. Supreme Court concluded that "the same considerations of public policy that underlie the common law rule [of absolute immunity] likewise countenance absolute immunity under 1983." <u>Id</u>. at 424. Thus, courts routinely hold that absolute immunity bars § 1983 claims for initiating judicial or quasi-judicial proceedings. <u>See</u>, <u>e.g.</u> <u>Imbler v. Pachtman</u>, 424 U.S. 409 (1976)(prosecutor absolutely immune from liability under § 1983 for initiating and pursuing criminal prosecution); <u>Malachowski v. City of Keene</u>, 787 F.2d 704 (1st Cir.), <u>cert</u>. <u>denied</u>, 479 U.S. 828 (1986)(police officer absolutely immune from liability under § 1983 for filing delinquency petition); <u>Walden v. Wishengrad</u>, 745 F.2d 149 (2d Cir. 1984)(department of social services attorney who initiates and prosecutes child protection orders is absolutely immune from liability under § 1983); <u>Salyer v. Patrick</u>, 874 F.2d 374, 378 (6th Cir. 1989)(family service workers who filed juvenile abuse petitions were absolutely immune from liability under § 1983); <u>Spear v. Town of West Hartford</u>, 954 F.2d 63 (2d Cir.), <u>cert</u>. <u>denied</u>, 506 U.S. 819 (1992)(acting town manager and corporation counsel who authorized and instituted a civil RICO suit were absolutely immune from liability under § 1983). Assuming that § 1983 is even applicable, there is no basis for reaching any other conclusion here.[5]

Finally, it is important to recognize that absolute immunity applies regardless of the motivation behind the conduct at issue. Although the Commission found that three out of the

---

[5] As the defendants make clear in their briefs, their conduct does not constitute state action. Accordingly, § 1983 is not even applicable to this case. <u>See</u> Defendants' Briefs; <u>Dematteis v. Eastman Kodak, Co.</u>, 511 F.2d 306, 311 (2d Cir. 1975); <u>Carey v. Continental Airlines</u>, 823 F.2d 1402, 1404 (10th Cir. 1987).

four plaintiffs had in fact violated the state election laws, and thus the complaints clearly had merit, absolute immunity would apply even if no violations had been found. As the Supreme Court concluded in <u>Imbler v. Pachtman</u>, 424 U.S. 409, 427-428 (1976), the risk of harm from erroneous or malicious prosecution is outweighed by the need to protect the integrity of, and public confidence in, the judicial process.

Similarly, in the present case, the "State indisputably has a compelling interest in preserving the integrity of its election process." <u>Burson v Freeman</u>, 504 U.S. 191, 199 (1992)(internal quotation marks omitted). Although it is the Commission's responsibility to achieve this goal by enforcing the state's election laws, it is vitally important to the Commission that citizens participate in the process by reporting suspected violations. If citizens were unwilling to step forward out of fear that they could be sued for monetary damages, the Commission's ability to protect the integrity of the electoral process would be severely diminished.   As in <u>Field</u> and <u>Craig</u>, the concern that some complaints may turn out to be unfounded, or even malicious, is more than outweighed by the importance of protecting public participation in the process of government.[6]

In sum, this is precisely the type of case to which the doctrine of absolute immunity applies. Accordingly, all of the plaintiffs' claims against the defendants based on the fact that the defendants filed complaints against the plaintiffs with the Commission are barred in their entirety.

---

[6] It should be recognized that an individual who is the subject of a complaint is not without recourse. If he believes that the complaint is unfounded, he is free to appeal the Commission's ruling to the Connecticut Superior Court pursuant to Conn. Gen. Stat. § 4-183.

## **CONCLUSION**

For all of the foregoing reasons, and the reasons set forth in the defendants' briefs, the State Elections Enforcement Commission, as amicus curiae, respectfully requests that this Court grant the defendants' motions for summary judgment.

AMICUS CURIAE
CONNECTICUT STATE ELECTIONS
ENFORCEMENT COMMISSION

RICHARD BLUMENTHAL
ATTORNEY GENERAL

Susan Quinn Cobb
Assistant Attorney General


BY: _____
Jane R. Rosenberg
Assistant Attorney General
Federal Bar No. ct 16092
55 Elm Street
P.O. Box 120
Hartford, CT  06141-0120
Tel: (860) 808-5020
jane.rosenberg@po.state.ct.us

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed in accordance with Rule 5(b) of

the Federal Rules of Civil Procedure on this 1st day of  September,  2004 to:

Kenneth John Laska, Esq.
Drawer A
63 East Main Street
Plainville, CT  06062
Tel:  (860) 747-2792
Fax: (860) 747-8609

Beatrice S. Jordon, Esq.
Howd & Ludorf
65 Wethersfield Avenue
Hartford, CT  06114
Tel:  (860) 249-1361
Fax: (860) 522-9549

Karen L. Karpie, Esq.
Murphy and Karpie
350 Franklin Ave., Suite 408
Bridgeport, CT  06604
Tel : (203) 333-0177
Fax: (203) 333-0177

John A. Barbieri, Esq.
P.O. Box 1445
New Britain, CT 06050
Tel:  (860) 224-7119
Fax: (860) 225-7319

Charles E. Vermette, Jr., Esq.
Litchfield Cavo, Attorneys at Law
40 Tower Lane, Suite 200
Avon, CT  06001
Tel :  (860) 255-5577
Fax : (860) 255-5566

Paul M. Clyons, Esq.
Law Offices of Heidi Zultkowski
P.O. Box 9011
New Britain, CT  06050-9948
Tel:  (860) 827-4351
Fax: (860) 827-4386

William T. Barrante, Esq.
P.O. Box 273
Watertown, CT  06795
Tel:  (860) 379-9885
Fax: (860) 738-4906

_____
Jane R. Rosenberg
Assistant Attorney General