Issues Report [Cassidy v Pavano]

• Exhibit F Deposition of William Petit

[16:1] - [17:25]        6/23/2004    William Petit

• Exhibit F Deposition of William Petit

```
page 15
25  Q.   And was there anything illegal about that?
page 16
 1  A.   Again, the same as was pointed out; that Friends
 2       For a Better Plainville were not registered, at a
 3       later point in time.  I did not see anything
 4       illegal with it at the time.
 5  Q.   Okay.  The next group is on Page 19.  This page
 6       has two ads by two of the petitioning candidates.
 7       That's Henry Syskowski and John Cassidy?
 8               MS. KARPIE:  I'm going to object to the
 9           form of the question.
10               You can answer it.
11  A.   I don't know.
12  BY MR. BARRANTE:
13  Q.   You didn't know at the time?
14  A.   I do not know.
15  Q.   Did someone advise you that there was something
16       wrong?
17  A.   Someone advised us later that there was something
18       wrong.
19  Q.   Which was?
20  A.   There was no addresses on their ads.
21  Q.   So that would apply to all the advertisements from
22       the petitioning candidates?
23  A.   That is correct.
24  Q.   Can you tell me then why you signed this complaint?
25  A.   I signed the complaint because of the ad that is
page 17
 1       not there from "A Concerned Citizen" against my
 2       daughter and myself.
 3  Q.   So you signed this complaint because of an ad that
 4       wasn't even made an issue by the --
 5  A.   I don't know why it's not part of that.
 6  Q.   Well, did you bring that up to any of the other --
 7  A.   I also signed it because once I decided to sign
 8       it --
 9  Q.   Pardon?
10  A.   -- we felt that anything that was wrong that we
11       felt was not following the law should be complained
12       about.
13  Q.   Now, do you remember who invited you -- how many
14       meetings did you have at Barbara Willard's house?
15  A.   I don't recall.
16  Q.   Is it possible there were two?
17  A.   I don't recall.
18  Q.   Is it possible that you signed the complaint not at
19       her house but somewhere else?
20  A.   No.
21  Q.   You signed it at her house?
22  A.   I did.
23  Q.   Was David Underwood there?
24  A.   Yes.
25  Q.   Do you remember the first time you went to -- do
page 18
 1       you remember who invited you to Barbara Willard's
```

[24:1] - [24:25]        6/23/2004    William Petit

• Exhibit F Deposition of William Petit

page 23

-11-

Segal & Laska LLC / Attorneys at Law / 63 East Main Street / Plainville, Connecticut 06062

```
                        25       politics --
                   page 24
                    1   A.   Correct.
                    2   Q.   -- father/son, father/daughter, etc.?  And your
                    3        complaint was "A Concerned Citizen" should have
                    4        been a name of a person?
                    5   A.   Should have been identified by name of a person or
                    6        a treasurer of a pack or . . .
                    7   Q.   Now, before you signed this, did you look at
                    8        everything that was attached to it?
                    9   A.   No, I did not.
                   10   Q.   So you didn't -- when did you -- did you tell
                   11        somebody, one of the other defendants or anyone
                   12        else, that you wanted the ad you were concerned
                   13        about included in the complaint?
                   14   A.   I did not.
                   15   Q.   You did not?
                   16   A.   I did not.
                   17   Q.   So why did you believe it was?
                   18   A.   I didn't believe it was.  I believed the complaint
                   19        was about everything that was -- that we felt was
                   20        wrong in the paper.
                   21   Q.   I'll turn back to the page that's marked Exhibit B.
                   22        Everything that's listed here or --
                   23   A.   I don't recall now.
                   24   Q.   -- anything at all that --
                   25   A.   Anything that we looked at in the paper that we
                   page 25
                    1        felt was wrong.
```

[45:1] - [45:25]            6/23/2004    William Petit

• Exhibit F Deposition of William Petit

```
                   page 44
                   25                MS. KARPIE:  That's a different question.
                   page 45
                    1   BY MR. BARRANTE:
                    2   Q.   Was there a target that this ad was aimed at?
                    3                MS. KARPIE:  The ad?
                    4                MR. BARRANTE:  Excuse me.  The
                    5        complaint.
                    6   BY MR. BARRANTE:
                    7   Q.   That the complaint was aimed at?
                    8   A.   I believe the complaint was against the newspaper
                    9        for running ads that we felt were not properly
                   10        signed.
                   11   Q.   Did you believe it was the newspaper's job to --
                   12   A.   I do.
                   13   Q.   -- not publish those ads?
                   14   A.   No.
                   15   Q.   What do you believe the newspaper's job was?
                   16   A.   To see that those ads were properly signed,
                   17        properly identified.
                   18   Q.   Is that the function of a newspaper?
                   19   A.   I believe so.
                   20   Q.   So a newspaper has --
                   21   A.   I believe so.
                   22   Q.   The newspaper has the power or authority to --
                   23   A.   To require ads to be proper.
                   24   Q.   Now, how would the newspaper know that Friends For
                   25        a Better Plainville wasn't properly registered?
                   page 46
                    1   A.   I believe it's their responsibility to find out.
```

• Exhibit G Deposition of Patrick Ringrose

[12:1] - [12:25]            6/23/2004    Patrick Ringrose

-12-

• Exhibit G Deposition of Patrick Ringrose

```
page 11
25            complaint?
page 12
 1  A.   Only in one case.
 2  Q.   Which one is that?
 3  A.   The ad on Page 5.
 4  Q.   Which is the ad that is headed: Vote for those who
 5       will represent, quote, you, not themselves?
 6  A.   The one that was signed by Friends For a Better
 7       Plainville.
 8  Q.   Which statutory provision did that violate?
 9  A.   It was my understanding at the time "friends,"
10       being plural, indicated a committee; and if there
11       was a formal committee acting and placing ads, they
12       had to have a treasurer listed.
13  Q.   And they also have to be registered with the town
14       clerk?
15  A.   I didn't know that at the time.
16  Q.   But there was no listing of any treasurer?
17  A.   Correct.
18  Q.   So that was the only statute you were familiar
19       with.  Was there somebody at this meeting at
20       Barbara Willard's that explained the election law?
21  A.   If there was, I don't recall.  It was a general
22       discussion, not a formal meeting.
23  Q.   Who invited you to the meeting?
24  A.   I don't recall.
25  Q.   Was it Mrs. Willard?
page 13
 1  A.   I don't recall.
```

[15:1] - [16:25]      6/23/2004    Patrick Ringrose

• Exhibit G Deposition of Patrick Ringrose

```
page 14
25  A.   I don't know how they date them.  The one that
page 15
 1       came out a few days before the election in late
 2       October.
 3  Q.   For the record, they date them monthly, so
 4       November, December, January, etc.  So it would
 5       have been the edition that came out just before the
 6       election.  The election was November 6 or around
 7       that day?
 8  A.   First Tuesday after the first Monday in November.
 9  Q.   Let's go through it then.  We've already looked at
10       the advertisement on Page 5.  Your complaint was
11       that there was no treasurer indicated?
12  A.   Correct.
13  Q.   And that's a violation of the law according to your
14       understanding?
15  A.   That was my understanding at the time.
16  Q.   Okay.  Was there anything else about this
17       advertisement that you found any complaint or had
18       any complaint about?
19  A.   No.
20  Q.   All right.  The next one is a -- this is on
21       Page 13.  It's an advertisement by Janice
22       Eisenhauer who was a petitioning candidate for the
23       Town Council.  Was there a violation with this ad?
24  A.   Not that I was aware of.
25  Q.   Not that you were aware of.  Okay.  But it was
page 16
 1       one of the -- on the second page -- let's see.
 2       This is on Page 13.  It's one of the ads that was
 3       complained about.  We'll go to the next ad which
 4       is on Page 17.  The number is not complete on the
 5       copy.  Was there a complaint about -- that you had
```

-13-

```
 6          about this advertisement?
 7   A.     Yes.
 8   Q.     What was that?
 9   A.     Same as the one on Page 5:  Paid for by Friends For
10          a Better Plainville; "friends," being plural,
11          indicating more than one person and no treasurer
12          being noted.
13   Q.     Okay.  The next one is on Page 19.  There are
14          actually six.  Was there any violation that you
15          saw in these ads?
16   A.     Not that I saw, but during the course of the
17          general conversation during the meeting at Barbara
18          Willard's house, a number of people there said that
19          candidates have to have their home address listed
20          and that they were missing from these.
21   Q.     Do you remember who those people were who said
22          that?
23   A.     I don't.
24   Q.     Did you believe this was a serious violation of the
25          law?
page 17
 1   A.     Which?
```

[26:1] - [27:25]        6/23/2004    Patrick Ringrose

• Exhibit G Deposition of Patrick Ringrose

```
page 25
25          paper was supporting them?
page 26
 1   A.     Sure.
 2   Q.     And what was the election violation for these
 3          petitioners' ads?
 4   A.     Didn't I answer that question already?
 5   Q.     I don't think so.  If you want to refer back to
 6          the complaint sheet, Exhibit B, that might refresh
 7          your memory.
 8   A.     My understanding at the time was that petitioning
 9          candidates needed to have their address printed in
10          the advertisement.
11   Q.     With their name; in other words, "Paid For By
12          William Cunningham" with his address?
13   A.     I don't know about the "Paid For" part.
14   Q.     But the address had to be there?
15   A.     The general consensus and what was discussed at
16          that meeting at Barbara Willard's was that a
17          petitioning candidate had to have their address as
18          part of the ad.
19   Q.     So that's why that complaint was made against those
20          particular people; because they didn't have their
21          address on their advertisement?
22   A.     That's why I signed it.
23   Q.     Now, getting back to your belief that the Hometown
24          Connection as a newspaper was supporting these
25          petitioning candidates, did the lack of the address
page 27
 1          have any -- did that factor into that conclusion?
 2   A.     I suppose it did.
 3   Q.     In other words, if they had had their addresses,
 4          would you have assumed -- would you have believed
 5          that the paper wasn't supporting them?
 6   A.     It wouldn't have been an issue if the address had
 7          been there.
 8   Q.     It wouldn't have been an issue for the commission,
 9          but would you have still believed that the paper
10          was supporting these people?
11   A.     I said I believed they were supporting.  I didn't
12          say they didn't have the right to.  My only issue
13          was the correctness of the ads with my general
14          understanding of election law advertising.
```

Segal & Laska LLC / Attorneys at Law / 63 East Main Street / Plainville, Connecticut 06062

```
15  Q.   So the paper -- you're saying the paper had the
16       right to support them and that you believe they
17       were supporting them, and the reason you believe
18       they were supporting them is that they had the
19       advertisements on one page of the paper?
20  A.   No.
21  Q.   No?   Then why did you believe the paper was
22       supporting them?
23  A.   It had nothing to do with advertisements being on
24       one page of the paper.
25  Q.   Or advertisements in the paper.  In fact, one of
page 28
 1       the -- now that you mentioned that, one of the
```

• Exhibit H Deposition of Marliss Pavano

[30:1] - [30:25]    6/23/2004    Patrick Ringrose

• Exhibit H Deposition of Marliss Pavano

```
page 29
25  Q.   How is it a different issue?
page 30
 1  A.   It's not editing the advertising.   It's
 2       withholding publication if the newspaper believes
 3       the ads are incomplete, are not in compliance with
 4       election regulations.
 5  Q.   So you believe a newspaper has the freedom to
 6       withhold or refuse to print a political
 7       advertisement?
 8  A.   I would assume that they do.
 9  Q.   Now, at some point, you learned -- I believe it was
10       in the early part of 2002 -- that the State
11       Elections Commission had found that there were no
12       violations by either Helen Bergenty or the Hometown
13       Connection?
14  A.   I'm not sure of the time frame, but I remember
15       hearing about the resolution.
16  Q.   What was your reaction to that?
17  A.   I was fine with it.
18  Q.   Did you agree with it?
19  A.   I accepted it.   They're the experts.
20  Q.   What exactly did you want the Elections Commission
21       to do?
22  A.   I wanted the Elections Commission to review the ads
23       in question from the Hometown Connection and make a
24       determination if they were in compliance or they
25       weren't.
page 31
 1  Q.   Now, you also learned about the same time or --
```

[10:1] - [11:25]    6/23/2004    Marliss Pavano

• Exhibit H Deposition of Marliss Pavano

```
page 9
25  Q.   Just tell us what it is.
page 10
 1  A.   It looks like a State Elections Enforcement
 2       Commission affidavit form for filing a complaint.
 3  Q.   Is this a document that you signed?
 4  A.   Yes.
 5  Q.   And what date was it signed?
 6  A.   It indicates here November 1 --
 7  Q.   Do you remember --
 8  A.   -- 2001.
 9  Q.   Do you remember signing it?
10  A.   Yes.
11  Q.   On the second page, your signature appears?
12  A.   Correct.
```

Segal & Laska LLC / Attorneys at Law / 63 East Main Street / Plainville, Connecticut 06062

```
13  Q.  And there's also a signature for Ronald
14      Pavano, Sr.?
15  A.  Correct.
16  Q.  Is that your husband?
17  A.  Yes.
18  Q.  Why did you sign it?
19  A.  Why did I sign this?  Because I felt that there
20      were improprieties in some of the ads.
21  Q.  Where did these ads appear?
22  A.  Do you want me to point them out?
23  Q.  Yes.
24  A.  This ad.
25
page 11
 1                    (Whereby the witness indicates.)
 2
 3  Q.  This is noted as being on Page 5 of the Hometown
 4      Connection.  What is the problem with that ad?
 5  A.  There is no address or treasurer listed.
 6  Q.  Okay.  Go to the next one.  This would be on
 7      Page 13.  What is this ad?
 8  A.  There is no address listed.
 9  Q.  For the candidate, that would be Janice Eisenhauer?
10  A.  Correct.
11  Q.  Then going to this ad paid for by Friends For a
12      Better Plainville, is there a problem with this ad?
13  A.  There is no treasurer listed nor an address.
14  Q.  Then we skip over to Page 19 which takes up the
15      last four pages of the complaint.  What is the
16      problem with those ads?
17  A.  There is no address listed.  Let me just look at
18      all of them just to make sure.
19  Q.  By all means.
20
21                    (Witness reviews document.)
22
23  A.  There are no addresses listed.
24  Q.  All right.  Now, before November 1, 2001, were you
25      familiar with state election law?
page 12
 1  A.  Yes.
```

[35:1] - [35:25]

6/23/2004   Marliss Pavano

• Exhibit H Deposition of Marliss Pavano

```
page 34
25  A.  I don't recall.
page 35
 1  Q.  Did you believe that the newspaper, because of the
 2      various advertisements that were in it, was going
 3      to influence the outcome of the referendum?
 4  A.  No.
 5  Q.  You did not believe that?
 6  A.  No.
 7  Q.  Did you believe the referendum was going to pass?
 8  A.  I didn't know.
 9  Q.  So your main concern was compliance with the law?
10  A.  Correct.
11  Q.  Okay.  Did you ever make a complaint to either the
12      town clerk or the secretary of the state of the
13      fact that David Underwood took his own
14      acknowledgement on this petition?
15  A.  No.
16  Q.  That didn't bother you?
17  A.  I didn't know.
18  Q.  You didn't see it?
19  A.  Apparently not.
20  Q.  If you had noticed it, would you have taken action
21      on it?
```

Segal & Laska LLC / Attorneys at Law / 63 East Main Street / Plainville, Connecticut 06062

```
                        22   A.   I would have questioned it.
                        23   Q.   So the first time you met with the other
                        24        signatories was at the meeting at Barbara Willard's
                        25        house?
                        page 36
                         1   A.   Yes.
```

• Exhibit K. Deposition of John J. Cassidy

[34:1] - [35:25]           6/26/2004    John Cassidy

                           • Exhibit K. Deposition of John J. Cassidy

```
page 33
 25     A.   Just the statements that were made.
page 34
  1     Q.   Okay.  Well let's go through the statements.  What
  2  statements?
  3     A.   Derogatory statements.  I can't go into detail.
  4  They were derogatory, demeaning, vicious and vile.
  5     Q.   Well, if they were derogatory, vicious and vile, do
  6  you recall any specific statements?
  7     A.   No.
  8     Q.   You don't recall a single one?
  9     A.   No.  Not in total, no.
 10     Q.   Now, are you also aware that in the first count of
 11  your complaint, you also alleged that the defendants brought
 12  the complaint with the SEEC as political payback for your
 13  opposition to the Linden Street School project?
 14     A.   Yes.
 15     Q.   And can you tell me what the basis is for your
 16  belief that the complaint was filed by the ten individuals as
 17  political payback?
 18     A.   Would you restate that, please?
 19     Q.   Could you tell me what the basis is for your belief
 20  that the ten individuals filed the complaint with the SEEC as
 21  political payback against you?
 22     A.   Their actions.
 23     Q.   What actions?
 24     A.   Their statements.
 25     Q.   What statements?
page 35
  1     A.   All of the ones that they were making.  All of the
  2  ones they wrote.
  3     Q.   Can you be more specific?
  4     A.   No, I can't.
  5     Q.   So, as you sit here today, you can't recall a single
  6  action or a single statement that leads you to believe that
  7  they filed a complaint as political payback against you?
  8     A.   They wrote editorials.  They wrote articles.  They
  9  talked to people.  People talked to me.
 10     Q.   But do you recall any specific article or editorial
 11  or newspaper?
 12     A.   They were all in the New Britain Herald.  I have got
 13  them all home.  I would have brought them if you asked me.
 14     Q.   So, you have kept a copy of all of the newspaper
 15  articles and editorials that you believe demonstrate that
 16  the --
 17     A.   Yes.
 18     Q.   And is that something that you would be able to
 19  provide a copy of to your attorney?
 20     A.   Yes.  If he asked me, yeah.
 21          MS. JORDAN:  Okay.  Attorney Barrante, is there
 22     any problem in terms of getting copies of those
 23     documents, if he is relying on them for his claim,
 24     that evidences the political payback?  I believe that
 25     was something that was asked for in discovery.
page 36
  1          MR. BARRANTE:  Yeah.  I know he has a lot of
```

Segal & Laska LLC / Attorneys at Law / 63 East Main Street / Plainville, Connecticut 06062

[44:1] - [46:25]    6/26/2004    John Cassidy

• Exhibit K. Deposition of John J. Cassidy

```
page 43
25              THE WITNESS:  Yeah.
page 44
 1       Q.    (By Ms. Jordan)  Are you also aware in the first
 2  count of your complaint you also alleged that the defendant
 3  filed a complaint with the SEEC for the purpose of influencing
 4  the outcome of the election and the Linden Street School
 5  referendum?
 6       A.    Yes.
 7       Q.    Can you tell me what the basis is for your belief
 8  that the defendants filed that complaint to influence the
 9  election and the referendum?
10       A.    My belief is that they knew about this before the
11  paper was ever officially out.
12       Q.    That they knew about what?
13       A.    The ads and everything, all that they complained
14  about.
15       Q.    How would they know about the ads and what was in
16  the ads before the paper was published?
17       A.    This is not fact.  I just suppose that one of the
18  complainants had seen a newspaper.
19       Q.    So, this is just based on your assumption, then?
20       A.    Yes.
21       Q.    And can you tell me how the defendants' act of
22  filing the complaint with the SEEC, how did that influence the
23  election or the referendum?
24       A.    The complaint itself.
25       Q.    Their act of filing the complaint?
page 45
 1       A.    By them filing the complaint and making it public,
 2  in my opinion, they wanted to demean us and take away our
 3  credibility, enhance theirs.
 4       Q.    So, this is based on your opinion?
 5       A.    Yes.  That's what it's all about, isn't it?
 6       Q.    Other than your opinion and your assumptions that
 7  the defendants knew about the paper before it was published,
 8  do you have any other support for your claim that they were
 9  attempting to influence the election or the referendum?
10       A.    What they said and published.
11       Q.    And, again, these are the items that you can't
12  identify.  You said what they said and what they published.
13  Are these the statements and the articles that you cannot
14  identify?
15       A.    Right.
16       Q.    Now, in the first count of your complaint, you also
17  alleged that the defendants, the ten individuals you
18  identified, that their act of filing the complaint with the
19  SEEC resulted in an abuse of process.  Are you aware of that?
20       A.    An abuse?
21       Q.    Abuse of process.
22       A.    Against me or against one of us?  Against who?
23       Q.    You're alleging that their actions in filing that
24  complaint resulted in an abuse of process against you?
25       A.    I believe it, yes.
page 46
 1       Q.    And what is the basis for your claim that it
 2  resulted in an abuse of process against you?
 3       A.    My belief is that the State of Connecticut has
 4  election laws and they have a right to investigate complaints.
 5  They don't have to investigate all complaints.  They don't
 6  have to honor all complaints.  These ten individuals had an
 7  ulterior motive not -- their complaint was not to protect the
 8  citizens of the State of Connecticut against election
 9  infractions or alleged infractions, but they had an ulterior
10  motive because of the school and to get back at me and other
11  individuals, and that's not what the process is used for.
12  They conspired to do something, to gain something that they
```

-18-

```
13  couldn't gain in another way, and they used the process that
14  the state gives us with the laws to protect citizens against
15  election infractions.
16       Q.   Okay.  Well, what is the basis for your claim that
17  the defendants had an ulterior motive?  Is that just based on
18  your belief?
19       A.   To me it's clear.
20       Q.   Okay.  I understand that, but I am asking what that
21  is based on.  Is it based on your belief that it's clear that
22  they had an ulterior motive?  What is it based on?
23       A.   Why would they file a complaint?  They never filed
24  it before.
25       Q.   You don't get to ask the questions.
page 47
1        A.   Huh?
```

[47:1] - [48:25]

6/26/2004   John Cassidy

• Exhibit K. Deposition of John J. Cassidy

```
page 46
25       Q.   You don't get to ask the questions.
page 47
1        A.   Huh?
2        Q.   You don't get to ask the questions.  My question to
3   you is, what is the basis for your belief that they had an
4   ulterior motive?  Is it just something that you believe or do
5   you have any support for that?
6        A.   I ran advertisements before, never put my address
7   before and I never had a complaint filed against me before.
8        Q.   Okay.  My question is, is your argument that there
9   was an ulterior motive against you, is that --
10       A.   Of course.
11       Q.   -- just based on your belief?
12       A.   Yes.
13       Q.   And can you tell me how the filing of the SEEC
14  complaint by the defendants, how that was an abuse of process?
15       A.   Because they used the system to make a gain; to
16  demean us and to take away and violate my rights; and that is
17  wrong and that's an abuse of process.
18       Q.   Well, how did they violate your rights?
19       A.   Because in my opinion it had nothing to do with
20  election laws.  It had all to do with the school project and
21  the election.
22       Q.   Well, did any of the ten defendants that you
23  identified appear at the hearing of your complaint before the
24  SEEC?
25       A.   At my hearing?
page 48
1        Q.   Yes, at your hearing?
2        A.   No, they weren't there.
3        Q.   Did any of the defendants offer any type of written
4   statement or testimony at the hearing against you?
5        A.   No, they did not.
6        Q.   Did any of the defendants that you identified offer
7   any evidence at your hearing against you?
8        A.   I thought I answered that, but they didn't.  No,
9   they did not.
10       Q.   And the SEEC did, in fact, find you in violation of
11  the election laws.  Is that correct?
12       A.   They said I shouldn't do it again.
13       Q.   But they acknowledged that there was something that
14  you did in error and advised you not to do it again?
15       A.   That's their opinion.  I could do it again if I
16  wanted to.
17            MR. BARRANTE:  Excuse me.  To interject, I have
18       a copy of the letter that Patrick Ringrose wrote to
19       the New Britain Herald regarding the election and the
20       complaint that was filed against the plaintiffs.
21       I'll give you each a copy of it.
```

```
                    22          MS. JORDAN:  Well, I am just going to go on with
                    23     my questioning and we will take a break so I will
                    24     have a chance to go through it.
                    25          MR. BARRANTE:  That's a partial response.
               page 49
                     1     Q.   (By Ms. Jordan)  Are you also aware that in your
```

[53:1] - [53:25]    6/26/2004    John Cassidy

• Exhibit K. Deposition of John J. Cassidy

```
page 52
 25     A.   It was either him or his associate buddy there.
page 53
  1     Q.   In your complaint, you also alleged that William
  2 Petit, Patrick Ringrose and Marliss Pavano filed the complaint
  3 with the SEEC in their capacity as public officials for the
  4 Town of Plainville.  Can you tell me what the basis is for
  5 your claim that they filed the complaint as public officials
  6 or in that capacity as public officials?
  7     A.   That's the way they signed it.
  8     Q.   So, it's based purely on the manner in which they
  9 signed the complaint?
 10     A.   Right.
 11     Q.   Can you just describe for me what damages or
 12 injuries you're claiming to have sustained as a result of the
 13 defendants' filing of the SEEC complaint?
 14     A.   Rephrase that, please.
 15     Q.   What damages or injuries are you claiming to have
 16 suffered because of the filing of the SEEC complaint?
 17     A.   My reputation, number one.
 18     Q.   Anything else?
 19     A.   My credibility and my intelligence.
 20     Q.   Anything else?
 21     A.   Not, that I can think of.
 22     Q.   I'm going show you a document and I'm going to ask
 23 you to please take a look at that and let me know if you
 24 recognize that document.
 25     A.   I don't.
page 54
  1     Q.   Can you look through the entire document, please?
```

[60:1] - [61:25]    6/26/2004    John Cassidy

• Exhibit K. Deposition of John J. Cassidy

```
page 59
 25     Q.   Well, how did it intimidate you?
page 60
  1     A.   By their action of filing the complaint.
  2     Q.   Can you be more specific?
  3     A.   No, I can't.
  4     Q.   Well, did the filing of the complaint prevent you
  5 from publishing any materials in any newspaper?
  6     A.   It made me look and be very careful of what I did
  7 and I said.
  8     Q.   Okay.  But my question to you is, did the filing of
  9 the complaint prevent you from ever publishing anything in a
 10 newspaper?
 11     A.   Nothing prevents me from doing anything that I want
 12 to do.  That's my right.  I can do what I want to do.
 13     Q.   So, is your answer no?
 14     A.   Whether I suffer from it, that's another case, but I
 15 can do what I want to do.
 16     Q.   So, is that a no, that it didn't prevent you?
 17     A.   Of course it didn't prevent me.  It caused me -- it
 18 made me look at things different.
 19     Q.   And you presently write a column for the Hometown
 20 Connection.  Correct?
 21     A.   No, I don't.
```