```
14      Q   You sent a letter?
15      A   Yes.
16      Q   To whom?
17      A   Connecticut Bar.
18      Q   The Connecticut Bar Association?
19      A   Yes.
20      Q   Alleging what?
21      A   I didn't allege anything.  All I did was
22  supply the information that I had found two documents
23  in the town records showing Mr. Michalik's law firm
24  handled two mortgages on a piece of paper on the
25  corner of upper and lower Camp Street.  And the
page 78
 1  article from a newspaper clipping that showed he had
```

[81:1] - [82:25]    6/30/2004    William Cunningham

• Exhibit L Deposition of William Cunningham

```
page 80
25          Q   There is an orange envelope.  Is that some
page 81
 1  of the documents you reviewed?
 2          A   No.  Those are payments and a fax
 3  transmittal.
 4          Q   Did you review those documents for this
 5  deposition today?
 6          A   Not really reviewed.  I just glanced at
 7  some of those.
 8          Q   In that envelope?
 9          A   Yes.
10          Q   And it helped refresh your recollection?
11          A   On some things, yes.
12          Q   May I see it?
13          A   Sure.
14          Q   You say your reputation has been damaged?
15          A   Yes.  In my opinion.
16          Q   And your reputation has been damaged so
17  much -- what present office do you hold in the Town of
18  Plainville?
19          A   I am a sitting Inland Wetlands
20  Commissioner.
21          Q   When were you appointed as Inland Wetlands
22  Commissioner?
23          A   It would have been January 2004.
24          Q   So, your reputation was damaged so much
25  that you were appointed to the Inland Wetland
page 82
 1  Commission, correct?
 2          A   Not until this past election.  There was a
 3  change of seating on the council.
 4          Q   So, your reputation hasn't been damaged?
 5          A   Not with the new sitting council, no, it
 6  appears.
 7          Q   So, your reputation hasn't been damaged
 8  with your friends?
 9          A   I don't know if I am their friend.  It is
10  people I know.
11          Q   So, your reputation with your acquaintances
12  hasn't been damaged?
13          A   I don't know if they considered my
14  reputation or just looked at my track record when I
15  sat on the commission prior.  They figured I could do
16  the job.
17          Q   Did you have a discussion with
18  Helen Bergenty about retaining Attorney Barrante?
19          A   Possibly.  I don't recall.  There could
20  have been.  I don't recall any specific conversation
21  regarding it, no.
22          Q   Well, how did you get to Attorney Barrante?
```

-31-

```
                        23      A    I believe it was in conversation with Jack.
                        24      Q    Jack who?
                        25      A    Cassidy.
                        page 83
                         1      Q    And did you talk to Ms. Bergenty about
```

[93:1] - [95:24]        6/30/2004    William Cunningham

• Exhibit L Deposition of William Cunningham

```
page 92
25  stalking school buses and that if any person in the
page 93
 1  Town of Plainville had felt as strongly about it as he
 2  did he would recommend they call the Plainville police
 3  department and lodge a complaint.
 4           Q    Now, Mr. Ringrose is the chairman of the
 5  Board of Education?
 6           A    Yes, he is.
 7           Q    Is the defendant, William Petit, a member
 8  of the Board of Education?
 9           A    Yes, he is.
10           Q    Is the defendant, Marliss Pavano, a member
11  of the Board of Education?
12           A    Yes, she is.
13           Q    Is the defendant, Barbara Willard, a member
14  of the Board of Education?
15           A    Yes, she is.
16                    MR. BARRANTE:  I have nothing
17           further.
18
19  RECROSS EXAMINATION BY MS. KARPIE:
20           Q    I am confused.  This story you related
21  about your son, what does this have to do with this
22  case?  Does it have anything to do?
23           A    Not really.
24           Q    This claim Mr. Ringrose accused you of
25  stalking school buses, does that have anything to do
page 94
 1  with this case?
 2           A    No.
 3                    MS. KARPIE:  I don't have
 4           anything further.
 5                    MR. VERMETTE:  Thank you for
 6           clearing that up.  I don't have
 7           anything further.
 8                    MR. LASKA:  I have a few
 9           questions.
10
11  RECROSS EXAMINATION BY MR. LASKA:
12           Q    Have you sought psychiatric counseling?
13                    MR. BARRANTE:  Objection.
14           Q    Have you ever sought psychiatric
15  counseling?
16           A    Yes.
17           Q    When?
18           A    Recently.
19           Q    Who treated you?
20           A    A woman from Rocky Hill.
21           Q    For what purpose?
22           A    Pain management.
23           Q    Arising out of what?
24           A    My back injury.
25           Q    Nothing with regard to this incident?
page 95
 1           A    No.
 2           Q    Have you ever received psychiatric
 3  counseling for this particular incident?
 4           A    No.
 5           Q    So, you are not claiming any psychiatric
```

-32-

```
 6  damages?
 7       A    No.
 8       Q    Have you ever sought psychiatric counseling
 9  or any kind of psychiatric therapy prior to what you
10  have received for pain management?
11       A    No.
12       Q    Any kind of counseling?
13       A    No.
14            MR. LASKA:  Thank you.
15            MR. BARRANTE:  Is that it?
16            MR. LASKA:  Yes.
17            MR. BARRANTE:  Good.  You
18       read the complaint.  You know he's
19       not claiming psychological damages.
20
21  RECROSS EXAMINATION BY MR. BARRANTE:
22       Q    With respect to the incident involving your
23  son, did that relate to the question regarding
24  intimidation?
25            MR. VERMETTE:  Objection to the
```

• Exhibit N Deposition of Henry Syskowski

[50:1] - [51:25]        6/30/2004   Henry R. Syskowski, Jr.

• Exhibit N Deposition of Henry Syskowski

```
page 49
25  and, you know, quite a few references were made
page 50
 1  alleging that Helen Berganti owned the newspaper and
 2  ran it the way she wanted.
 3       Q    Now, you indicated a little earlier in your
 4  testimony that your concern is bringing an action on
 5  your behalf and not on behalf of the newspaper.
 6       A    I filed on my behalf, but I joined in with
 7  the suit that was against -- for the paper.  That suit
 8  had already been filed, and I joined in.  I'm Complaint
 9  No. 7, or something, in the suit.
10       Q    Would it surprise you to know that there is
11  no lawsuit on behalf of the newspaper?
12       A    No, it wouldn't surprise me.  Like I said, I
13  really didn't go through this thing in depth.
14       Q    And your intent is solely to bring a lawsuit
15  for the actions against you personally?
16       A    That was my intent when I joined in, I
17  guess.
18       Q    Okay.  Now, in your complaint are you aware
19  that you also allege that the defendants brought the
20  complaint with the SEEC as political payback against
21  you personally for your opposition to the Linden Street
22  School project?
23       A    That was one of the things, yes.
24       Q    Can you tell me what the basis is for your
25  claim that the defendants filed their complaint with
page 51
 1  the SEEC as political payback against you for your
 2  opposition to the referendum?
 3       A    I had gotten a lot of static because I voted
 4  against their followings when it came to the school.
 5       Q    When you say you got a lot of static, can
 6  you be more specific?
 7       A    At the time I think two of my grandchildren
 8  were going to Linden Street School, and I still voted
 9  against it.  But I got quite a bit of static from them
10  --
11       Q    When you say from "them," who is them?
12       A    -- for going against it.
13       Q    Who's "them"?
14       A    Bill Petit.  I know Val Dumais at a lot of
```

-33-

```
15  the Town Council meetings speaking up.  And I couldn't
16  be specific, there were other people at the meeting
17  that spoke up.  Town Council meetings, it's an open
18  meeting for anybody to attend.  I couldn't give you
19  exact names.
20      Q    But the only person you can recall is Bill
21  Petit and possibly Val Dumais?
22      A    Yes.
23      Q    What do you mean by static?
24      A    I've been having an ongoing problem with
25  Bill Petit for a few years.
page 52
 1      Q    What type of ongoing problem?
```

[55:1] - [56:25]      6/30/2004   Henry R. Syskowski, Jr.

• Exhibit N Deposition of Henry Syskowski

```
page 54
25  carefully and set an example by me for the rest of
page 55
 1  them.
 2      Q    So your belief about Bill Petit's intent to
 3  file a complaint against you because of the school
 4  referendum is really based on the fact about this gun
 5  license issue?
 6      A    It's a compilation of quite a few things,
 7  not just that one specific.
 8      Q    So nothing specific, just a variety of
 9  things?
10      A    Yeah, quite a few.  I guess you might say
11  that was "the coup de grace," the last straw.
12      Q    Now, in your complaint you also allege that
13  the defendants filed the SEEC complaint for the purpose
14  of influencing the outcome of the election and the
15  referendum.  Are you aware of that?
16      A    Yes.
17      Q    Can you tell me what the basis of your claim
18  is that the purpose of the defendants was to influence
19  the election and the referendum?
20      A    Well, like I stated earlier, they would have
21  done anything at all to keep me from getting into
22  office, absolutely anything.  I had been slandered and
23  whatnot at Town Council meetings.
24      Q    Well, how would the filing of the SEEC
25  complaint influence the election?
page 56
 1      A    By putting me in bad light with the public.
 2  Once the word got out that the complaint had been
 3  filed...
 4      Q    And this is based on your opinion that it
 5  would place you in a bad light?
 6      A    Based on common sense.
 7      Q    It's your belief, though?
 8      A    Yes.
 9      Q    And what is the basis for your claim that
10  the purpose of filing the SEEC complaint was to
11  influence the school referendum?
12      A    The SEEC complaint wouldn't have influenced
13  the school referendum that I know of specifically.
14      Q    So it's your testimony that it wouldn't
15  influence the referendum?
16      A    Specifically not that I can -- no, other
17  than the fact, like I say, reference had been made to
18  the fact that we were in violation of the election laws
19  and we were the same people that voted against the
20  school referendum.  You know, things of this nature.
21      Q    But nothing specific that you can think of
22  as you sit here?
23      A    Not that I can recall.  I have to apologize,
```

```
                                    24  like I say, because I've had 19 hospital admissions
                                    25  since this and 11 surgeries. I spent six months in one
                                  page 57
                                     1  convalescent home and three months at another; so it's
```

[57:1] - [58:25]                  6/30/2004    Henry R. Syskowski, Jr.

                                  • Exhibit N Deposition of Henry Syskowski

```
                                  page 56
                                    25  since this and 11 surgeries. I spent six months in one
                                  page 57
                                     1  convalescent home and three months at another; so it's
                                     2  kind of hard to remember this in between everything
                                     3  else.
                                     4       Q    Okay.  We're just asking to the best that
                                     5  you can remember.
                                     6       A    Okay.
                                     7       Q    In your complaint you also allege that the
                                     8  defendants' filing of the SEEC complaint resulted in an
                                     9  abuse of process. Are you aware of this?
                                    10       A    Yes.
                                    11       Q    Can you explain to me how the filing of the
                                    12  SEEC complaint resulted in an abuse of process?
                                    13       A    As it related to me, like I said in the
                                    14  letter to Mr. Oyola, nothing had been said about my
                                    15  first ad appearing. And if it was to make sure that
                                    16  the election laws were complied with, I would think
                                    17  they would have made a complaint when my first ad
                                    18  appeared, rather than the one just before the election.
                                    19       Q    How does that result in an abuse of process?
                                    20       A    It's what I would call selective
                                    21  enforcement.
                                    22       Q    Well, do you know if any of the defendants
                                    23  appeared before the SEEC to offer any testimony or
                                    24  statements against you personally?
                                    25       A    No.
                                  page 58
                                     1       Q    Do you know if any of the defendants offered
                                     2  any evidence against you before the SEEC?
                                     3       A    No.
                                     4       Q    And you, in fact, signed the consent
                                     5  agreement with the SEEC about the violation that was
                                     6  marked as Defendants' Exhibit 2 that you looked at
                                     7  earlier?
                                     8       A    Yeah. I signed this on the recommendation
                                     9  of Mr. Oyola.
                                    10       Q    Now, in your complaint you also allege that
                                    11  the defendants William Petit, Patrick Ringrose and
                                    12  Marliss Pavano acted willfully and maliciously against
                                    13  you personally in filing the SEEC complaint. Are you
                                    14  aware of that allegation?
                                    15       A    Yes.
                                    16       Q    What I want to do is I want to go through
                                    17  that with regard to each of the people I've identified.
                                    18  Can you tell me what is the basis for your belief that
                                    19  William Petit filed a compliant with a malicious intent
                                    20  towards you personally?
                                    21       A    Well, like I said, I'd been having problems
                                    22  with Mr. Petit for years before this.
                                    23       Q    So this would be the gun issues --
                                    24       A    Right.
                                    25       Q    -- that you've mentioned earlier?
                                  page 59
                                     1       A    Right. A compilation of everything.
```

[65:1] - [66:25]                  6/30/2004    Henry R. Syskowski, Jr.

                                  • Exhibit N Deposition of Henry Syskowski

Segal & Laska LLC / Attorneys at Law / 63 East Main Street / Plainville, Connecticut 06062

```
page 64
25      Q       So it's your testimony that Marliss Pavano
page 65
 1   as well made reference to the complaint and violation
 2   of the election laws when you would speak?
 3      A       Yes.
 4      Q       And you believe that that was a harassment
 5   of you for violation of the election laws?
 6      A       For alleged violation, yes.
 7      Q       In your complaint you also allege that
 8   William Petit, Patrick Ringrose and Marliss Pavano
 9   filed their complaint with the SEEC in their capacity
10   as public officials for the Town.  Are you aware of
11   that allegation?
12      A       I know Bill Petit was a public official, and
13   Pat Ringrose was chairman of the school board.  Miss
14   Pavano, I'm really not that familiar with.  I thing she
15   was a board member.
16      Q       What's the basis for your claim that when
17   they signed the SEEC complaint they did so in their
18   official capacity as a town official?
19      A       I'm trying to think back to the complaint.
20   I'm trying to think.  I think some did sign as
21   officials.  Others were known to be officials.
22      Q       Is the basis of your claim just purely on
23   the fact on how they signed the complaint, that they
24   signed with their title?
25      A       That, plus, like I said, they were known as
page 66
 1   public officials.
 2      Q       So just the fact that they signed with their
 3   titles and they were generally known as public
 4   officials?
 5      A       Yeah.  And the way the Town Charter reads,
 6   they would be held responsible for any actions, etc.
 7      Q       Well, do you know if the Town sanctioned and
 8   voted to say go ahead and file the SEEC complaint?
 9      A       I really don't know, but I know the Town
10   agreed to defend them in some capacity.  That was
11   brought up at a meeting.  And Attorney Mischalik said
12   they'd be defended by the Town, so I would assume that
13   the Town was backing them.
14      Q       So that's just your assumption?
15      A       Yeah.  Nothing was said to me specifically.
16      Q       Now, can you just explain for me what
17   damages or injuries you're claiming to have sustained
18   as a result of the filing of the SEEC complaint?
19      A       Well, most of it is the stress factor
20   related to, you know, hearing this over and over at the
21   coffee shop, at the Town Council meetings.
22      Q       Anything else or just the general stress?
23      A       The general stress factor that's involved.
24      Q       Okay.  I'm going to show you a document and
25   ask you to take a look at that.
page 67
 1      A       Do you want me to read the whole document?
```

[68:1] - [69:25]         6/30/2004   Henry R. Syskowski, Jr.

• Exhibit N Deposition of Henry Syskowski

```
page 67
25      A       Yes.
page 68
 1      Q       How much time did you have to spend
 2   defending yourself?
 3      A       I don't know exactly.  Like I say, Mr. Oyola
 4   had called me, and when I had told him I wasn't
 5   involved in the group ad that was the center of the
 6   complaint, and I had mentioned to him there was a
```

```
 7  previous ad to the November ad, he had told me he would
 8  have to amend the complaint, fax it to me for me to
 9  sign it and fax it back.
10       Q    Well, would --
11       A    I would probably say on that aspect maybe
12  three and a half hours with him all tolled for the day.
13       Q    Now, in that response you also indicate that
14  you were infringed on your right to freedom of the
15  press.
16       A    Yes.
17       Q    Can you tell me how?
18       A    Because I was unjustly penalized for placing
19  an ad.
20       Q    Are you saying that you're prevented from
21  placing any other ads should you feel like doing so?
22       A    Ads per se, no.  Political ads -- I never
23  ran it again because of, you know, the hassle involved
24  with that.
25       Q    So this hasn't prevented you from placing an
page 69
 1  ad or writing a letter to the editor of the paper or
 2  anything of that sort?
 3       A    No, it hasn't.
 4       Q    Has this prevented you at all from speaking
 5  freely on political issues or concerns that you have at
 6  council meetings?
 7       A    By no means.
 8       Q    Now, looking at the last sentence of that
 9  response --
10       A    To justify, I had to defend myself at
11  counsel meetings, but I never hesitated to speak up.
12       Q    Okay.  The last sentence of that response
13  you indicate that this incident has caused you anxiety
14  that resulted from this experience, which may have had
15  an adverse impact on existing medical problems.
16       A    Yes.
17       Q    Can you explain that to me?
18       A    I was in a cancer support group at the
19  Veterans' Hospital.  And when all this came about, I
20  was put into -- I don't know what group it is, it's a
21  support group, people with depression and things of
22  that nature.
23       Q    Well, is it your claim that the SEEC
24  complaint caused your depression or caused you to be in
25  that group?
page 70
 1       A    The SEEC complaint and the hassle that
```

• **Exhibit O Deposition of Jeanette Hinkson**

[48:1] - [48:25]     6/29/2004    Jeannette Hinkson

• Exhibit O Deposition of Jeanette Hinkson

```
page 47
25       A.   It may have been -- it may have been December
page 48
 1  because we had already been to the Election Enforcement.
 2       Q.   So, it was after you already went up to the
 3  commission?
 4       A.   Yeah, it was.
 5       Q.   And do you recall who was present at the meeting?
 6       A.   At the Election Enforcement or with Mr. Barrante?
 7       Q.   No.  The meeting with Mr. Barrante?
 8       A.   Well, Attorney Poulis was there and I believe Mr.
 9  Cassidy was there, and I believe Robert Pugliese was there,
10  Helen Bergenty, myself, Janice Eisenhauer was there, and I
11  want to say Robert Mercer, but I won't swear that he was there
12  that day.
13       Q.   Okay.
```

Segal & Laska LLC / Attorneys at Law / 63 East Main Street / Plainville, Connecticut 06062

```
14   A.   And I don't believe Mr. Majsak was there.
15   Q.   Do you recall if William Cunningham was present?
16   A.   No. I don't believe he was.
17   Q.   Do you recall if John Mastrianni was present?
18   A.   Yes, Mr. Mastrianni was there.
19   Q.   Do you recall if Henry Syskowski was present?
20   A.   I think Henry Syskowski was there, but don't hold me
21   to that one either because, like I say, I didn't really know
22   any of these people. I knew of Mr. Cassidy because he used to
23   get up at the podium at council meetings and say Jack Cassidy,
24   7 Florence Lane. But as for the rest of the candidates, no,
25   you know, I had no association with them prior to that.
page 49
1    Q.   Do you recall what was discussed at the meeting?
```

[61:1] - [62:25]      6/29/2004   Jeannette Hinkson

• Exhibit O Deposition of Jeanette Hinkson

```
page 60
25   Q.   And how about the articles that you referenced as
page 61
1  you sit here today, do you know of any specific article or
2  newspaper that it was published in?
3    A.   As far as election things or as part of, you know,
4  just discrediting Mrs. Bergenty and the paper itself?
5    Q.   No. Articles that you believe establish that the
6  defendants filed a complaint with the SEEC to discredit or
7  penalize the paper?
8    A.   No, not that I recall right at this moment.
9    Q.   Now, in your complaint, you also alleged that the
10 defendants filed their complaint with the SEEC to penalize you
11 for associating yourself with the other plaintiffs in the
12 newspaper. Are you aware of that?
13   A.   Yes.
14   Q.   Can you tell me what the basis is for your claim
15 that that's the case?
16   A.   Well, just by the remarks. Like I say, the
17 continuing remarks by Mr. Pavano, the looks I get at functions
18 from the Willards. And the Willards stem back a long way with
19 a little animosity towards me, so --
20   Q.   Anything else?
21   A.   No.
22   Q.   Okay. Well, do you believe that William Petit filed
23 the complaint with the SEEC specifically to penalize you?
24   A.   Not penalize me personally, but because of my
25 association with the paper and Mrs. Bergenty.
page 62
1    Q.   Okay. So, if I understand you, then, you believe
2  that he filed the complaint with the intent to penalize you
3  for your association with the newspaper?
4    A.   I don't know what his intent was, to tell you the
5  truth. It's very strange because I always, you know, talked
6  to Mr. Petit and thought as another business person -- we
7  served with the Chamber of Commerce and always thought things
8  were just fine.
9    Q.   So, it's your belief that he threatened to penalize
10 you?
11   A.   Yes.
12   Q.   And how about Patrick Ringrose?
13   A.   I never knew Mr. Ringrose.
14   Q.   Well, do you believe that Patrick Ringrose filed a
15 complaint with the SEEC to penalize you for your association
16 with the newspaper and the plaintiffs?
17   A.   I think Mr. Ringrose filed a complaint against me
18 because he knew I was against the school referendum.
19   Q.   Well, my question was limited to your allegation
20 that he filed the complaint to penalize you for associating
21 yourself with the other plaintiffs and the newspaper.
22   A.   Mr. Ringrose filed a complaint to penalize anybody
```

Segal & Laska LLC / Attorneys at Law / 63 East Main Street / Plainville, Connecticut 06062

```
23  that went against that referendum for that school.
24       Q.   So, that's still not the question that I'm asking.
25  In your complaint, you alleged that the defendants, including
page 63
 1  Patrick Ringrose, filed the complaint with the SEEC to
```

[63:1] - [63:24]         6/29/2004    Jeannette Hinkson

• Exhibit O Deposition of Jeanette Hinkson

```
page 62
25  In your complaint, you alleged that the defendants, including
page 63
 1  Patrick Ringrose, filed the complaint with the SEEC to
 2  penalize you for your association personally with the
 3  plaintiffs and the newspaper.
 4       A.   If you mean by that did he file it because the
 5  newspaper had a good control on what was printed about the
 6  school referendum, then, yes, he went after me for that.
 7       Q.   No.  I'm asking you why you believe he was
 8  attempting to penalize you.  I mean, it says penalize you
 9  personally specifically with your association with the other
10  plaintiffs and the newspaper, not including the school
11  referendum, just with regard to your association with the
12  newspaper and the other plaintiffs.  Do you think --
13       A.   It would be with the newspaper.  As far as the other
14  plaintiffs, I didn't know the other plaintiffs.  So, he
15  couldn't have -- if that's what he thought, that was his
16  thought, but I didn't know these other people.
17       Q.   No.  Well, my question to you is based on your
18  allegation, do you believe he intended to penalize you
19  personally?
20       A.   No.  I don't think he was going to penalize me
21  personally, but because of my association with the paper, he
22  was going to do anything he could to stop any arguments.
23       Q.   And you indicated that you didn't know William
24  Petit.  Correct?
25       A.   I knew William Petit.  He is a businessman in town.
```

[63:25] - [64:25]        6/29/2004    Jeannette Hinkson

• Exhibit O Deposition of Jeanette Hinkson

```
page 63
24  Petit.  Correct?
25       A.   I knew William Petit.  He is a businessman in town.
page 64
 1       Q.   No.  But I mean you don't know him personally?
 2       A.   Oh, I know him personally.  I am not a social -- I
 3  have never been invited to his house.
 4       Q.   Okay.
 5       A.   But I know who he is and I, you know, served on the
 6  Chamber of Commerce in different functions with him.
 7       Q.   And how about Patrick Ringrose?
 8       A.   Never met the man --
 9       Q.   How about --
10       A.   -- until after this.
11       Q.   Okay, how about Marliss Pavano?
12       A.   Never saw her except during election time.
13       Q.   And do you believe that Marliss Pavano filed a
14  complaint with the SEEC to penalize you yourself for your
15  association with the paper?
16       A.   Marliss, no.
17            MR. BARRANTE:  Can we take a short break right
18       now.  It's about four o'clock.  I just want to see if
19       Mrs. Taddy had come on the assumption that she didn't
20       get my message.
21
22            (A recess was taken)
23
```

Segal & Laska LLC / Attorneys at Law / 63 East Main Street / Plainville, Connecticut 06062

```
                          24         MS. JORDAN:  Back on the record.
                          25    Q.   (By Ms. Jordan)  Now, in your complaint you also
                     page 65
                           1   alleged that the defendants, in filing the complaint with the
```

[65:1] - [66:25]          6/29/2004    Jeannette Hinkson

• Exhibit O Deposition of Jeanette Hinkson

```
page 64
 25    Q.   (By Ms. Jordan)  Now, in your complaint you also
page 65
  1   alleged that the defendants, in filing the complaint with the
  2   SEEC, resulted in an abuse of process.  Are you aware that you
  3   made that claim?
  4    A.   Yes.
  5    Q.   Can you tell me what the basis is for your complaint
  6   that the filing of the complaint was an abuse of process?
  7    A.   Well, there were so many people that signed it, it
  8   was almost like a gang.  And as far as filing it against me, I
  9   still don't know what I did.  So, I would have to say it was
 10   an abuse of process.  I'm not an attorney, thank God.  You
 11   guys are, because you are going to sort this all out.
 12    Q.   But it's your belief that it was an abuse of process
 13   because of the number of people who signed it?
 14    A.   The number of people, and I felt as if I didn't do
 15   anything.  I still don't know if I did anything wrong.  Well,
 16   according to the SEEC, I didn't do anything, but they never
 17   withdrew the charges.  They just let it run its full course.
 18    Q.   Now, at the time that you had your hearing before
 19   the SEEC, did any of the defendants appear at the hearing
 20   against you?
 21    A.   I didn't have a hearing.
 22    Q.   You didn't?  Okay.  Did you know if any of the
 23   defendants offered any statements against you with the SEEC?
 24    A.   No, I don't.
 25    Q.   Do you know if any of the defendants offered any
page 66
  1   evidence against you?
  2    A.   No, I don't.  Just this.
  3    Q.   So, it's just your belief by the number of people
  4   who signed it and the fact that it was brought against you and
  5   not withdrawn, that's your belief that there was an abuse of
  6   process?
  7    A.   Right.
  8    Q.   Okay.  Now, in your complaint, you also alleged that
  9   each of the defendants acted willfully and maliciously against
 10   you in filing the complaint with the SEEC.  Are you aware of
 11   that?
 12    A.   Somewhat.  I know that all of them -- I really don't
 13   think -- maybe they did as a group file this because sometimes
 14   people do things in mass that they wouldn't do alone.  So, in
 15   that way, yes, but I don't think that personally -- Mrs.
 16   Pavano knows me.  I believe there is a Dean Rustic --
 17    Q.   Well, why don't I make it easier.  Why don't we go
 18   through them so you're not guessing.
 19    A.   All right.  Go ahead.
 20    Q.   Do you believe that William Petit filed the
 21   complaint with some malice towards you personally?
 22    A.   Yes.
 23    Q.   He did.  And what is that based on?
 24    A.   Based on just the remarks after the filing of what
 25   he said the night before election and after -- since then.
page 67
  1    Q.   So, these are the remarks that you have heard?
```

[81:1] - [82:1]           6/29/2004    Jeannette Hinkson

• Exhibit O Deposition of Jeanette Hinkson

Segal & Laska LLC / Attorneys at Law / 63 East Main Street / Plainville, Connecticut 06062

```
page 80
 25         A    Signed with their title.
page 81
  1         Q    Now, can you explain for me what damages or
  2    injuries you are claiming to have suffered as a result
  3    of this incident?
  4         A    Other than losing time from my business to
  5    have to go to Hartford to retain an attorney, give
  6    depositions which my business has had to suffer.
  7    Monetarily I can't tell you how many people didn't buy
  8    merchandise because they sympathize with them.  Or the
  9    remarks I was involved in some criminal act along with
 10    my good friend, Ms. Bergenty.
 11              That is another remark.  You must have done
 12    something, the state is investigating you.  Other than
 13    that which when you have a stroke or a heart attack
 14    this cannot be a proven thing because you don't know
 15    what caused it.  But I have always been a very healthy
 16    and strong person until after this.  To have a doctor
 17    swear this heart attack or this stroke was caused by
 18    this, you can't -- no one knows what this is caused
 19    by, but I know how I felt.  I know I can't face people
 20    anymore.
 21                    MS. JORDAN:  Could you read
 22              back the response when she was
 23              talking about the business
 24              suffering.
 25                    (At which time the Reporter
page 82
  1              read the last question.)
  2    BY MS. JORDAN:
```

[124:1] - [125:25]        6/29/2004    Jeannette Hinkson

• Exhibit O Deposition of Jeanette Hinkson

```
page 123
 25         A    Yes.  Then it says, "Ms. Hinkson, this is
page 124
  1    to inform you that Mrs. Kathryn Lawson has filed a
  2    complaint against you for alleged violations of
  3    Connecticut General Statutes Section 9-33(d),
  4    9-33(f), 9-33(w).
  5         Q    That is from the state, though; is that
  6    right?
  7         A    Yes.
  8         Q    Did you ever see any complaint that the
  9    defendants filed that included you by name?
 10         A    The only letter I have was another letter
 11    from the state.  I don't have it.  That said that the
 12    state said that these people had made the charges
 13    against me.  And that was from Mr. Blumenthal's office
 14    that said that.
 15         Q    So, there is another letter other than this
 16    one that I just showed you.
 17                    MS. KARPIE:  Why don't we have this
 18              marked.
 19                    (At which time the Letter
 20              referred to was marked Defendant's
 21              Exhibit Three for Identification.)
 22
 23    BY MS. KARPIE:
 24         Q    Looking at Exhibit One a copy of your ad.
 25         A    It's not an ad.  It is a public service
page 125
  1    announcement.
  2         Q    That indicates you wrote it?
  3         A    No.
  4         Q    In fact, it said it was paid for by Someone
  5    Who Cares?
```

Segal & Laska LLC / Attorneys at Law / 63 East Main Street / Plainville, Connecticut 06062

```
                   6      A    Yes.
                   7      Q    Do you have any knowledge as to whether any
                   8 one of the defendants knew you had written that
                   9 particular ad or public service announcement, whatever
                  10 you want to call it?
                  11      A    The rest of the candidates.  The rest of
                  12 these people in there, the Cassidys, all those people.
                  13 Is this who we are talking about?
                  14      Q    What I am asking you if you know whether
                  15 the people you have sued in this lawsuit, the
                  16 defendants?
                  17      A    Knew that I put that in?
                  18      Q    Yes.
                  19      A    Well, I assume that the Election
                  20 Enforcement Commission must have told them.
                  21      Q    And how would they have found that out, the
                  22 Election Enforcement Commission?
                  23      A    I told the Election Enforcement Commission.
                  24 I went before them, told them I did that.
                  25      Q    Until you told the Election Enforcement
                  page 126
                   1 Commission that this ad or public service
```

[136:1] - [137:25]        6/29/2004    Jeannette Hinkson

• Exhibit O Deposition of Jeanette Hinkson

```
page 135
 25 with the SEEC, did any of the defendants know that you
page 136
  1 had paid for the Someone Who Cares announcement?
  2      A    No.
  3      Q    You said it would be very easy to find out
  4 when the Hometown Connection's November 2001 issue was
  5 first available to a member of the general public.
  6 How would you go about doing that?
  7      A    I would probably call the printer and find
  8 out when it was sent to the post office because that
  9 would be the first step.  And then -- not the post
 10 office, to the labeling company.  Then the labeling
 11 company would have then -- it usually takes a day or
 12 so to send it up to the Plainville post office.
 13      Q    What's the typical number of days for an
 14 edition to be available to the public from the time it
 15 leaves your office?
 16      A    From the time it leaves my office at that
 17 time was probably about three or four days.
 18      Q    And you don't know as you sit here today
 19 what day the paper left your office back in November
 20 of 2001?
 21      A    No, I don't.
 22      Q    Where do the Balbonis pick up the paper to
 23 be publicly displayed?
 24      A    At the Plainville post office.
 25      Q    Okay.  Those papers wouldn't have labels on
page 137
  1 them, would they?
  2      A    No.
  3      Q    So, a set of papers went to the labeling
  4 company without any labels being put on them?
  5      A    Yes.
  6      Q    Then they went to the post office?
  7      A    Yes.
  8      Q    Then the Balbonis would pick them up?
  9      A    Yes.
 10      Q    How would they know they were to be picked
 11 up?
 12      A    That was their job.  We would say the
 13 papers was going to the post office this morning.
 14      Q    How would you learn that?
```

Segal & Laska LLC / Attorneys at Law / 63 East Main Street / Plainville, Connecticut 06062

```
          15      A    Usually the labeling company would call us.
          16      Q    Say we are done with the labeling, they are
          17  at the post office?
          18      A    Yes.  We would meet them at the post office
          19  with a check.
          20      Q    Would that check be dated?
          21      A    Yes.
          22      Q    The day you pick them up or paid for them?
          23      A    Yes.
          24      Q    You have access to those checks?
          25      A    Yes.
          page 138
          1       Q    Can we request you get a copy of that check
```

[143:1] - [143:25]    6/29/2004    Jeannette Hinkson

• Exhibit O Deposition of Jeanette Hinkson

```
          page 142
          25      A    This didn't come with this.
          page 143
          1       Q    You didn't get any attachment with that
          2   letter?
          3       A    No.
          4       Q    How did you know what Mr. Oyola was talking
          5   about?
          6       A    I knew of this one.
          7       Q    How did you know about this?
          8       A    It came to Ms. Bergenty.  Ms. Bergenty said
          9   look at this.  Next thing I know I get this.  I am
          10  drawn into it.
          11      Q    So, you did see the June 23, 2001, Exhibit
          12  One?
          13      A    Yes, I saw it.
          14      Q    Is that the only complaint you saw signed
          15  by these ten individuals about the November 2001
          16  Hometown Connection?
          17      A    No.
          18      Q    Your name is not listed in the complaint?
          19      A    No.
          20      Q    When you got the letter from Mr. Oyola,
          21  nobody filed a complaint against you.  Your name is
          22  not in it?
          23      A    I called Mr. Oyola, I asked him.  That's
          24  when he said I was going to jail and get a two
          25  thousand dollar fine.
          page 144
          1       Q    You didn't say my name isn't in here?
```

[147:1] - [147:25]    6/29/2004    Jeannette Hinkson

• Exhibit O Deposition of Jeanette Hinkson

```
          page 146
          25  defendants ever learned of that?
          page 147
          1       A    No.
          2       Q    Okay.  And yet you maintained that the
          3   defendants should have somehow notified the Election
          4   Commission that the charges against whoever paid for
          5   that ad should be withdrawn.  What is the basis for
          6   your being able to say that?
          7       A    The basis is did the Election Enforcement
          8   Commission make this up and file the charges for
          9   Ms. Lawson?  By this letter Ms. Lawson somehow filed
          10  the charges.  So if Ms. Lawson filed the charges then
          11  she -- she figured I wrote something.  My name isn't
          12  in there.  Did the state do this then?  Is this what
          13  you're saying?
          14      Q    No, Ma'am.  You're saying the defendants,
```

-43-

Segal & Laska LLC / Attorneys at Law / 63 East Main Street / Plainville, Connecticut 06062

```
15  the ten people who signed the SEEC complaint should
16  have withdrawn the charges against you.  I am trying
17  to explore your basis for that assessment.  How do you
18  come to that conclusion if they didn't know it was
19  you?
20       A   Yes.
21       Q   And you have no basis to know they ever
22  found out it was you.  And those charges were
23  ultimately dismissed by the State.  When did they
24  possess any information that should have led them to
25  withdraw those charges?
page 148
1        A   I have no idea.
```

[189:1] - [190:25]

6/29/2004    Jeannette Hinkson

• Exhibit O Deposition of Jeanette Hinkson

```
page 188
25  ordered it or didn't order it I don't know.
page 189
1        Q   You are not saying Ms. Bokus was --
2        A   All I know she requested a copy of the
3   tape.
4        Q   That is all you know?
5        A   That is all I know.
6        Q   Are you a still a member of the Republican
7   Town Committee?
8        A   Yes, I am.
9        Q   What facts do you have that would indicate
10  that Mr. Pavano wanted to penalize you for associating
11  with this newspaper?
12       A   Other than remarks he's made in Plainville.
13       Q   The remarks -- the only remark that you
14  know --
15       A   Not to me.  He doesn't talk to me.
16       Q   And the only remarks you know he made were
17  November 5, 2001?
18       A   That is right.
19       Q   What facts do you have within your own
20  knowledge that he's abusing the process by filing a
21  complaint with the SEEC?
22       A   Only they filed the charges and that letter
23  from the SEEC.
24       Q   And I take it -- your name is not in this
25  complaint?
page 190
1        A   Not on this original complaint.
2        Q   You have other facts other than the fact
3   that complaint was filed with the SEEC?
4        A   Yes.  And the letter from Mr. Blumenthal's
5   office.
6        Q   What facts do you have that would indicate
7   that Mr. Pavano acted either willfully or maliciously
8   in these incidents?
9        A   Like I say, only from the things that were
10  said around town and what Mr. Mercer told me.
11       Q   I am not asking what Mr. Mercer said.  I am
12  not asking what you heard from gossip.  I am asking
13  what you have of your own personal knowledge.
14       A   Mr. Pavano would know me and has known me
15  since the early '70s and knows better than to come up
16  and do something like that and start calling me names.
17       Q   So, you're saying he wouldn't call you
18  names?
19       A   Not to my face.
20       Q   Now, you have had an ongoing dispute with
21  the Willards, correct?
22       A   I haven't had an ongoing dispute with them.
23  I don't get in a confrontation with them.  It is just
```

```
24  that is what happened and I feel that there is an
25  animosity there because of what happened with the
page 191
 1  return to the association. I don't care one way or
```

[200:4] - [200:24]

6/29/2004   Jeannette Hinkson

• Exhibit O Deposition of Jeanette Hinkson

```
page 200
 3       A    It could have been. That might have been.
 4       Q    So, when you told Attorney Laska that the
 5  Hometown Connection would not publish this you meant
 6  as a letter to the editor not as an exhibit to another
 7  article?
 8       A    That is what I said it would have to be in
 9  conjunction with something else. Someone would have
10  to take credit for putting it in.
11       Q    At some point did you call Mr. Gilberto
12  Oyola?
13       A    Yes.
14       Q    Did he explain to you what the problem was
15  that the Commission was investigating with respect to
16  you?
17       A    They were investigating all the ads in it.
18  He asked me what my ad was. That was the ad. He
19  already had that. He had a copy of that from our
20  bookkeeper.
21       Q    He already had this ad referring to Hinkson
22  Number One. When you explained to him Someone Who
23  Cares was you, did he say very well, no problem?
24       A    No.
25       Q    What did he say?
```

[204:14] - [205:1]

6/29/2004   Jeannette Hinkson

• Exhibit O Deposition of Jeanette Hinkson

```
page 204
13  RECROSS EXAMINATION BY MR. LASKA.
14       Q    That public service announcement, if you
15  had not told the SEEC that you wrote that public
16  service announcement you probably would never have
17  been subject to a complaint, correct?
18       A    You have to tell.
19       Q    But you told them?
20       A    Of course, I told them.
21       Q    You told them. Ms. Lawson didn't tell
22  them, correct?
23       A    I have no idea what Ms. Lawson told them.
24       Q    But you told the SEEC that you were the
25  concerned citizen?
page 205
 1       A    Yes.
 2       Q    Okay. Was Mr. Barrante showing you
```

Segal & Laska LLC / Attorneys at Law / 63 East Main Street / Plainville, Connecticut 06062