FILED

2004 SEP 10 A 11: 51

U.S. DISTRICT COURT
HARTFORD, CT.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN J. CASSIDY, ET AL | CIVIL NO. 3.02CV1688(CFD) |
| Plaintiffs | |
| v. | |
| KATHRYN M. LAWSON, ET AL | |
| Defendants: | SEPTEMBER 9, 2004 |

## MOTION FOR SUMMARY JUDGMENT

The Defendant, Daniel Ciesielski, pursuant to Fed. R. Civ. P. 56 (c) moves for Summary Judgment on the First, Third, Fourth and Fifth Counts of the Plaintiffs' Second Amended Complaint dated November 18, 2002.

The Defendant is entitled to Summary Judgment for the following reasons:

1). The Plaintiffs' abuse of process claims fail as a matter of law;

2). The Defendant is entitled to absolute immunity with regard to the abuse of process claims;

3). Plaintiff Hinkson's claim of malicious prosecution fails as a matter of law;

4). As to the Third Count (John Mastrianni v. Daniel Ciesielski), this is a libel action and the following pertains:

Defendant allegedly made statements published in The Herald, a New Britain based newspaper. The statements arose out of a recent referendum in Plainville

- 1 -

involving the construction of a new school (hereinafter referred to as the Linden Street school project). In response to a certain leaflet *[See attached Exhibit 2]* the plaintiff distributed opposing the school project, defendant remarked that the information Mastrianni was spreading was incorrect. "I think he put the information out intentionally". Plaintiff alleges that this quoted statement is defamatory. Plaintiff alleges that defendant also made the following statement referring to plaintiff and others: "This was about a group of citizens that were going to say anything they could to prevent this school from being built." Plaintiff alleges that this statement is libelous as well.

As to this last quoted statement, the defendant did not say it. The quote is attributed, in the newspaper article, to one Anthony Zaleski. A copy of the article is attached *[See attached Exhibit 1]* along with a pertinent portion of plaintiff's deposition testimony *[See attached Exhibit 3]*.

As to the statement "I think he put the information out intentionally", it is either not libelous or a privilege attaches to it preventing it from serving as the basis for an action in libel. It is pure opinion; it does not imply an objectively verifiable statement of fact; defendant made it in the course of or in the context of a political campaign.

In support of this Motion, defendant submits a Memorandum of Law.

THE DEFENDANT,
DANIEL CIESIELSKI

BY /s/ Paul M. Clyons
Paul M. Clyons, Esq.
Law Offices, Rodd J. Mantell
700 Stanley Drive
New Britain, CT 06053
Tel: (860) 827-4351 / Facsimile: 827-4386
Federal Bar No. CT06291

## CERTIFICATION

I hereby certify that a copy of the above was mailed, postage prepaid, on September 9, 2004, to:

William T. Barrante, Esq.
P.O. Box 273-65 Elm Street
Watertown, CT 06795

Kenneth John Laska, Esq.
63 East Main Street
Plainville, CT 06062

Karen Karpie, Esq.
350 Fairfield Avenue, Suite 408
Bridgeport, CT 06604

Beatrice Jordan, Esq.
Howd & Ludorf
65 Wethersfield Avenue
Hartford, CT 06114

Charles E. Vermette, Jr.
Litchfield Cavo
40 Tower Lane, Suite 200
Avon, CT 06001

John Barbieri, Esq.
18 Cedar Street
New Britain, CT 06050

David Koskoff, Esq.
144 West Main Street
Plainville, CT 06062

_____
Paul M. Clyons, Esq.
Attorney for Daniel Ciesielski
Federal Bar No. CT06291

**EXHIBIT 1**

EXHIBIT

Page B1 | Page B3

# THE HERALD

**SATURDAY**
February 23, 2002
Our 122nd Year
No. 361

www.ctcentral.com

Series

Details...

## Councilwoman under fire

### State continues to review political ads in newspaper

By MARK CYPHERS
Staff Writer

PLAINVILLE -- For the third time in her political career, Councilwoman Helen Bergenty may be asked to resign from her seat on the Town Council.

"... if Mrs. Bergenty is found guilty of violating state election law, I would ask for her immediate resignation from the Town Council," Plainville resident and Board of Education member Anthony Zaleski wrote in a letter to the editor appearing in today's edition of *The Herald*.

"I was elected by the people, to represent the people, and that is what I intend to do," said Bergenty, who vehemently declined Zaleski's possible invitation to resign.

Bergenty will appear in front of the state Elections Enforcement Commission next month following a three-month investigation into several ads which appeared in November's edition of Plainville's *Hometown Connection* newspaper, of which Bergenty founded and is currently president.

The commission will hear Bergenty's side of the issue, as well as the state's, and then make a decision on whether Bergenty did indeed violate state election laws, said Albert Lenge, deputy director of the state Elections Enforcement Commission. While a specific date has not yet been set, Lenge said the public hearing will most likely happen around

REACTION continues on Page A6

## Court date is set

Snelgrove

## Crash killed wives

Husbands

**U.S BEATS RUSSIA**

# REACTION: Councilwoman under fire

from A1

the middle of March.

In Bergenty's case, the commission has specifically been investigating an ad that prompted readers to vote for petitioning candidates shortly before last fall's elections, Lenge said. The ad partially reads, "The petitioning candidates ask for your support in the upcoming election."

Because there was no attribution on the ad, Lenge said the commission will be investigating who was responsible for paying for it. State law requires that any ad paid for by a candidate must have the name and address of the candidate printed following the words "paid for by."

The commission will also be questioning whether or not the Hometown Connection had the right to print such an ad while Bergenty was a candidate running for office at the same time she was the president of the newspaper.

The ad was paid for by by the newspaper and was put in simply as a favor to the petitioning candidates, Bergenty said.

In addition to the investigation by the commission, a disclaimer printed in every edition of the Hometown Connection states that "... the corporation shall not participate in, or intervene in any political campaign on behalf of or in opposition to any candidate or public office."

"To allow her paper to print misleading and biased information is unfortunate and wrong," Zaleski wrote in his letter. "As it is, the IRS frowns on non-profit papers being used for political purposes."

"As far as I am concerned, this was not a political ad," Bergenty said to questioning about the advertisement.

By giving the newspaper a non-profit status, it is also intended to be non-political, which is not the case in the Hometown Connection, said Zaleski. Free speech is great, but not when it is used in a biased fashion, he said.

"Elected officials will be held to a higher standard," Zaleski continued. "If (Bergenty) did not do anything wrong and it was somebody else at the paper, then (Bergenty) needs to come out and say who."

As president of the paper, Bergney said she is indeed responsible for everything that goes into the newspaper.

"I am not a vicious person. I would never do what they are doing," she said of all the accusations and investigations against her. "They want to close down the paper," she added, saying that accusations were personal attacks.

"I will retract (the request for Bergenty to resign) and apologize if she is not found of any wrongdoing," Zaleski said.

Being asked to resign will be nothing new, Bergenty said. "I have been asked to resign before."

Indeed, the request was presented before the councilwoman three times in the past 10 years, once for tax debts during an election year, and once for a controversy of whether or not a decision to accept a non-supermajority vote while forming a charter revision commission. Bergenty declined each of the invitations.

"These people need to realize that they cannot do the wrong thing and then get away with it," said Daniel Ciesielski, one of 10 people who initially complained against Bergenty and the rest of the advertisements.

Walter Majsak, Robert Mercer and Henry Syskowski were all cited by the state Elections Enforcement Commission for not following state election laws when submitting their advertisement to the Hometown Connection. Each were cited for their wrongdoing and told to obey election laws in the future.

Jack Mastriani was asked to pay a $50 fine for his admitted involvement in the dispersion of improperly attributed fliers that promoted the defeat of the Linden Street School referendum. Jack Cassidy will also argue his case in from of the state Elections Enforcement Commission next month.

It is not necessarily the punishment that the violators received, but rather the fact that the state recognized that they had broken the law with their actions, Ciesielski said. In addition, he said, the information which Mastriani was spreading was incorrect and he knew it was incorrect.

"I think he put the information out intentionally," Ciesielski said.

"This was about a group of citizens that were going to say anything they could to prevent this school from being built," Zaleski said.

"There were some good people involved in not supporting Linden Street School that got sucked into these muddy politics."

Mastriani, who was out of state, was not available for comment.

As a candidate, he was not told by either the Hometown Connection or the town clerk that an address was required in a political advertisement, said Majsak.

"I don't feel I broke the law because you have to know the law to break it," he said, but added that he will make sure to abide by election laws in the future.

# SMOKING: Funding sparks a debate

from A1

ads, which are costly," Harp said. "But tobacco use costs our economy millions if not billions in prevention programs address smoking, but neither is funded with settlement money.

"Most of our money is a grant was used to take care of people (with tobacco-related illnesses) who could not afford medical bills, or who had no insurance," od was in 1997-98, with the state realizing nearly $127.2 million. It has declined slightly each subsequent year, but still weighed in at

**EXHIBIT 2**

# Save Linden – Save Plainville
# VOTE NO
## NOV. 6th



- **Reject this plan and send it back to Board of Education. It's simply to extravagant and unnecessary.**

- **Why not use one of the two alternate & less expensive plans?**

- **Other towns similar in size to Plainville are paying $8 to $10 million less for Kindergarten – grade 5. Visit State of CT web site for verification.**

- **The Education Lobby feels they need a New School to accommodate their new curriculum. Ridiculous! Do Ivy League Schools tear down 300 yr old buildings? NO! They RENOVATE.**

- **Five of our council members decided to pass the buck to the taxpayers by putting it on the referendum. This way they wouldn't have to explain the large tax increases when the Library, Police Station, Sewer Plant and other School renovations kick-in. It's said they did this to insure a large vote turn-out so they could be reelected. <u>Oh really?</u>**

- **Making matters worse we now have "All In The Family" government. Family members who are in control of Plainville's purse strings and its destiny. TAXPAYERS BEWARE.**

- **Ask yourself how much will your taxes increase when all these projects kick-in.**

  **ANSWER: A lot! Not $107 a year, but more like $400 to $500 a year. A 5 mill increase is very conservative, with $8 million interest added to our debt for the next 20 years. And don't forget to add in your sewer tax.**

- **If you want to help, please get involved and <u>VOTE NO</u> on Nov. 6.**

Published by the Silent Majority Team – Sharon Charest, *Communications* – Jack Mastrianni, *Secretary*

**EXHIBIT 3**

```
 1        Q    Do you know what he looks like?
 2        A    You know, I'm not sure I can pick him out.
 3        Q    So if he walked in the room, you wouldn't know
 4   he was Daniel Ciesielski?
 5        A    No.
 6        Q    Now, in parsing out what Mr. Ciesielski
 7   supposedly said, do you believe that if he said that he
 8   thought that the information you were putting out was
 9   incorrect, do you consider that libelous?
10        A    Could you repeat that?
11        Q    Sure.  If he were to say that, I think that
12   Mr. Mastrianni's information on the red flyer is
13   incorrect, would you consider that libelous?
14        A    No.
15        Q    Okay.  And so is it fair to say that what you
16   consider libelous is his purported statement that you knew
17   it was incorrect?
18        A    I would think so, yes.
19        Q    How do you interpret that statement?  What
20   does that mean to you?
21        A    Well, he's telling the public that I did it on
22   purpose; that I knew it was incorrect, and I did it
23   anyway.
24        Q    And --
25        A    How he would know that is beyond me.
```

1   Q   What is the meaning of him making such a
2   statement to you?  What import does it have?
3   A   That I'm a liar.
4   Q   Now, in your complaint you allege that -- this
5   is in the third count -- you allege that, "Ciesielski also
6   said in the interview that plaintiff, Mastrianni, and
7   others who opposed the project, were going to say anything
8   they could to prevent the school from being built."
9       Is it your understanding from the article that
10  Mr. Ciesielski said that?
11  A   Yes.
12  Q   Could you look at the article for me?
13  A   Yeah, sure.  Where are we now?
14          MR. BARRANTE:  Right here.
15          THE WITNESS:  Could you repeat your
16      question?
17  BY MR. CLYONS:
18  Q   Sure.  Is it your understanding that
19  Mr. Ciesielski said this was about a group of citizens
20  that were going to say anything they could to prevent the
21  school from being built?
22  A   Well, it says "Zaleski said."
23  Q   Okay.  And who is Zaleski?
24  A   I think he was on the Board of Education at
25  the time.

```
 1         Q    And did you ever ask Mr. Zaleski to retract
 2    that statement quoted in this newspaper article?
 3         A    I don't know if he was specifically talking
 4    about me there.  Looks like he was talking about other
 5    people that were involved in the complaint.
 6         Q    It's your understanding that he was excluding
 7    you from that group of people?
 8         A    I wouldn't know.
 9         Q    And why did you allege in your lawsuit that
10    Mr. Ciesielski said that?
11         A    Because he's quoted there.
12         Q    Is he quoted as saying what I just read to
13    you, that this is about a group of citizens?
14         A    No, he's not.
15         Q    Okay.  But you allege in your lawsuit that
16    Mr. Ciesielski said that?
17         A    No.  In my lawsuit I allege that
18    Mr. Ciesielski said exactly what he did say, and I
19    repeated it.
20         Q    All right.  Let me show you a copy of the
21    third count on the complaint.
22              MR. CLYONS:  Will you mark this.
23              (Defendant's Exhibit Number 5:
24              Marked for Identification.)
25
```

BY MR. CLYONS:

Q    Can you read Paragraph 9 for me.

A    Do you want me to read it out loud?

Q    You can read it to yourself.

(Pause.)

Have you finished reading?

A    Yeah.

Q    Do you not allege in that paragraph that Mr. Ciesielski said that you would say anything you could to prevent the school from being built?

A    That's what it says here.

Q    But that's not what he says.

A    That's right. That's how it was taken by a lot of people.

Q    That Mr. Ciesielski said that?

A    Uh-huh.

Q    So they were reading it as well as some people read your red flyer; correct?

A    Could be.

Q    Because it clearly says in the article that Mr. Zaleski made that statement; correct?

A    Yes.

Q    And it actually says "Zaleski said" after the quote; correct?

A    Yes.