1

1      UNITED STATES DISTRICT COURT

2        DISTRICT OF CONNECTICUT

3

4                          COPY

5

6

7   JOHN J. CASSIDY, ET AL      :
              Plaintiffs        :    CIVIL NO.3.02CV1688(CFD)
8                               :
            V.                  :
9                               :    JULY 15, 2003
   KATHRYN M. LAWSON, ET AL     :
10           Defendants         :

11

12

13

14

15        **DEPOSITION OF DANIEL CIESIELSKI**

16

17

18

19
              Erin M. Barsevich
20            LSR NO. 422

21

22
           A+ REPORTING SERVICES
23            10 Ryan Drive
       Wallingford, Connecticut 06492
24
             (203) 269-9976
25

EXHIBIT 17

4

1    D A N I E L   C I E S I E L S K I,

2                a Defendant herein, having

3                been first duly cautioned and

4                sworn by Erin M. Barsevich, a

5                Notary Public commissioned and

6                qualified within and for the

7                State of Connecticut, deposed

8                and testified as follows:

9                    THE COURT REPORTER:  Please

10               state your name and address for

11               the record.

12                   THE DEPONENT:  Daniel P.

13               Ciesielski, C-i-e-s-i-e-l-s-k-i.

14               33 Overlook Drive, Plainville.

15   DIRECT EXAMINATION BY MR. BARRANTE:

16       Q.    Mr. Ciesielski, my name is William

17   Barrante.  I represent the plaintiffs in this case.

18   Have you ever been deposed before?

19       A.    No.

20       Q.    In any lawsuit?

21       A.    No.

22       Q.    Okay.  What I'm going to do is ask you

23   questions as if we're in the courtroom except we're

24   not.  There's no judge.  Your testimony will be taken

25   down.  Your counsel will be here to protect your

14

1              you understand it.

2    BY MR. BARRANTE:

3         Q.    Do you understand the question?

4         A.    No.  I don't understand the question.

5         Q.    Okay.  Why did you find a problem with

6    these various advertisements?

7         A.    The advertisements that were presented in

8    the newspaper did not follow the rules and regulations

9    of the election commission.

10        Q.    And the newspaper was also -- the complaint

11   was also made against the newspaper?

12        A.    Not that I'm aware of, no.

13        Q.    Against Mrs. Bergenty, the president of the

14   newspaper?

15        A.    I don't remember.

16        Q.    You don't remember?

17        A.    I don't remember.

18        Q.    Against Miss Hinkson who's associated with

19   the newspaper?

20        A.    I don't think any complaint was against

21   Miss Hinkson at all.

22        Q.    Do you read Plainville's Hometown

23   Connection?

24        A.    I pick it up and look at it, yes.

25        Q.    Do you have an opinion of that newspaper?

```
 1              MR. CLYONS:  I'm going to
 2         object to the form of the
 3         question.
 4              MR. BARRANTE:  He's allowed
 5         to answer.
 6    A.    Yes, I have an opinion of it.
 7              MR. BARRANTE:  Under -- just
 8         to clarify -- Rule 701, Federal
 9         Rules of Evidence.
10  BY MR. BARRANTE:
11    Q.    What is your opinion of the newspaper?
12    A.    I'm not giving you it.
13    Q.    You're not?
14    A.    No.
15    Q.    Why not?
16    A.    Because I choose not to.
17    Q.    So you're refusing to answer that question?
18    A.    You're asking me for my opinion, my opinion
19  is my opinion, which I do not want to share.
20    Q.    Counsel?
21              MR. CLYONS:  I don't know
22         what the relevance of the
23         questioning is.
24              MR. BARRANTE:  It's certainly
25         relevant as to why this complaint
```

A+ REPORTING SERVICES

1          was made.

2                    MR. CLYONS:  I don't see how.

3          He didn't file a complaint against

4          the newspaper.

5                    MR. BARRANTE:  He filed it

6          against the people who were

7          putting out the newspaper, who put

8          ads in the newspaper.

9                    MR. CLYONS:  It's against the

10         people who put ads in the

11         newspaper, what does that have to

12         do with the newspaper?

13                   MR. BARRANTE:  Okay.

14    BY MR. BARRANTE:

15         Q.    Do you have an opinion of Helen Bergenty?

16         A.    Yes.

17                   MR. CLYONS:  I'm going to

18         object to that.

19                   MR. BARRANTE:  Federal Rules

20         of Evidence number 701, if the

21         witness is not testifying as an

22         expert, the witness's testimony in

23         the form of opinions or inferences

24         is limited to those opinions or

25         inferences which are rationally

1      based on the perception of the

2      witness.

3           MR. CLYONS:  But what does

4      that have to do with this case,

5      his opinion of various people?

6      His opinion in what context?

7           MR. BARRANTE:  His opinion in

8      the context of the Plainville

9      politics.

10          MR. CLYONS:  The Plainville

11     politics, what does that have to

12     do with your particular claims in

13     this case?

14          MR. BARRANTE:  Because it

15     arose out of an election and a

16     referendum in Plainville.

17          MR. CLYONS:  What does it

18     have to do with the filing of

19     these complaints with the

20     election's commission?

21          MR. BARRANTE:  Well, the

22     reason they were filed.

23          MR. CLYONS:  You've asked him

24     the reason they were filed and he

25     told you.

1          MR. BARRANTE:  Yeah, that was

2     the technical reason.

3          MR. CLYONS:  What other

4     reason do you want?

5          MR. BARRANTE:  The background

6     of the various defendant's

7     reasons --

8          MR. CLYONS:  Are you --

9          MR. BARRANTE:  -- for

10    entering into this group of

11    people.

12         MR. CLYONS:  Are you going to

13    ask him his opinion about every

14    one of those people?

15         MR. BARRANTE:  Yes.

16         MR. CLYONS:  Well, he's not

17    going to answer that.

18         MR. LASKA:  I want to

19    interpose an objection too.  I

20    think it's beyond the scope of

21    what this lawsuit is.  I also

22    think that it's somewhat

23    disingenuous by you, since you're

24    the attorney for the Hometown

25    Connection, I'm quite sure that

1   answers, you seem to have a very good command of the

2   Linden Street School situation.  You seem to be very

3   passionate about it.  Now, are you telling me that the

4   Linden Street School project did not factor into

5   filing this Exhibit A Election Complaint?

6        A.    Correct.  I am telling you the Linden

7   Street School had nothing to do with that complaint.

8        Q.    Nothing to do with it?

9        A.    Nothing.

10        Q.    It was not discussed at all?

11        A.    Nothing.  Had nothing to do with it.

12        Q.    You had two meetings, you had an initial

13   meeting and the meeting at which it was signed?

14        A.    Had nothing to do with it.

15        Q.    At the meeting at which it was signed, was

16   everyone there at the same time?

17                   MR. VERMETTE:  Objection.

18              Who is everyone?

19   BY MR. BARRANTE:

20        Q.    Everyone who signed the complaint?

21        A.    I don't know.  I can't -- I don't know

22   that.

23        Q.    You don't know that?

24        A.    No, I don't.

25        Q.    But there was a gathering of more than say

32

1    two people?

2         A.    Yes.

3         Q.    The Linden Street project was not discussed

4    at all?  No one mentioned it?

5         A.    I didn't say that.

6         Q.    Oh, did somebody mention it?

7         A.    What I said was is that complaint had

8    nothing do with the school.

9         Q.    Had nothing with with it?

10        A.    Yes.  Correct.

11        Q.    Nothing to do with the opposition to the

12    school that appears in the various ads that are

13    attacked?

14        A.    The Linden Street School project had

15    nothing to do with this at all, period.

16        Q.    Then that's not the reason -- the people

17    who got together to sign this were all in favor of the

18    project?

19                   MS. KARPIE:  Object to the form.

20                   MR. BARRANTE:  On what grounds?

21                   MR. VERMETTE:  Didn't make any sense.

22                   MS. KARPIE:  First of all, it

23              didn't make any sense to me and

24              secondly, it assumes things.  I'm

25              objecting to the form of the

35

1   meeting?

2        A.    No, I don't.

3        Q.    Do you remember whether the first time you

4   discussed these various advertisements was at that

5   first meeting?

6        A.    I don't remember.

7        Q.    You don't remember if you spoke to anyone

8   about these advertisements before you got together at

9   this meeting of the people who put this together?

10       A.    I don't know.  I don't know, but I believe

11  it was the first time we talked about this at the

12  meeting.

13       .Q.    Now, was this meeting -- Do you know if

14  this meeting was called for the purpose of discussing

15  this complaint?

16       A.    Yes.

17       Q.    There wasn't a meeting that happened to be

18  on some other topic in which this came up?

19       A.    Correct.

20       Q.    It was a meeting specifically to bring a

21  complaint against the plaintiffs to the State Election

22  Commission?

23       A.    No.  The meeting was to discuss the ads in

24  the paper, those items that were in the paper.

25       Q.    Okay.

1    A.    It wasn't a discussion on we were going to

2  bring suit or bring complaint or whatever the

3  terminology is, it evolved out of this.

4    Q.    So at this first meeting, it was just

5  discussing the ads?

6    A.    No.  Your question was, was this meeting

7  brought together to discuss or to bring forward a

8  complaint.  The answer to that is, No.  It evolved out

9  of the meeting.

10    Q.    Okay.  So the meeting was called to discuss

11  the ads?

12    A.    Yes.

13    Q.    What was said about the ads?

14    A.    What was said about the ads is based upon

15  what we observed in the newspaper, that the ads did

16  not meet the Election Commission requirements.

17    Q.    Do you know whether everyone at this

18  meeting already knew that before they got to the

19  meeting, or did someone say these ads are in violation

20  of the law?

21    A.    I knew that I knew that it was in violation

22  of the law.

23    Q.    Being experienced as a democratic party

24  leader?

25    A.    From my position as democratic town

44

1    STATE OF CONNECTICUT :
                          :   ss  OXFORD
2    COUNTY OF NEW HAVEN  :

3            I, Erin M. Barsevich, a Notary Public, do

4    hereby certify:

5            That DANIEL CIESIELSKI was by me duly sworn

6    in the within-entitled cause;

7            that said deposition was reported by me, a

8    Licensed Shorthand Reporter, was thereafter

9    transcribed under my direction and is a true and

10   complete transcription of all testimony given by said

11   witness.

12           I further certify that I am not a relative,

13   counsel or attorney of any party, or interested,

14   financially or otherwise, in this action.

15           IN WITNESS WHEREOF, I have hereunto set my

16   hand and seal at Oxford, Connecticut this _15th_ day of

17   ____August_____, 2003.

18

19

20   ____Erin M Barsevich_____

21   Notary Public, LSR NO. 422

22   My commission expires 9/30/04

23

24

25

WILLIAM T. BARRANTE
ATTORNEY
Collins House, P.O. Box 273
Watertown, Conn. 06795

Tel. (860) 274-0301
Winsted office:
(860) 379-9885

FAX (860) 738-4906

11th July 2002

Mr. Daniel Ciesielski
33 Overlook Drive
Plainville, CT 06062

Re: Jack Mastrianni

Dear Mr. Ciesielski:-

In my letter to you of April 4, 2002, I outlined your libeling of Jack Mastrianni in an interview you gave to the New Britain Herald, published on February 23, 2002, regarding Mr. Mastrianni's role in the defeat of the Linden Street School referendum. You stated falsely that the information Mr. Mastrianni put out to the public was "incorrect" and also that "he knew it was incorrect" and that "he put the information out intentionally."

These false statements have injured not only Mr. Mastrianni's character in the Plainville community but also defamed him as to the operation of a communications business, in which a false allegation of not being truthful would have an adverse effect on the business.

Therefore, in accordance with Section 52-237 of the Connecticut General Statutes, I hereby demand that you retract those libelous statements in as public a manner as you made them within thirty (30) days of your receipt of this letter. If this is not done, Mr. Mastrianni will seek both general and special damages against you in a civil action, pursuant to Section 52-237.

Very truly yours,

William T. Barrante

WTB/ipse

SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Daniel Ciesielski
33 Overlook Drive
Plainville, CT 06062

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X                                    ☐ Agent
                                     ☐ Addressee
B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☐ Certified Mail      ☐ Express Mail
   ☐ Registered          ☐ Return Receipt for Merchandise
   ☐ Insured Mail        ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)   7002 0460 0002 5538 8163

PS Form 3811, August 2001          Domestic Return Receipt          102595-02-M-1035



EXHIBIT 18

1

UNITED STATES DISTRICT COURT

2

DISTRICT OF CONNECTICUT

3

4

5

6   JOHN J. CASSIDY, ET AL.    :    Civil Action No.

                              :    3:02 CV 1688(CFD)

7                V.            :

                              :

8   KATHRYN M. LAWSON, ET AL.  :    December 15, 2003

9

10

11

12            DEPOSITION OF JOHN MASTRIANNI

13

14

15

16

17

18

19

20            EXHIBIT 19

21

22

23            BARBARA C. LETSON

              Licensed Shorthand Reporter

              49 Long View Drive

24            Simsbury, Connecticut  06070

              (860) 658-0500

25            FAX (860) 658-1199

4

1    J O H N   M A S T R I A N N I,

2

3           a Plaintiff herein, having

4           been first duly cautioned and

5           sworn by Barbara C. Letson, a

6           Notary Public commissioned and

7           qualified within and for the

8           State of Connecticut, deposed

9           and testified as follows:

10

11   DIRECT EXAMINATION BY MR. CLYONS:

12        Q    Good afternoon, Mr. Mastrianni.

13        A    Good afternoon.

14        Q    My name is Paul Clyons.  I represent Daniel

15   Ciesielski in this lawsuit that you have brought.  I'm

16   going to be asking you some questions about yourself,

17   about the circumstances of this case, and about your

18   claims.  If at any time I ask you a question that you

19   don't understand, let me know and I'll rephrase it; okay?

20        A    Yes.

21        Q    What's your current address?

22        A    365 Woodford Avenue, Unit 37, Plainville,

23   Connecticut.

24        Q    How long have you lived there?

25        A    Three years.

1    in relation to the old building?

2         A    It would be west on Maple Street.  The

3    building would be gone, and from there on the building

4    would go west to the end of the property.

5         Q    I want to ask you about the so-called "red

6    flyer."  It's got a number of points --

7         A    Uh-huh.

8         Q    -- and I would like to ask you about all of,

9    or most of them.

10         The first point, you say the plan is "too

11    extravagant and unnecessary."

12         A    Uh-huh.

13         Q    What is your basis for saying that?

14         A    They were doubling the size of the school and

15    they wanted to tear the old building down, and I preferred

16    to see that remain and have it renovated.  It went from

17    almost 50,000 square feet to almost 100,000.  In fact, it

18    was 112,000 and then they pushed it back to 92,000.

19         In order to achieve this, they had to project

20    school enrollment to go up and so they took the maximum

21    possible, which would be 523 children.

22         Q    And you disagreed with their projection in

23    terms of school enrollment?

24         A    No one could prove that projection, I don't

25    think, and even to this day you can't.

32

1    Q    The second point or question you pose on this

2    flyer is why not use one of the two alternate and less

3    expensive plans.  There are actually three alternate

4    plans; correct?

5    A    I was speaking of the cheaper one.

6    Q    And --

7    A    Those three did not tear the building down.

8    Q    And one of the cheaper ones I think you said

9    was 22 million; correct?

10    A    Yes.

11    Q    And the other one was, you think was 18

12    million?

13    A    I think that.  Somewhere around there.  I'm

14    not sure.  The figures were constantly changing.

15    Q    And was that difference in price what made you

16    think that Plan B was not the correct plan to use?

17    A    Would you repeat the question?

18    Q    Sure.  The difference in price between 18 and

19    24, 25 million or 24, 25 million and 22 million, is that

20    what motivated you to disagree with Plan B?

21    A    Well, I thought all the plans were very

22    expensive to start with.  And it could have been done

23    cheaper.  But of the four plans, I would have taken the

24    cheaper plan because it saved the school.

25    Q    Why did you think it could have been done

1   cheaper?

2        A    Because other towns had done it cheaper.  They

3   picked a very expensive architect in my view.

4        Q    And how do you know that the architect was

5   more expensive than architects the other towns have used?

6        A    By looking in the Web site and finding out

7   what the final costs were between those and various

8   architects.

9        Q    And was that --

10       A    It was listed on the Web site.

11       Q    Other than the architect, was there any other

12   explanation for the difference in the price between the

13   Plainville proposal and what other towns had done?

14       A    No.

15       Q    Other than looking on that Web site, did you

16   do any other investigation to determine why there were

17   these differences in cost?

18       A    I had been involved in many restorations at

19   Aetna Life and Casualty and Capitol Avenue projects where

20   old brick buildings and factories were renovated and got

21   facts and figures from various people who worked on those

22   particular buildings.

23            It was all -- it was based on square footage

24   and how much a square foot for renovation as to building

25   and renovating old and renovating new.  I estimated that

34

1    you could renovate it $150 a square foot, and in my view

2    and my research, and they were coming up well over 210 or

3    $20 a square foot in the proposal on Kaestle Boos.  So I

4    thought their basic per-square-foot costs were sort of out

5    of line.

6            And what was prompting me to get involved in

7    this is every week there would be a different percentage

8    that would come out in the paper by one of the various

9    members that was speaking, spokespersons for the

10   committee.

11           It started out at 62.5 that the state would

12   reimburse the town.  Then the following week it was 67.5,

13   when, in effect, they weren't telling people in the town

14   who were eventually going to vote on this that that

15   percentage is correct.  It could have been correct in both

16   case.  But they do not pay for hallways or gyms, things

17   like that.

18           So the actual cost to the town was more like

19   65 percent for the town, or it ended up the state was only

20   reimbursing the town for about 45 percent, 48 percent,

21   depending on how the construction was going to go.

22           You would get more money for renovating an old

23   school, as Newington did a 1910 school, than you would for

24   building new.  That's how the state factors those things.

25       Q    How do you know that?

1     A     Because I called.

2     Q     Who did you call?

3     A     The guy that -- I have his name here.  Dave --

4     I should know it.  I personally went up and talked with

5     him.  Let me go through the minutes.  I can get his name.

6                    (Pause.)

7                    I have some minutes here; doesn't have his

8     name in here.  He's the same gentleman that the

9     Superintendent of Schools, Kathy Binkowski, and I

10    discussed at the State Department of Education on what the

11    new -- the second referendum was going to be about.  And

12    for the life me, I just can't think.

13    Q     This Dave person, he worked for the State of

14    Connecticut?

15    A     Yes.  He's the head man you talk to and tells

16    you what you can get in ways of grants and what you cannot

17    get.

18    Q     And in what department of the State of

19    Connecticut does he work?

20    A     Department of Education.  Facilities unit of

21    the state Department of Education.

22    Q     So the steering committee at that time, prior

23    to the first referendum -- let me back up a minute.

24                    Was the November 2001 referendum on the Linden

25    Street School the first referendum for the Linden Street

1    School?

2        A    Yes.

3        Q    Okay.   The steering committee that proposed

4    Plan B was indicating to the public that the State of

5    Connecticut would pick up roughly 67, 65 percent of the

6    cost of the plan; is that correct?

7        A    Yes.

8        Q    And you talked to this Dave person at the

9    Department of Education, and after talking to him, it was

10   your opinion that the actual reimbursement by the state

11   would be 45 percent?

12       A    That's correct.

13       Q    Okay.

14       A    And that was true because that's exactly what

15   the state offered in writing.

16       Q    And when did they offer that in writing?

17       A    Well, they have to do that.  They would do

18   that, in those days, before it went to referendum.  The

19   rule is now changed.  They don't do it until after the

20   referendum is approved.  But before referendum they would

21   give you an amount, and I believe the amount the town

22   would have to pay on that particular B plan was

23   $13.5 million.  So if you do the math, $13.5 million is

24   more than half of a 24.2-million-dollar budget, so

25   therefore, the town was actually paying more.  The state

1   was not giving in real dollars 67 percent of the total

2   cost.   That was not being conveyed to the people of

3   Plainville.

4        Q    Now, the Department of Education put this in

5   writing that they were only going to pay the difference

6   between $13.5 million and 24-point-whatever million?

7        A    I believe so.

8        Q    And was this communicated to someone prior to

9   the November 2001 referendum?

10        A    To someone?  I'm sorry.

11        Q    Yes.   Was this written to someone, the

12   steering committee or someone in the town, before the

13   November 2001 referendum?

14        A    I'm not sure.  I would expect it would have

15   been.  The final dollar figure would depend upon the plans

16   submitted after the referendum was approved.  Before the

17   money is given out, they have to go over the plans.

18        Q    All right.  But did I understand you correctly

19   that in November of 2001 the state would commit to an

20   amount prior to the actual referendum?

21        A    Well, yes.  Here it is.  It says, "Estimated

22   cost to Plainville was $13.553 million on the proposed B

23   plan."

24        Q    Where are you?

25        A    I'm reading at the bottom.  That had to be

38

1    given to -- the architects work with the state when they

2    put their budgets together as to what it's going to cost.

3    See that at the bottom?

4         Q    Okay.  So you're looking at the second page

5    of --

6         A    Looking at the B --

7         Q    Okay.  You're looking at Option B, and this is

8    on the second page of Exhibit 3.  And this is what was --

9         A    The estimate.

10        Q    -- the estimate, and this was given to the

11    public prior to the vote; correct?

12        A    I think it was.  I've got it there.

13        Q    And so the estimated cost to the town of

14    $13.5 million and change was correct, was it not?

15        A    Yes.

16        Q    Okay.  But you're saying at some point in time

17    there appeared in the newspaper or somewhere else a rumor

18    or --

19        A    In the newspaper.

20        Q    -- in the newspaper, a different figure?

21        A    They weren't referring to that figure.  They

22    were referring to a percentage, which is, I said, was

23    disingenuous when they should really say that they weren't

24    going to get -- it was implied that the town would receive

25    60-some-odd percent of the total budget, and that was

39

1   false.

2       Q    Okay.  And who was making these statements

3   about the percentage?

4       A    Coming out of the steering committee and

5   facilities comittee and people who were lobbying for the

6   building.

7       Q    But the written estimates as --

8       A    Submitted by Boos.

9       Q    -- submitted by the architect and as indicated

10  on Exhibit 3 was correct, was it not?

11      A    I think it was, yes.

12      Q    Okay.  Now, the third point you make on the

13  red flyer is that other towns similar to Plainville are

14  paying 8 to 10 million less for their schools?

15      A    Yes.  They were around 15 million, some 17,

16  some 13 million for renovation.

17      Q    And how did you know that?

18      A    It's right there on the Web site for everybody

19  to read.

20      Q    And other than getting that information on the

21  Web site, did you get it from anywhere else?

22      A    No, I don't think so.

23      Q    Now, in your next point, the fourth one from

24  the top, you refer to the education lobby, and what do you

25  mean by "the education lobby"?

40

1    A    This -- I believe there was a PAC.

2    Q    Political action committee?

3    A    Political action committee who was registered
4  and out there promoting a site that -- not all members of
5  the steering committee.  This was just a group of people
6  that were looking to sell the plan.

7    Q    And who were these people?

8    A    I wouldn't know.  I do know that I think
9  Kathryn Lawson was -- I think headed up that group.

10    Q    And do you know why they were trying to sell
11  this plan?

12    A    We needed something to happen to the school.
13  Repair it.

14    Q    And other than that, did they have any other
15  motivation to try to sell Plan B, Option B, as opposed to
16  the other options?

17    A    I wouldn't know.

18    Q    Your next point on the flyer says that "Five
19  of our counsel members decided to pass the buck to the
20  taxpayers by putting it on the referendum."

21    A    Uh-huh.

22    Q    What do you mean by that?

23    A    They could have rejected the plan and send it
24  back to the committee for a redo.  They chose not to do
25  that, and so they voted to accept that and put it on the

1    referendum and let the people vote on it up or down.

2         Q    And why do you consider that passing the

3    buck?

4         A    Well, many people got up and spoke in the oral

5    petitions expounding on their disapproval and the cost and

6    timing being wrong.  It was sort of a catch-22.  No time

7    was very good, I guess, in spending $24 million in the

8    town, but there were other projects that were coming up

9    and they were already in the works, the library and the

10   police station being one.

11        The council also knew that they had a problem

12   with the sewer plant, and since that -- they were just

13   talking about the Linden Street School -- they chose not

14   to really discuss that.  I brought that up at the oral

15   petition, asking them about the plan, what were they going

16   to do with it.  I point that out in the flyer.

17        Q    Now, how many people are on the town council

18   or were at that time?

19        A    I believe seven.

20        Q    And you indicate in the flyer that five of the

21   members decided to put the issue to referendum; correct?

22        A    Yes.

23        Q    And do you know who the five were?

24        A    I think Mr. Stewart (phonetic), Mr. Petit,

25   Chris Warzorko (phonetic).  I don't know if Chris Pogotus

1   (phonetic) was on the committee at that time.

2          Q    At this time, let's say between April 2001 and

3   the referendum, would it be fair to say that people in the

4   community were aware of your position on the Linden Street

5   School?

6          A    I would think so.

7          Q    And other than putting out this flyer, how

8   would they know you had --

9          A    I wrote letters to the editor.

10         Q    To the editor?

11         A    Spoke at the meetings.

12         Q    How many meetings did you speak at?

13         A    Probably about three that were important.

14         Q    And did you privately speak to people about

15  the issue?

16         A    I may have, obviously.

17         Q    And would it be fair to say that anyone in

18  town that was interested in the issue would know your

19  position on it?

20         A    I would think so.

21         Q    Okay.  Your next point on the flyer, I think

22  it's the sixth one down, you state, "Making matters worse,

23  we now have," quote, all in the family, closed quote,

24  "government.  Family members who are in control of

25  Plainville's purse strings and its destiny.  Taxpayers

43

```
 1   beware."
 2       Q    What did you mean by that?
 3       A    Well, Plainville at that particular time had a
 4   lot of key positions filled with family personnel.  The
 5   chairman of the Board of Education that proposed Plan B to
 6   the council is Tom Warzorko.  His son is Chris Warzorko,
 7   who was chairman of the council at the time, I believe.
 8            And the biggest dollars that we spend in
 9   Plainville is, obviously, the Board of Education, and
10   therefore, he is in a key position to present this to the
11   council and get it passed.  And who is on the council but
12   his son.
13            Also, we have Mr. Michalek who is on the
14   council, and town council at that time was his father.
15            Mr. Petit's daughter was serving on the
16   steering committee, and Mr. Petit was on the council.  And
17   his daughter, obviously, was for the project or she
18   wouldn't have been on the steering committee to start
19   with, so that's what I meant by that.
20       Q    Did you mean to suggest by that that any of
21   these people had something personal to gain by --
22       A    No.
23       Q    -- Option B --
24       A    No.
25       Q    -- passing?
```

44

1          A      No, they had -- they had their own agenda.    In

2     an oral petition before this went to the voters and the

3     council passed it five to two, I believe, I asked

4     Mr. Warzorko to recluse (sic) himself since his father was

5     the one who presented this, and he chose not to do that.

6     I thought it was a big conflict of interest that he should

7     not vote on this $24 million when his father presented it

8     to the council.

9          Q      Did you mean to suggest by this that these

10    individuals had something personally to gain by

11    proposing --

12         A      No.

13         Q      -- and trying to sell Option B?

14         A      No, not at all.

15         Q      So was it your opinion, or is it your opinion,

16    that the reason they made this proposal of Option B was

17    that they honestly agreed that it was the best option in

18    terms of the Linden Street School?

19         A      I believe they believed that, yes.

20         Q      Okay.  When you wrote that this statement

21    about all-in-the-family government, did you believe that

22    people reading this might believe that you were suggesting

23    that these family members had something personally to gain

24    by what they were proposing?

25         A      No.

1    Q    Now, your next point on this flyer is a

2    proposed question, "Ask yourself how much will your taxes

3    increase when all these projects kick in," and by "all

4    these projects" you mean the library, police station,

5    sewer --

6    A    Sewer plant.

7    Q    -- and the school?

8    A    And the school renovations.  The school

9    renovations is plural because the high school is in dire

10   need of renovation also at $30 million.

11   Q    Was this something under contract at that

12   time --

13   A    Yes.

14   Q    -- the high school?  Okay.  And was that

15   subject to any definite plans in terms of what was

16   going --

17   A    No.

18   Q    -- to be done?  Okay.

19   A    No.

20   Q    Then in the following point then you seem to

21   answer your own question.  You say that it's going to cost

22   400 to $500 a year in taxes for each property owner.  Is

23   that correct?

24   A    If all the projects were to be considered,

25   yes.

STATE OF CONNECTICUT :

                 : ss

COUNTY OF HARTFORD   :

          I, Barbara C. Letson, a Notary Public, do hereby certify:

          That John Mastrianni was by me duly sworn in the within-entitled cause;

          that said deposition was reported by me, was thereafter transcribed under my direction, and is a true and complete transcription of all testimony given by said witness.

          I further certify that I am not a relative, counsel, or attorney of any party, or interested, financially or otherwise, in this action.

          IN WITNESS WHEREOF, I have hereunto set my hand and seal at Simsbury, Connecticut, this 7th day of January, 2004.


*Barbara C. Letson*
Notary Public
My Commission Expires:
April 30, 2004
License No. 00189