UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOHN J. CASSIDY, WILLIAM E. CUNNINGHAM,          NO. 3:02cv1688(CFD)
JOHN MASTRIANNI, JEANNETTE HINKSON,
and HENRY R. SYSKOWSKI, JR.,

Plaintiffs

v.

KATHRYN M. LAWSON, DEAN RUSTIC,
DAVID UNDERWOOD, DANIEL CIESIELSKI,
WILLIAM PETIT, PATRICK RINGROSE,
MARLISS PAVANO, RONALD PAVANO, SR.,
BARBARA WILLARD and GARY WILLARD,

Defendants          JULY 12, 2005

## PLAINTIFFS' SUPPLEMENTAL MEMORANDUM
## OF LAW RE: SUMMARY JUDGMENT

The plaintiffs hereby present this supplemental memorandum of law as

authorized by the Court at the oral argument on July 1, 2005.

**I.      Abuse of process can be grounded in the mere filing of a
complaint to the State Elections Enforcement Commission if the
complainants' purpose was purely political.**

As the Court observed at the oral argument on July 1, 2005, the State

Elections Enforcement Commission (SEEC) is an agency that can be

manipulated, unlike, say, the Statewide Grievance Commission. The SEEC

deals with politics and politicians, and the politicians have learned how to use the

SEEC politically. This is what happened in Plainville in November 2001. Political

chairmen and politicians have been using the SEEC complaint procedure as

a weapon against political opponents. In the present case the complainants, the defendants here, were in November 2001 the Republican town chairman (Underwood), the Democratic town chairman (Ciesielski), a member of the town council (Petit), two members of the board of education (Ringrose and Mrs. Pavano), plus three people (Mrs. Lawson, Mrs. Willard and Dean Rustic) who were involved in a group promoting passage of the Linden Street School referendum, which was opposed by all the plaintiffs.

Unlike other administrative agencies, e.g., the Statewide Grievance Commission or the Commission on Human Rights and Opportunities, where the complainant must be available to testify, all that complainants in an SEEC matter need do is file the complaint. The SEEC takes over from there, first with an investigation and then, if necessary, with an evidentiary hearing. The only witnesses might be the SEEC investigator, the respondent, and any people the respondent wanted to testify. In the Cunningham case, which the undersigned personally handled before the SEEC, the investigator did not have to testify because Mr. Cunningham acknowledged that he did not put his address under his name in the political advertisement and a copy of the ad was before the SEEC as evidence.

The SEEC Complaint (plaintiffs' Exhibit 1) was signed by the defendants on November 1, 2001. It was filed with the SEEC on November 2, 2001. Election Day was November 6, 2001. One of the defendants or someone

2

working with them (none of them will say who) took the trouble to deliver the
Complaint to the SEEC the next day.  Time was important, because they had to
make sure the SEEC had it before they could inform the press.  Thus the
petitioning candidates and the people opposed to the referendum who had ads in
the Hometown Connection got bad press just before the election.  The
defendants' work was done.

It was not good enough, though, because the referendum failed anyway.
The SEEC did not conduct the hearings on the Complaint until February 2002,
when the matter hit the press again.  Mr. Ciesielski, Democratic town chairman,
blamed the Hometown Connection for the defeat and also libeled plaintiff John
Mastrianni, a strong opponent of the referendum.   Some of the other defendants,
such as Patrick Ringrose, also made comments adverse to the newspaper.

The concept of "process" is "broad enough to include **the mere filing of a
civil action** [or administrative complaint] to achieve a collateral purpose **other
than winning the lawsuit**." American Management Services, Inc. v. George S.
May Intern. Co., 933 F.Supp. 64, 69 (D. Mass. 1996) [emphasis added], citing
Powers v. Leno, 509 N.E.2d 46 (Mass. App. 1987).

In deciding whether to draw any inference of ulterior purpose in
defendants' signing and filing of the SEEC Complaint, a jury may consider
defendants' admissions that they did not follow or take part in the SEEC

3

proceedings once they had set it in motion and once the initial bad publicity about plaintiff candidates and the newspaper had been effectuated. <u>Powers v. Leno,</u> 509 N.E.2d at 49.

Attached to this memorandum as an additional exhibit (plaintiffs' Exhibit 20) is a copy of an e-mail dated May 27, 2005 from Barbara Willard, one of the defendants, to Lorri Goldsmith, a current member of the Plainville Board of Education, setting forth her thoughts about the Hometown Connection newspaper. She sent a copy to several other defendants. Mrs. Willard says:

> I think they [Helen Bergenty and Jeannette Hinkson] have reached **a new**, all-time low. I don't know where to begin to describe the disgust I felt after reading the latest edition of **their supposed "newspaper"**. I'm so sick of them and their personal vendettas. **It's not the first time this group has attacked our children** but it is certainly one of the most blatant examples of their nastiness.

(Emphasis added.)

She adds at the end, "Mrs. Hinkson wants an end to all the ugliness and angry attacks yet she's the one who helps instigate it."[1]

Even though this statement of Mrs. Willard was made long after the day she signed the SEEC Complaint, it would be open to the jury to infer that she had an ulterior purpose at the time she signed the Complaint. <u>Powers</u>, <u>supra</u>.

Under the unique circumstances of this case, defendants' filing of the

4

---

[1] This little tirade was the result of the Hometown Connection's failure to include photos of all the graduating seniors this year at Plainville High School. Mrs. Willard, Mrs. Lawson and their friends thought this was done on purpose, but the truth is that the photos sent to the newspaper by the High School left some of the students out.

SEEC Complaint as a political tool or weapon constituted an abuse of process.

**II.    Neither absolute nor qualified immunity shields defendants in this case.**

(A)  The public official defendants

The public official defendants are William Petit, who signed the Complaint as a member of the town council, and Patrick Ringrose and Marliss Pavano, who signed as members of the board of education.  Although they are now claiming they were not acting in their official capacities, they did not sign the Complaint as "citizen" or as "owner, Petit's Store."   If a sheriff or police officer, in uniform, takes part in a Ku Klux Klan lynching, he could be held liable as a public official. In the movie "The Mollie Maguires,"  starring Richard Harris and Sean Connery, about Irish-American radicals in the Pennsylvania coal mines in 1876, three police officers, wearing civilian hats and civilian coats over their uniforms, break into the home of one of the "Mollies" and shoot and kill him and his wife.  This was not part of an authorized arrest with a warrant.  It was a crime.  Those officers could not successfully claim immunity under the 1876 version of Section 1983 (which was passed just after the Civil War).

As the court said in <u>Spear v. West Hartford</u>, 954 F.2d 63, 66 (2d Cir. 1992), a civil rights action against West Hartford officials with respect to the town's defense of an abortion clinic against pro-life protesters, "Absolute immunity, because is detracts from section 1983's broadly remedial purpose, . . .

5

applies only to a limited class of officials and functions," citing <u>Scheuer v.</u>
<u>Rhodes,</u> 416 U.S. 232, 243, 94 S.Ct. 1683, 1689-1690, 40 L.Ed.2d 99 (1974),
including "certain discretionary acts." These discretionary acts are acts that are
part of the official's job, such as bringing a criminal prosecution, defending a town
from a civil lawsuit, or bringing such a suit. It was not part of the job of a town
councilman (Petit) or a school board member (Ringrose and Mrs. Pavano) to
bring an SEEC Complaint against a newspaper and political candidates. They
were not performing a discretionary public act, even though they were not acting
in this matter as private citizens. Although their conduct was not authorized by
the Town Council or the Board of Education, they can be held liable under
Section 1983 as a police officer who unlawfully beats up a detainee can be.

　　　　And as the court said in <u>Hosty v. Carter</u>, 325 F.2d 945, 947 (7th Cir.
2003), "Qualified immunity protects government officials **performing**
**discretionary functions** when their conduct does not violate clearly established
statutory or constitutional rights of which a reasonable person would have
known." Defendant's conduct here was not discretionary, and because they
intended to harm a newspaper in the exercise of its First Amendment rights,[2]
they should have known they were treading on First Amendment waters. See
<u>State v. Brookins</u>, 844 A.2d 1162 (Md. 2004); <u>Commonwealth v. Coyle</u>, 421 A.2d
716 (Pa. Super. 1980), *reversed* 424 A.2d 867 (Pa. 1980).

6

---

[2] Freedom of the press is not simply a First Amendment right. It is also a common-law freedom, the result
of the jury's verdict in the Zenger case in New York, 1734. <u>See</u> R. G. Elliot, "Benjamin Franklin and the
Seedtime of American Newspapers: Persistent Issues of a Free Press," 72 Conn. Bar Journal 478, 490 (Dec.
1998). A private person could therefore violate your press freedom without violating the constitution.

The court may find that defendants had a reasonable expectation that the statute under which they complained about the petitioning candidates' failure to include their addresses was valid and thus they were not violating anyone's First Amendment rights.  However, regulation of campaign advertising necessarily treads upon freedom of the press rights—if defendants' **purpose** was political as opposed to civic, then they should not be allowed to shield themselves in immunity, anymore than the police officer could argue that the suspect he beat up was definitely a criminal.   A wrongful or ulterior purpose turns what would otherwise be valid process into an abuse of process.

(B)   The defendants in general

Defendants argue that if plaintiffs prevail, the ordinary citizen will be intimidated such that he or she might not file an election complaint if he or she believes a campaign finance statute has been violated.  Defendants here, however, are not the ordinary citizen desirous of having clean and fair elections. They just did not like the idea that their opponents in the school referendum got ads out in the November 2001 issue of the Hometown Connection that might sway the voters.[3]  They are political players:  two town chairmen, one councilman, two school board members, and people associated with a group fighting for passage of the referendum.  (Two of the defendants, Gary Willard and

7

---

[3] The court should be aware that the organization supporting the referendum also had an ad in the November 2001 issue of the Hometown Connection.  Plaintiffs' counsel intends to introduce the complete November 2001 edition of the newspaper as an exhibit at trial.

Ronald Pavano, Sr., are spouses of two defendants. Mr. Pavano was active in the Republican party with his wife in opposition to plaintiff Hinkson.)

With respect to immunity in SEEC matters, the law should treat political people differently from the ordinary civic-minded resident. People who have a political axe to grind, who want to take advantage of pre-election publicity which puts their opponents in a bad light, should not get this immunity. Defendants were not fighting for the integrity of the election. None of the ten had ever made an SEEC complaint before, even though there were occasions to do so.[4]

### III. Plaintiffs have stated a claim for violation of free press rights.

Defendants have argued that plaintiffs' First Amendment rights have not been violated because there has been no "chilling effect" as a result of defendants' conduct that has stopped plaintiffs from speaking out in the community. That is only one aspect of freedom of speech and press. Probably the best example of a freedom of the press case where there was no "chilling effect"[5] was the Pentagon Papers case[6], where Dr. Ellsberg, who stole the Papers, furnished them to the New York Times for publication. The first part of them was published on Day One. On Day Two, Attorney General Mitchell filed an action in federal court to enjoin the Times from publishing them. The Times sent the Papers to the Washington Post, which published the second part on Day Three, and so forth and so on, until the Supreme Court ruled that the

8

---

[4] Plaintiff John Cassidy in previous years had ads and fliers without his address, and nobody complained.
[5] In fact, the government's action had the effect of firing up the press.
[6] 403 U.S. 713 (1971).

government had no power to stop their publication.

The First Amendment can be violated by penalizing a prior publication as well as by threatening future publication. There is no sensible reason why one can be the ground for a civil suit and not the other. In the present case, the plaintiffs were penalized (being cited by the SEEC) for what they had already published. Defendants infringed their press freedom for political purposes.

**IV.    The court may deny summary judgment even if it does not find that C.G.S. Section 9-333w does not require petitioning candidates to place addresses in their ads.**

The claim of abuse of process by plaintiffs Cassidy, Cunningham and Syskowski may be brought even if the SEEC actions against them were valid. Abuse of process generally involves a legal process that has been abused. In this case, as discussed above, the defendants abused the SEEC process by using it for a purpose for which it was not intended.

The defendants are not responsible for the SEEC's misinterpretation of the law. But even if they had a right to rely on the validity of the statute, that did not give them the right to abuse the process. That is what is important here.

**V.    Plaintiff Jeannette Hinkson states a claim for malicious prosecution.**

As Paragraph 21 of the First Count of the Third Amended Complaint (filed by leave of Magistrate Judge Smith) makes clear, the principal target of the SEEC Complaint in this case was the Hometown Connection newspaper. As set

9

forth in Paragraph 2 of the Fourth Count, plaintiff Hinkson was a principal of that

newspaper.  Defendants claim that Mrs. Hinkson brought this upon herself

because she told the SEEC that she authored the advertisement the SEEC later

determined violated no law.  But she did this in response to the SEEC's

investigation of the newspaper.  The SEEC asked, "Who put this ad in the

paper?" Mrs. Hinkson, as publisher of the paper, dutifully responded.  And as she

will testify at trial, the investigator threatened her with fines and jail, before the

SEEC ultimately determined that the ad in question violated no law.  And both

the SEEC (Plaintiffs' Exhibits 6 and 9) and the Attorney General (Plaintiffs'

Exhibit 7) asserted that the complaint against Mrs. Hinkson was brought by

"Kathryn Lawson et al."  This must be a matter for a jury to sort out.

### VI.    Because all of the defendants were in league in a common cause, all of them should be held liable, even if one particular defendant did not have any particular animus against one particular plaintiff.

In the various deposition extracts presented in this case, it is shown that

Marliss Pavano and David Underwood had an animus against Jeannette Hinkson

in a Republican party dispute, but plaintiff John Cassidy had no problems with

defendant William Petit.  When people get together in a group, they become

liable for what the group does.  If the target was the Hometown Connection, the

petitioning candidates, who placed their ads in that paper, can claim injury as a

result of the defendants' actions.  If the defendants intended only the newspaper

10

to answer for the missing addresses, they cannot now claim they did not intend to take action against the candidates. As tort law teaches us, if you aim at X and hit Y, you are liable for injuring Y. Plaintiffs do not have to prove that each defendant had a desire to injure each plaintiff, as long as the defendants were in a common cause to injure the newspaper. Thomas v. Roach, 165 F.3d 137 (2d Cir. 1999). Plaintiffs may recover against all the defendants if they can prove (1) a combination of the defendants, (2) to use the SEEC process for political purposes, (3) which was actually done, and (4) which damaged the plaintiffs. Northern Tankers (Cyprus) Ltd. v. Backstrom, 967 F.Supp. 1391 (D. Conn. 1997). See also Croy v. Skinner, 410 F. Supp. 117 (N.D. Ga. 1976); Pryor v. Cajda, 662 F. Supp. 1114 (N.D. Ill. 1987). Plaintiffs will be able to prove this.

**Final Note:** The lack of discussion of any point discussed in the previously filed memoranda of law in this case is not an abandonment of those claims or arguments.

PLAINTIFFS

By _____
William T. Barrante
P.O. Box 273
Watertown, CT 06795
Fed. Bar No. CT10677
(860) 274-0301
Fax: (860) 738-4906
Email: william.barrante @snet.net

11

## CERTIFICATION

I certify that on July 13, 2005, 2005 a copy of the above was mailed to:

Atty. Beatrice S. Jordan
65 Wethersfield Avenue
Hartford, CT 06114

Atty. Charles E. Vermette, Jr.
40 Tower Lane, Ste 200
Avon, CT 06001

Atty. John Barbieri
P.O.Box 1445
New Britain, CT 06050

AAG Jane Rosenberg
P.O. Box 120
Hartford, CT 06141-0120

Atty. Kenneth John Laska
Drawer A, 63 East Main Street
Plainville, CT 06062

Atty. Paul M. Clyons
P.O. Box 9011
New Britain, CT 06050

Atty. Karen L. Karpie
350 Fairfield Avenue
Bridgeport, CT 06604

William T. Barrante

12

**V. Staskavich**

From:       "Barbara & Gary Willard" <gbwillard@sbcglobal.net>
To:         <elja8146@comcast.net>; "Mom" <janiceo99@aol.com>; "Honey & Dad"
            <dagoldsmith@snet.net>; "Donna Zapatka @ home" <dzap59@comcast.net>; "Sue Yudkin"
            <syudkin@comcast.net>; "Barbara Willard" <bwillard@willardtravel.com>; "Tom Wazorko"
            <thomas.wazorko@snet.net>; "Chris Wazorko" <rczork@msn.com>; "Joyce & Jim Voisine"
            <james_d_voisine@sbcglobal.net>; "Becky Tyrrell" <becka59@comcast.net>; "Lynn Szach"
            <szach@nso.uchc.edu>; "Marge & Victor Staskavich" <vicmar@snet.net>; "Sharon & family"
            <iesuer5@cs.com>; "Patrick Ringrose" <pringrose@snet.net>; "Ken & Lynda Prigodich"
            <kprigodich@comcast.net>; "Rich Piotrowski" <piotrowsklr@llro.com>; "Bill Petit"
            <pandpfoods1@juno.com>; "Missy Pavano" <rmpavano@aol.com>; "Rich & Margaret Osborn"
            <Osbornri@amsworld.com>; "Rosemary Morante" <rosemarym@snet.net>; "Rob Michalik"
            <ra_michalik@yahoo.com>; "Bob Michalik" <rmichalik@MBSCLAWYERS.COM>; "Sue McCarthy"
            <sdmccarthy@hotmail.com>; "Kate Lawson" <lawsonfamily@comcast.net>; "Ken Laska"
            <Kenneth.Laska@SNET.Net>; "Charlotte Koskoff" <charlottekoskoff@hotmail.com>; "Art Hoerle"
            <art@idealms.com>; "Ken Hedman" <kenhedman@comcast.net>; "Lorri Goldsmith"
            <lgoldsmi@neuron.uchc.edu>; "Heidi Famigletti" <judgeheidi@aol.com>; "Val Dumais"
            <dumaisval@aol.com>; "Dave Dudek" <dudeks@comcast.net>; "Kirby and Lin Deegan"
            <kirbydeegan@comcast.net>; "Betsy Crum" <bcrum@wihed.org>; "Bill Crowley"
            <wcrowley@snet.net>; "Shelley Cloutier" <jclout@comcast.net>; "Robert Ciotto"
            <rbcinct01@aol.com>; "Dan Ciesielski" <ccellski@Yahoo.com>; "Hanna Chapman"
            <hanna.chapman@comcast.net>; "Ceil" <HayesSushi@aol.com>; "Betty & Gary Boukus"
            <eboukus@aol.com>; "Barb & family" <barbaraabbott@sbcglobal.net>
Sent:       Friday, May 27, 2005 11:56 PM
Subject:    Re: Hometown Connection

Lorri,

I think they've just reached a new, all-time low. I don't know where to
begin to describe the disgust I felt after reading the latest edition of
their supposed "newspaper". I'm so sick of them and their personal
vendettas. It's not the first time this group has attacked our children but
it's certainly one of the most blatant examples of their nastiness! I'd be
interested to know how many of the graduates they left off. Maybe we can
collect their photos and have them printed in the Citizen?

I also made the mistake of reading the rest of the "paper". I was furious
after reading the "letters" they printed as well as the political cartoon
portraying the BOE as pigs at the trough. As usual, their letters contain
zero truth and are being used as an opportunity to smear anyone they don't
like which at the moment happens to be the BOE, the school administrators
and our teachers. My sister was right when she stood up at the microphone at
the last town meeting.......Mrs. Hinkson wants an end to the ugliness and
angry attacks yet she's the one who helps to instigate it .

How sad this is for our entire community.....what is it going to take to
stop this insanity?

Barbara
----- Original Message -----
From: <elja8146@comcast.net>
To: "Mom" <janiceo99@aol.com>; "Honey & Dad" <dagoldsmith@snet.net>; "Donna
Zapatka @ home" <dzap59@comcast.net>; "Sue Yudkin" <syudkin@comcast.net>;

*EXHIBIT 20*                          5/28/05